1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| INTERNATIONAL BUSINESS MACHINES CORPORATION,<br><br>Plaintiff,<br><br>v.<br><br>JEFF S. SMITH,<br><br>Defendant. | No. 2:17-mc-00095 RSL<br><br>DECLARATION OF PIETRO J. SIGNORACCI IN SUPPORT OF IBM'S MOTION TO ENFORCE AND COMPEL COMPLIANCE WITH SUBPOENA SERVED ON AMAZON WEB SERVICES, INC.<br><br>Note on Motions Calendar: **August 15, 2017**<br><br>(Related to No.: 17-cv-5808-CS (S.D.N.Y.)) |

17
18

PIETRO J. SIGNORACCI declares, under penalty of perjury, pursuant to 28 U.S.C. § 1746, as follows:

19
20
21
22
23
24

1.      I am associated with the law firm of Paul, Weiss, Rifkind, Wharton & Garrison LLP, attorneys for Plaintiff International Business Machines ("IBM") in a related action in the United States District Court for the Southern District of New York, International Business Machines Corporation v. Smith, No. 17 Civ. 5808 (S.D.N.Y.) (the "Action"). I am personally familiar with the facts set forth herein. I submit this declaration in support of IBM's Motion to Enforce and Compel Compliance with Subpoena Served on Amazon Web Services, Inc.

25
26
27
28

2.      On August 1, 2017, IBM filed the Action seeking to enforce its non-competition and non-solicitation agreements with Defendant Jeff Smith, and to enjoin Smith from beginning work for Amazon Web Services ("AWS"). At the time of filing, IBM moved for a temporary restraining order and preliminary injunction to prevent Smith from starting work at AWS on

DECLARATION OF PIETRO J. SIGNORACCI IN SUPPORT OF IBM'S MOTION TO ENFORCE & COMPEL COMPLIANCE WITH SUBPOENA SERVED ON AWS - 1

**Jackson Lewis P.C.**
520 Pike Street, Suite 2300
Seattle, Washington 98101
(206) 405-0404

1    August 7, 2017. True and correct copies of IBM's redacted, as-filed Complaint, Application for a

2    Temporary Restraining Order and a Preliminary Injunction, and my supporting Declaration

3    (including relevant exhibits thereto), are attached as Exhibits A, B, and C, respectively.

4         3.    The Court in the Action entered a temporary restraining order on August 1, 2017,

5    subject to limited exceptions, and scheduled a hearing on IBM's motion for a preliminary

6    injunction for August 21 and 24, 2017. During the August 1, 2017 hearing, counsel for both

7    parties, including counsel for AWS, agreed to cooperate to conduct expedited discovery in advance

8    of the August 21 preliminary injunction hearing. True and correct copies of excerpts of relevant

9    portions of the August 1, 2017 transcript (as recently submitted to the Court attendant to IBM's

10   efforts to enforce the subpoena direct to AWS), as well as the initial and further orders entered by

11   the Court, are attached as Exhibits D, E, & F, respectively.

12        4.    On August 2, 2017, I participated in a discovery conference with counsel for

13   Defendant Smith and counsel for AWS. Counsel for AWS has also appeared as co-counsel for

14   Smith in the Action. During the conference, the parties agreed to exchange document requests

15   that same day. Counsel for AWS represented that AWS would accept service by email of a

16   subpoena for the production of documents and would cooperate with the parties in accordance with

17   the expedited schedule of the proceedings. Counsel for AWS also stated that if IBM intended to

18   depose the CEO of AWS, Andrew Jassy, it would need to do so before August 10, 2017, and stated

19   that Mr. Jassy would be unavailable from August 10 to August 20.

20        5.    I served a subpoena for the production of documents on counsel for AWS by email

21   on August 2, 2017. The subpoena calls for the production of, inter alia, all communications

22   between AWS and Smith ("Request 1"), documents sufficient to show the names of, and general

23   subject matters discussed by, any and all committees, teams, and/or groups of AWS executives

24   and/or employees Smith is expected to participate in at AWS ("Request 7"), and documents

25   concerning competition between AWS and IBM ("Request 9"). A true and correct copy of this

26   email and subpoena (the "Subpoena") are attached as Exhibit G.

27        6.    I separately served a notice of subpoena on counsel for Smith, including counsel

28   for AWS, by email on August 2, 2017. Counsel for AWS responded that AWS "wants to cooperate

---

DECLARATION OF PIETRO J. SIGNORACCI IN SUPPORT OF
IBM'S MOTION TO ENFORCE & COMPEL COMPLIANCE
WITH SUBPOENA SERVED ON AWS - 2

**Jackson Lewis P.C.**
520 Pike Street, Suite 2300
Seattle, Washington 98101
(206) 405-0404

1   and will endeavor to perform a search and produce on an expedited and voluntary basis." A true

2   and correct copy of this email exchange is attached as Exhibit H.

3       7.      On August 3, 2017, I wrote to counsel for AWS to confirm that IBM intended to

4   proceed with a deposition of Mr. Jassy on August 9, 2017.  During discussions concerning Mr.

5   Jassy's deposition, counsel for AWS did not raise any concerns with AWS's production of

6   documents in response to the Subpoena.

7       8.      On August 7, 2017, the parties appeared before Magistrate Judge Paul E. Davison

8   in the Action on several discovery disputes, including IBM's intention to depose Mr. Jassy.  Judge

9   Davison directed Smith to make Mr. Jassy available for a deposition on August 9, 2017, in Seattle,

10  Washington.  True and correct copies of the parties' letters submitted to the Court in advance of

11  that hearing are attached as Exhibits I, J, & K, respectively.

12      9.      On August 8, 2017, AWS sent IBM a letter enclosing its production in response to

13  the Subpoena.  A true and correct copy of that letter enclosed is attached as Exhibit L.

14      10.     I have conducted, and have supervised other attorneys at the firm who have

15  conducted, a review of the documents produced by Smith in the Action.  Smith produced text

16  messages between himself and Mr. Jassy between May 16, 2017 and July 31, 2017.

17      11.     I have conducted, and have supervised other attorneys at this firm who have

18  conducted, a review of the documents produced by AWS in response to the Subpoena.  We have

19  been unable to locate any documents produced by AWS that are responsive to Request 7 or Request

20  9.  In addition, we have been unable to locate the text messages produced by Smith in the

21  documents produced by AWS, or any text messages between Smith and Mr. Jassy.

22      12.     On August 10, 2017, IBM sent counsel for AWS a letter setting forth its concerns

23  with AWS's production of documents in response to the Subpoena, and in particular AWS's failure

24  to produce any documents in response to Requests 7 and 9.  A true and correct copy of the letter

25  to AWS is attached as Exhibit M.

26      13.     On August 10, 2017, IBM also sent counsel for Smith a letter setting forth its

27  concerns with Smith's production of documents in the Action, and in particular Smith's failure to

28  produce any text messages with Mr. Jassy before May 16, 2017 or after July 31, 2017.

---

DECLARATION OF PIETRO J. SIGNORACCI IN SUPPORT OF
IBM'S MOTION TO ENFORCE & COMPEL COMPLIANCE
WITH SUBPOENA SERVED ON AWS - 3

**Jackson Lewis P.C.**
520 Pike Street, Suite 2300
Seattle, Washington 98101
(206) 405-0404

14.   On August 11, counsel for IBM and counsel for Smith participated in a discovery conference with Magistrate Judge Davison. Judge Davison set a hearing for all outstanding discovery disputes for 12:00 p.m. ET on Monday, August 14, and directed the parties to file letters in advance of that dispute by 9:00 a.m. on August 14, 2017.

15.   On August 11, counsel for IBM, Smith and AWS participated in a meet and confer regarding outstanding discovery disputes. During that meet and confer, counsel for AWS was asked whether AWS was willing to produce documents in response to Requests 7 and 9. Counsel for AWS did not articulate any reason why AWS should produce such documents, and was unwilling to engage in any discussion in an effort to narrow the scope of Requests 7 and 9. Counsel for AWS stated only that the production of certain documents would require disclosure of confidential AWS information. Counsel for AWS was advised that any production by AWS would be treated as subject to the Confidentiality Stipulation and Protective Order in the Action, a true and correct copy of which is attached as Exhibit N.

16.   On August 14, 2017, the parties in the Action filed letters with the Court in the Action concerning several discovery disputes, including those raised in IBM's August 10 letters to AWS and to Smith. A true and correct copy of IBM's redacted, as-filed letter is attached as Exhibit O.

17.   Also in the morning on August 14, 2017, counsel for AWS sent IBM a letter in response to IBM's August 10 letter to AWS, in which AWS informed IBM that any further disputes concerning the Subpoena or AWS's production of documents should be addressed in the Western District of Washington, where AWS is located.

18.   At the August 14 hearing before Judge Davison, counsel for AWS did not appear. Judge Davison instructed IBM to seek relief related to the Subpoena and AWS's production of documents in the United States District Court for the Western District of Washington. IBM stated that it would do so. During the August 14 hearing, counsel for Smith represented that Smith is not in possession of any communications with AWS, including any text messages with Mr. Jassy, other than those that were produced by Smith in the Action.

DECLARATION OF PIETRO J. SIGNORACCI IN SUPPORT OF
IBM'S MOTION TO ENFORCE & COMPEL COMPLIANCE
WITH SUBPOENA SERVED ON AWS - 4

**Jackson Lewis P.C.**
520 Pike Street, Suite 2300
Seattle, Washington 98101
(206) 405-0404

1    I declare under penalty of perjury that the foregoing is true and correct.

2

3

4                                              Pietro J. Signoracci

5

6    Executed on August 14, 2017.
     New York, New York

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DECLARATION OF PIETRO J. SIGNORACCI IN SUPPORT OF
IBM'S MOTION TO ENFORCE & COMPEL COMPLIANCE
WITH SUBPOENA SERVED ON AWS - 5

Jackson Lewis P.C.
520 Pike Street, Suite 2300
Seattle, Washington 98101
(206) 405-0404

1

**DECLARATION OF SERVICE**

2

    The undersigned declares under penalty of perjury under the laws of the State of

3

Washington that on this day, I e-mailed a true and accurate copy of the document to which this

4

declaration is affixed to the Clerk of the Court at newcases.seattle@wawd.uscourts.gov for filing

5

of a miscellaneous action.  I also sent a copy to the following:

6

7

**Counsel for Defendant Jeff F. Smith**
Ronald Richman:  ronald.richman@srz.com
Max Garfield:  max.garfield.@srz.com

8

9

**Counsel for Amazon Web Services, Inc.**
Michael Banks:  michael.banks@morganlewis.com
Richard Rosenblatt:  richard.rosenblatt@morganlewis.com
Sarah Bouchard:  sarah.bouchard@morganlewis.com
Brandon Brigham:  brandon.brigham@morganlewis.com

10

11

12

    Dated this 14th day of August, 2017, at Seattle, Washington.

13

14

15

_____
Andrea W. Preston

16

17

18

19

20

21

22

23

24

25

26

27

28

DECLARATION OF PIETRO J. SIGNORACCI IN SUPPORT OF
IBM'S MOTION TO ENFORCE & COMPEL COMPLIANCE
WITH SUBPOENA SERVED ON AWS - 6

**Jackson Lewis P.C.**
520 Pike Street, Suite 2300
Seattle, Washington 98101
(206) 405-0404

EXHIBIT  A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

FILED
U.S. DISTRICT COURT

2017 AUG 1 (VF) AM 9: 42

S.D. OF N.Y.W.P.

INTERNATIONAL BUSINESS MACHINES
CORPORATION,

                    Plaintiff,

        v.

JEFF S. SMITH,

                    Defendant.

17 Civ. **17 CV ___ 5808**

**COMPLAINT**

**JUDGE SEIBEL**

International Business Machines Corporation ("IBM" or the "Company"), by its
undersigned attorneys, upon personal knowledge with respect to itself and its actions and
otherwise on information and belief, alleges as follows:

### Nature of the Action

1.      Defendant Jeff Smith was, until he recently resigned to compete against
IBM, one of IBM's most senior executives with knowledge of IBM's most closely guarded
product development plans.  He now threatens to violate his one-year non-competition
agreement by going into direct competition with IBM as a senior executive of Amazon Web
Services ("AWS"), one of IBM's main competitors in Cloud Computing.   IBM brings this
action to enjoin Smith to honor his agreements with IBM and to recover damages for Smith's
other breaches of those agreements.

2.      If not enjoined to wait a year before competing against IBM -- as he
expressly agreed he would -- Smith will take with him to AWS all the highly confidential
information he knows about the technological innovations IBM is developing *specifically in the
Cloud Computing business where AWS competes directly against IBM*.  As one of only a dozen
high-ranking executives involved in top-level decision-making discussions regarding the

development of IBM's next generation Cloud Computing technology, which is set to be launched in the coming year, Smith knows such trade secrets as the product cost, design specifications, performance capabilities and release plans -- all of which would be very valuable to AWS. The competition in Cloud Computing is intense, with *Forbes* reporting just last week that "IBM Beats Amazon" in the "Cloud Wars" by becoming the first enterprise technology provider to surpass $15 billion in cloud revenue for a 12-month period.

3.  The IBM secrets that Smith threatens to take to IBM's competitor are so sensitive that he was instructed not to retain copies of written project presentations. As a colleague described one of the product development presentations shared by Smith, "Wow, this is amazing stuff." Yet, Smith violated that simple confidentiality obligation. In addition, Smith shared inside IBM information with the CEO of AWS, Andrew Jassy, *while Smith was serving as a trusted IBM executive*. Confirming that he cannot be trusted to protect and preserve IBM's trade secrets, Smith wiped his company-issued phone and tablet, making it impossible for IBM to detect other communications with Jassy or to determine if he transferred any other IBM information.

4.  Given Smith's first-hand knowledge of IBM's business strategies and product plans for competing in the Cloud Computing business where AWS and others compete directly against IBM, and having already disregarded his confidentiality obligations to IBM, it is inevitable that Smith will use IBM's trade secrets against IBM if he joins AWS before the expiration of his non-compete period. Smith will be reporting directly to the CEO of his employer, now in this case AWS, as part of the senior leadership team responsible for deciding how to compete against IBM. Switching sides in the competition with the type of competitively

sensitive information Smith knows puts those secrets at high risk of disclosure -- which is exactly why Smith agreed to wait a reasonable interval before joining a competitor.

5.        Nevertheless, Smith plans to start working at AWS on August 7, 2017, without waiting the remaining nine months required by his non-competition agreement. Smith's breach is especially flagrant because, as a Chief Information Officer (CIO), he could find employment in almost any industry. Before coming to IBM, he was the CIO of a banking business and a telecommunications company. But he has chosen to leave IBM and go not only to a direct competitor, but one of the competitors that would have the greatest use for the IBM secrets he was entrusted to protect.

6.        Accordingly, the injunctive relief IBM seeks by this action -- enforcing Smith's non-competition agreement for the remaining nine months -- is just, reasonable and necessary. IBM also seeks to recover the equity compensation Smith has forfeited by violating his contractual duties to IBM.

## Parties

7.        IBM is a New York corporation with its principal place of business in Armonk, New York.

8.        Jeff Smith is an individual who resides in Ridgefield, Connecticut.

## Jurisdiction and Venue

9.        The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332, because there is diversity of citizenship between the parties and the amount in controversy exceeds the sum of $75,000, exclusive of costs and interest.

10.        The Court has personal jurisdiction over Smith because, in the Noncompetition Agreement, he agreed to exclusive jurisdiction and venue in the federal and

state courts of the State of New York, New York County or County of Westchester, for all disputes arising from the agreement.

11.     Venue properly lies in this Court both because of Smith's aforementioned agreement, and pursuant to 28 U.S.C. § 1391, because IBM's headquarters are in this judicial district and a substantial part of the events giving rise to the claims occurred in this district.

<u>**Relevant Facts**</u>

<u>**IBM**</u>

12.     IBM is a globally integrated business that offers information technology ("IT") products and services to a wide range of business, public sector, and individual customers.

13.     IBM designs, develops, and brings to market a portfolio of software products and services for customers in all industries, including Hybrid Cloud, which offers businesses and government entities infrastructure, services, and tools for integrated Cloud Computing.

14.     Cloud Computing is the delivery of on-demand computing resources -- everything from applications to data storage -- over the internet on a pay-for-use basis.  Cloud Computing enables individuals and businesses to access, store and use data and software via the internet on computer servers owned and/or managed by third-party "Cloud" service providers -- such as IBM, AWS, Microsoft -- and pay for that service based on usage.

15.     IBM relies on trade secrets, other confidential information, and proprietary methods and processes in developing, implementing and marketing its product and services offerings, and each year it spends billions of dollars and dedicates extensive research efforts to the development of technological innovations supporting its hardware, software and services businesses.  Among other things, IBM utilizes trade secrets, proprietary information and methods, confidential technical know-how, competitively sensitive customer and distribution

4

information and confidential competitive strategies to design, develop, manufacture and bring to market a variety of products and services relating to computer systems.

16.     In order to protect its trade secrets, IBM asks a select group of some 1,700 of its approximately 380,000 employees to enter into noncompetition agreements.

**Jeff Smith**

17.     Smith started working at IBM in August 2014, as the CIO of the Company.

18.     Before joining IBM, Smith had been the CIO of Suncorp, a finance, insurance, and banking corporation headquartered in Brisbane, Australia. Prior to that, he had served as the CIO for Telstra, an Australian telecommunications and media company; as CIO for Honeywell AlliedSignal, an aerospace, automotive and engineering company based in New Jersey that was acquired by commercial conglomerate company Honeywell International, Inc.; and as CIO for Schlage Lock Company, a hardware manufacturing company acquired by Ingersoll Rand, Inc.

19.     On March 28, 2017, Smith informed IBM that he intended to accept an offer to join AWS as Vice President, reporting directly to AWS's CEO. IBM learned that Smith intended to commence employment with AWS on April 24, 2017. In response, IBM raised concerns regarding the noncompetition agreement Smith entered into with IBM (attached hereto as **Exhibit A**) and his confidentiality obligations. As a result of conversations among counsel, in which IBM expressed its concerns about Smith's joining a competitor like AWS, Smith decided to resign from IBM effective May 2, 2017, without accepting AWS's offer of employment.

20.     On June 13, 2017, Smith's counsel provided formal notice to IBM that Smith had, in fact, accepted a new offer to work as Vice President with AWS and intended to start working on August 7, 2017.

5

21.     As IBM's CIO, Smith was responsible for, among other things, devising and implementing IBM's competitive and proprietary strategies concerning developer tools; corporate data security; and cultural transformation, specifically Agile Culture.

22.     Smith also was a member of IBM's senior executive leadership team and technology development team, through which he was privy to confidential business information concerning IBM trade secrets, including the Company's ongoing plans to launch competitive products later in 2017 and 2018, as well as the Company's financial plans and competitive strategies.

23.     The IBM senior executive leadership team's meeting materials confirm that through his participation on this committee, Smith was privy to the Company's most sensitive information, including discussions about IBM's strengths and competitive strategies against its major competitors, including in the Cloud Computing business in which AWS competes directly against IBM.  This information will remain relevant and competitively sensitive well into 2018.

24.     As he was required to do, Smith regularly participated in the senior technology development team's meetings, and the meeting materials confirm that Smith regularly received sensitive Company information, including information regarding competitive products that IBM has not yet launched or publicly announced.  These include new IBM offerings under development in Cloud Computing; a new offering called Agile Accelerate, which will help customers manage and optimize their corporate culture and organizational performance; and new suites of products and services in regulatory and compliance technology.

25.     Smith was also a frequent speaker on behalf of IBM at industry conventions and other gatherings.  In the past 18 months, he visited with over 200 customers or

partners. Through this role, Smith marketed IBM business across all of its product lines. Smith developed close relationships with many important IBM customers and partners in his role as IBM's CIO. By his own admission, he was recently involved directly in transactions with two important customers in the financial services industry.

26.     Smith also was responsible for directly supervising IBM's Chief Information Security Officer, who regularly reports to Smith on IBM's strategies and incidents regarding Information Security. As a result, Smith has highly sensitive IBM confidential information regarding IBM's information security. This IBM confidential information could cause the Company irreparable harm if it were disclosed to anyone outside the Company, especially to an IBM competitor.

27.     Smith was a "Band A" executive at IBM. IBM employees with letter Bands (beginning at Band D and rising to Band A and AA) are IBM executives, and IBM employees with number Bands (beginning at Band 1 and rising to Band 10) are non-executives. Band A and AA executives are the highest ranking executives in the Company. And he was a member of IBM's selective Growth & Transformation Team ("G&TT"), a leadership group of about 300 high-level executives from all areas of IBM tasked with solving critical challenges and focusing on transforming the Company and its strategies. As a G&TT member, Smith participated in executive strategy sessions concerning all of IBM's business, including the most recent G&TT session that occurred in January 2017 and featured presentations on IBM's Cloud Computing strategies for 2017 and 2018.

**IBM's Executive Leadership and Technology Development Teams**

28.     Smith became a member of IBM's senior executive leadership team not merely by virtue of his role as IBM's CIO, but also because of his unique role in developing Company-wide strategies and pursuing customer opportunities. Prior to Smith, only one IBM

CIO had been a member of IBM's senior executive leadership team; the current CIO (Smith's replacement) is not currently a member of that team.

29.     As a member of IBM's senior executive leadership team and participant in the quarterly meetings with the Company's senior officers, Smith was privy to the Company's most sensitive business secrets and confidential information, including discussions about IBM's strategies for competing against its major competitors, including specifically AWS.

30.     Smith's participation on IBM's senior executive leadership and technology development teams exposed him to highly sensitive, strictly confidential IBM information regarding product development and competitive strategies, including in connection with Cloud Computing business that competes directly against AWS.  The information concerns, among other things, planned offerings that will combine new hardware and software to provide Cloud Computing services to large enterprises (such as banks, insurance companies, and government agencies) that are faster, more secure, and less expensive than before.  This information is held closely secret even within IBM.  Smith's participation on IBM's senior executive leadership and technology development teams also involved him in critical strategy and decision-making discussions with the Company's most senior executives.

31.     Smith knows the proprietary and confidential components, capabilities, and costs of IBM's forthcoming Cloud Computing products, as he received, reviewed, and discussed materials outlining the project in detail.  Specifically, Smith was briefed in detail about the enhanced speed and security of IBM's new Cloud Computing offering.  Smith also was told what it will cost IBM (per server per month) to deliver this new Cloud Computing service to customers, which is the most important competitive metric in setting prices to win business. Smith attended meetings, received presentations and participated in discussion about IBM's

8

server costs, IBM's competitive cost targets, and IBM's technology strategies and roadmap for achieving those targets.

32.     The confidential information Smith knows about the capabilities and cost of IBM's new Cloud Computing offering under development would be very helpful to a competitor, especially AWS, in attempts to counteract or compete against IBM -- if AWS knows the costs to IBM of providing those services to customers, AWS could use that information to set its pricing of potentially competitive services to a point that would undercut IBM's business. AWS could also use what Smith knows to devise competitive marketing and sales strategies in advance of IBM's launch.

33.     IBM's competitors and industry analysts are closely watching IBM's next moves in Cloud Computing.  In June, a report from technology analyst Gartner stated that "IBM is in the midst of a 'Next-Generation Infrastructure (NGI)' engineering project, but it has not announced a release date."[1]  That IBM is developing a next generation technology in the Cloud Computing business in which AWS and others compete directly against IBM is not a secret, but what that technology is, how it works, what it costs, and when it will be launched are trade secrets.

34.     This report illustrates the importance of the confidential information Smith knows about IBM's costs, and its usefulness to AWS.  The report compared offerings from IBM and AWS in the business area of "Cloud Infrastructure as a Service, Worldwide," with a focus on the costs of the competitors' Cloud Computing offerings.  The report stated that, "AWS is perceived as a cost leader" in the Cloud Computing market, but suggested that IBM's forthcoming Cloud Computing offerings could make IBM even more competitive on costs.  The

---

[1]     *See* Gartner, *Magic Quadrant for Cloud Infrastructure as a Service, Worldwide* (last visited June 29, 2017), https://www.gartner.com/doc/reprints?id=1-2G2O5FC&ct=150519.

report concludes: "The eventual rollout of [IBM's new Cloud Computing offerings] is likely to help IBM evolve beyond its current status as a hosting-scale provider, making it more viable for IBM to match the cost economics of the market leaders," including AWS.

**IBM-AWS Competition**

35.     IBM and AWS market to the same enterprise and government customers hardware, software and services offerings that compete directly against each other in many fields, especially in Cloud Computing. Recent industry reports identify IBM and AWS as among the top competitors in Cloud Computing.[2] IBM recently surpassed AWS in the area of cloud-computing revenue, making it the first enterprise-tech vendor to make over $15 billion in fully recognized cloud revenue for a 12-month period.[3]

36.     AWS is listed in IBM's SEC 10-K filing as among IBM's "principal competitors."[4] IBM considers AWS a "Champion Competitor," publicly measures its services

---

[2]    *See, e.g.*, Gartner, *Magic Quadrant for Cloud Infrastructure as a Service, Worldwide* (last visited June 29, 2017), https://www.gartner.com/doc/reprints?id=1-2G2O5FC&ct=150519; *see also* Investor's Business Daily, *Amazon Cloud Services Under Growing Threat From Microsoft, Google, IBM* (last visited July 10, 2017) http://www.investors.com/news/technology/amazon-cloud-services-under-growing-threat-from-microsoft-google-ibm (identifying IBM and AWS as among the top competitors in Cloud Computing and stating that "IBM continues to lead in hosted private cloud" based on report from Synergy Research Group).

[3]    *IBM Beats Amazon in 12-Month Cloud Revenue, $15.1 Billion to $14.5 Billion* (last visited July 30, 2017), https://www.forbes.com/sites/bobevans1/2017/07/28/ibm-beats-amazon-in-12-month-cloud-revenue-15-1-billion-to-14-5-billion/#160b4ee939d6.

[4]    U.S. SEC, *IBM Form 10-K For the Year Ended December 31, 2015* (last visited June 29, 2017), www.sec.gov/Archives/edgar/data/51143/000104746916010329/a2226548z10-k.htm.

against those offered by AWS,[5] and reports publicly on instances when customers switch over from AWS to IBM.[6] AWS likewise promotes articles describing IBM as its competitor.[7]

37. AWS has increased its competition against IBM by marketing new services in data, analytics, and applications in an attempt to gain a greater market share in the enterprise customer base. Many large enterprise customers, including banks and insurance companies, have historically constituted IBM's customer base. AWS is actively attempting to encourage certain enterprise customers to go to AWS, rather than IBM, for help with "digital transformation," such as migrating data to the Cloud. In recent months, AWS also has recruited high-level executives with experience in selling and providing Cloud Computing services to such enterprise customers, including executives from IBM. AWS's hiring of Smith appears to be part of this effort.

**Smith's Noncompetition Agreement with IBM**

38. Precisely because of his exposure to highly confidential and commercially sensitive information, Smith was one of IBM's senior executives who the Company asked to sign a noncompetition agreement, to restrict the potential disclosure of confidential IBM

---

[5] *See, e.g.,* IBM Advantage Blog, *Competitive Study of IBM Bluemix vs. AWS for Moving WAS Workloads to the Cloud* (Jan. 13, 2017), https://advantage.ibm.com/2017/01/13/competitive-study-of-ibm-bluemix-vs-amazon-aws-for-moving-was-workloads-to-the-cloud/; IBM Cloud computing news, *SoftLayer delivers a competitive edge in the fast-paced film industry* (Nov. 24, 2015), www.ibm.com/blogs/cloud-computing/2015/11/softlayer-delivers-a-competitive-edge-in-the-fast-paced-film-industry/; IBM Offering Information, *Evaluating Price And Performance of Cloud Providers SoftLayer vs. AWS and Microsoft* (Aug. 14, 2015), www-01.ibm.com/common/ssi/cgi-bin/ssialias?htmlfid=KUV12538USEN.

[6] *See* IBM News Releases, *MutualMind Migrates From Amazon Web Services and Rackspace to IBM Cloud to Unlock the Power of Social Media Data* (Sept. 25, 2014), www-03.ibm.com/press/us/en/pressrelease/44977.wss.

[7] *See* AWS Resources, *AWS named as a leader in the Infrastructure as a Service (IaaS) Magic Quadrant report for 6th consecutive year* (last visited June 29, 2017), https://aws.amazon.com/resources/gartner-2016-mq-learn-more/ (linking to TechRepublic, *Amazon still crushing cloud competition, says Gartner Magic Quadrant for IaaS* (Aug. 5, 2016)); AWS Media Coverage, *The Washington Post: Amazon Web Services wins court case over CIA cloud contract* (Oct. 13, 2013), https://aws.amazon.com/about-aws/media-coverage/2013/10/13/washington-post-amazon-web-services-wins-court-case-over-cia-cloud-contract/ (linking to The Washington Post, *Amazon Web Services wins court case over CIA cloud contract* (Oct. 13, 2013)).

information in the event that he left the Company.

39.    Smith executed his Noncompetition Agreement with IBM on June 7, 2014.

40.    In that agreement, Smith acknowledged and agreed that:

during [his] employment with IBM and for twelve (12) months following the termination of [his] employment . . . , [he] will not directly or indirectly within the "Restricted Area" "Engage in or Associate with" (a) any "Business Enterprise" or (b) any competitor of the Company, if performing the duties and responsibilities of such engagement or association could result in [his] intentionally or unintentionally using, disclosing, or relying upon IBM Confidential Information to which [he] had access by virtue of [his] job duties or other responsibilities with IBM; [or] (ii) . . . solicit, for competitive business purposes, any customer of the Company with which [he was] directly or indirectly involved as part of [his] job responsibilities during the last twelve (12) months of [his] employment with IBM. (Noncompetition Agreement § 1(e)(i), 1(e)(ii).)

41.    The Noncompetition Agreement provides the following definitions for the defined terms in the foregoing provision:

(a)    "Restricted Area" is defined as "any geographic area in the world in which [he] worked or for which [he] had job responsibilities, including supervisory responsibilities, during the last twelve (12) months of [his] employment with IBM." (*Id.* § 2(f).)

(b)    "Engage in or Associate with" is defined to mean, among other things, acting as an "associate, employee, member, consultant, or contractor." (*Id.* § 2(c).)

(c)    "Business Enterprise" is defined as "any entity that engages in, or owns or controls an interest in any entity that engages in, competition with any business unit or division of the Company in which [he] worked at any time during the three (3) year period prior to the termination of [his] employment." (*Id.* § 2(a).)

(d)    "IBM Confidential Information" is defined as including, among other things, information about "the Company's selling, manufacturing, servicing methods and

business techniques, implementation strategies . . . product information, customer and prospective customer lists, other customer and prospective customer information, client data, global strategic plans, marketing plans, information about the Company's management techniques and management strategies . . . information regarding the development status of specific Company products, assessments of the global competitive landscape of the industries in which the Company competes . . . [and] financial status and plans." (*Id.* § 2(d).)

42.     Thus, Smith agreed in the Noncompetition Agreement that, for a period of one year following the termination of his employment from IBM, he would not work for any competitor of IBM in any geographic area in the world for which he had job responsibilities in the last twelve months of his employment with IBM if such employment could result in the intentional or unintentional use or disclosure of IBM Confidential Information to which he was exposed in his IBM employment.

43.     Additionally, in the Noncompetition Agreement, Smith agreed and acknowledged that:

(a)     "the business in which the Company is engaged is intensely competitive" (*Id.* § 1(c));

(b)     his "employment by IBM has required . . . that [he] have access to, and knowledge of, IBM Confidential Information" (*Id.*);

(c)     "the Company would suffer irreparable harm if [he failed] to comply with [the noncompetition and the nonsolicitation covenants]" (*Id.* § 3.); and

(d)     "the restrictions set forth in [the noncompetition and the nonsolicitation covenants] are reasonable as to geography and duration." (*Id.*)

13

**Smith Violates the Noncompetition Agreement**
**by Accepting Employment with AWS As Its Vice President**

      44.    Notwithstanding the promises he made in his Noncompetition Agreement, Smith told IBM on March 28, 2017 that he intended to accept a job at AWS, with a proposed start date of April 24, 2017. Smith later informed IBM that the proposed role was Vice President of AWS, and would include responsibility for managing the overall strategy and operations of key segments of AWS's Cloud Computing business.

      45.    As a result of discussions among counsel for IBM, counsel for Smith, and counsel for AWS, Smith announced his resignation from IBM on April 27, 2017, without accepting employment from AWS. Smith informed IBM that he would pursue other opportunities, including offers he had received to join the boards of, and potentially receive employment from, companies that did not compete against IBM. Smith's resignation from IBM became effective May 2, 2017. Shortly after his resignation, Smith informed IBM that he had been offered a consulting role at a non-competitive Australian bank. IBM approved Smith's acceptance of this offer.

      46.    Counsel for AWS eventually informed IBM that AWS intends for Smith to be Vice President for AWS and AWS's senior leader in managing the overall strategy and operations of major areas of its Cloud Computing business, including global marketplace, developer tools, and global support and managed services.

      47.    AWS is on record in litigation it has brought itself to enforce its own non-compete agreements describing the role of AWS Vice Presidents:

- Directing the development of many of AWS's Cloud Computing business strategies;

- Participating in the highest levels of decision-making in the Cloud Computing business;

14

- Attending AWS Weekly Business Metrics Meetings, at which senior management discuss goals and metrics across all of AWS's products and services; and

- Participating in AWS's semi-annual formal operations planning processes.[8]

48. The IBM confidential information and competitive business secrets Smith knows, and the IBM customers Smith knows by virtue of his responsibilities as IBM CIO, will all be relevant to these AWS strategy, planning and decision-making activities.

49. The job that Smith intends to take at AWS is thus in competition against the job he held at IBM. Smith intends to move from IBM's strategic leadership team to AWS's strategic leadership team. His proposed role at AWS would involve him in the development of AWS products and competitive strategies to compete against IBM, including with respect to IBM's new offerings under development in Cloud Computing, Agile, and regulatory and compliance technology.

50. Smith poses a particular competitive threat to IBM, not merely because he knows the Company's trade secrets, but because he developed relationships with significant IBM customers or potential customers on the strength of IBM's goodwill, products and services, and often served as the public face of IBM at major industry events as IBM's highest ranking customer goodwill representative.

51. In addition, Smith was responsible for directly supervising IBM's Global Chief Information Security Officer. In his role as CIO, Smith attended certain steering committee meetings to discuss IBM's most sensitive data. This highly confidential information

---

[8] *See* Plaintiff Amazon.com Inc.'s Motion for Temporary Restraining Order, *Amazon.com Inc.* v. *Powers*, No. 2:12-CV-1911 (W.D. Wash., filed Oct. 30, 2012) [Docket No. 4] Ex. A pp. 6–8.

is kept closely secret within IBM, and it could cause the Company irreparable harm if this information were disclosed to anyone outside the Company -- especially a competitor like AWS.

52.     As AWS Vice President, Smith will report directly to Andrew Jassy, AWS's CEO.

**IBM's Right to Rescind Long-Term Incentive**
**Awards It Provided to Smith**

53.     As recently as June 2016, Smith accepted awards of IBM stock options, Restricted Stock Units, and Performance Share Stock Units under IBM's 1999 Long-Term Performance Plan, as amended through August 1, 2007 ("LTPP"). (The LTPP Prospectus is attached hereto as **Exhibit B**.) Smith's equity awards also were governed by a document titled "Terms and Conditions of Your Performance Share Units (PSUs) – Growth Award: Effective June 8, 2016" (the "Terms and Conditions") (attached hereto as **Exhibit C**).

54.     The equity awards that Smith received under the LTPP were in addition to, and not part of, the salary he received for his work at IBM.

55.     Under the LTPP, equity awards are subject to cancellation and rescission in certain circumstances, and any exercise, payment or delivery pursuant to a rescinded award is subject to repayment. In particular, the awards may be canceled and rescinded if the participant engages in "Detrimental Activity," as defined in the Plan.

56.     Detrimental Activity consists of eight categories of conduct, including, among others:

(a)     the rendering of services for any organization or engaging directly or indirectly in any business which is or becomes competitive with the Company;

(b)     the disclosure to anyone outside the Company, or the use in other than the Company's business, without prior written authorization from the Company, of any confidential information or material, as defined in the Company's Agreement Regarding Confidential

16

Information and Intellectual Property, relating to the business of the Company, acquired by the Participant either during or after employment with the Company;

(c)  any attempt directly or indirectly to solicit the trade or business of any current or prospective customer, supplier or partner of the Company; and

(d)  any other conduct or act determined to be injurious, detrimental or prejudicial to any interest of the Company.

57.  Smith's disclosure of IBM information to Jassy and his plan to work for AWS constitute Detrimental Activity under the LTPP, triggering IBM's right to rescind and recover awards granted to him in the prior twelve months.

58.  Smith had the choice each year whether to accept his equity awards. Upon acceptance of the awards in June 2016, he agreed that he understood that "IBM may cancel, modify, rescind, suspend, withhold or otherwise limit or restrict this Award in accordance with the terms of the Plan, including, without limitation, canceling or rescinding this Award if you render services for a competitor prior to, or during the Rescission Period. You understand that the Rescission Period that has been established is 12 months." (A copy of Smith's "Long-Term Incentive Award Acceptance Information" is attached hereto as **Exhibit D.**)

59.  In the Terms and Conditions to the LTPP, Smith acknowledged and agreed that if he were to violate the prohibition on direct or indirect solicitation of IBM customers, "the Company would suffer irreparable harm" and that "the Company will be entitled to any appropriate relief including money damages, equitable relief and attorneys' fees." (Ex. C p. 5.)

60.     The Terms and Conditions also require Smith to pay "all costs and expenses incurred by the Company" in a successful action to enforce the terms of the LTPP, "including reasonable attorneys' fees." (*Id.* p. 4.)

61.     The stock options that Smith exercised and Restricted Stock Units that were released to him in the twelve months prior to his resignation and announcement of his intent to join AWS total approximately $1,714,800.

## COUNT I — Breach of Noncompetition Agreement

62.     IBM repeats and realleges, as if fully set forth herein, the allegations of Paragraphs 1 through 61 above.

63.     The Noncompetition Agreement is an enforceable agreement that imposes upon Smith contractual obligations.

64.     IBM has complied with all material terms of this agreement.

65.     Smith has breached the terms of that agreement by, among other things, accepting a position as Vice President of AWS without waiting for expiration of the one-year non-compete period to which he expressly agreed.

66.     As Smith agreed in the Noncompetition Agreement, if he is not enjoined from working at AWS as Vice President until May 2, 2018, and thereby violating his Noncompetition Agreement, IBM will be irreparably injured.

67.     In view of the similarity of Smith's job at AWS to his job at IBM, he will inevitably (if inadvertently) make use of and/or disclose IBM trade secrets and other confidential and proprietary IBM information in performing his job at AWS.

68.     IBM will also be harmed if Smith violates the nonsolicitation covenants in the Noncompetition Agreement.

18

69.     In these circumstances, IBM is entitled to an injunction to prevent such irreparable injury.  IBM is also entitled to recover money damages to the extent that Smith is not enjoined from violating his agreement.

<b>COUNT II — Misappropriation of Trade Secrets</b>

70.     IBM repeats and realleges, as if fully set forth herein, the allegations of Paragraphs 1 through 69 above.

71.     IBM possesses certain trade secrets and confidential information with which Smith is familiar, and which Smith has a common law duty not to disclose outside of IBM.

72.     The Noncompetition Agreement is an enforceable agreement that imposes upon Smith contractual obligations, including the obligations of nondisclosure with respect to IBM's confidential information.

73.     If he is permitted to work for AWS, Smith will inevitably (if inadvertently) use and/or disclose IBM trade secrets for his own benefit and for the benefit of AWS.

74.     As an unavoidable result of Smith's impending misappropriation of IBM trade secrets in violation of his common law and contractual duties, IBM will be damaged.

<b>COUNT III — Breach of Fiduciary Duty</b>

75.     IBM repeats and realleges, as if fully set forth herein, the allegations of Paragraphs 1 through 74 above.

76.     As an employee of IBM up to and including May 2, 2017, Smith owed IBM fiduciary duties of loyalty and good faith.

77.     Smith breached his fiduciary duties to IBM by sharing inside IBM information with IBM's direct competitor, AWS, while Smith was an employee of IBM.

19

78.     IBM is therefore entitled to compensatory damages, including an amount at least equivalent to compensation paid to Smith after his breach.

## COUNT IV — Declaratory Judgment: Rescission of Equity Award

79.     IBM repeats and realleges, as if fully set forth herein, the allegations of Paragraphs 1 through 78 above.

80.     By accepting employment at AWS in competition against IBM, Smith has engaged in "Detrimental Activity" under the LTPP agreement, triggering IBM's right to rescind and demand repayment of equity awards granted to him in the prior twelve months.

81.     The LTPP agreement is an enforceable agreement, and IBM has performed all of its material obligations under the agreement.

82.     IBM has informed Smith of this claim. Smith has refused and, on information and belief, will continue to refuse to return and repay his equity awards, as required by the LTPP agreement.

83.     IBM does not have an adequate, alternative remedy in another form of action.

84.     Accordingly, IBM is entitled to a declaratory judgment confirming its right to rescind and demand repayment of Smith's equity awards.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff IBM demands judgment seeking relief against defendant Jeff Smith as follows:

(a)     Imposing a preliminary and permanent injunction ordering Smith to refrain from: (i) breaching the terms of his Noncompetition Agreement with IBM, (ii) commencing employment with AWS as Vice President, or in any other position that would create a risk of inevitable disclosure of IBM trade secrets, prior to the expiration of his twelve-month non-competition period on May 2, 2018; or (iii) directly or indirectly soliciting, for competitive business

purposes, any IBM customer with which Smith was directly or indirectly involved as part of his job responsibilities during the last twelve months of his employment with IBM.

(b) Declaring that IBM is entitled to rescind and demand repayment of the equity awards granted to Smith in the twelve months prior to his accepting employment with AWS;

(c) Awarding IBM its attorneys' fees, costs, and disbursements incurred as a result of this action;

(d) Awarding IBM monetary damages in an amount sufficient to compensate the Company for Smith's breaches of contract, together with rescission of any LTPP Awards Smith has received from IBM within the last twelve months and of any other compensation or benefits that IBM is entitled to rescind; and

(e) Awarding IBM such further relief as the Court deems just and proper.

Dated: New York, New York
July 31, 2017

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

By: _____

Robert A. Atkins
Steven C. Herzog
Pietro J. Signoracci

1285 Avenue of the Americas
New York, New York 10019-6064
(212) 373-3000
ratkins@paulweiss.com
sherzog@paulweiss.com
psignoracci@paulweiss.com

*Attorneys for Plaintiff*
*International Business Machines Corporation*

21

# Exhibit A

*Smith, Jeff*
*New hire*

# NONCOMPETITION AGREEMENT

In recognition of the critical role that you will play as a senior executive with International Business Machines Corporation ("IBM") and in recognition of your access to IBM Confidential Information by virtue of this position, and further as consideration for being hired as a senior executive, along with any and all awards to be granted to you under an International Business Machines Corporation Long-Term Performance Plan ("LTPP"), as well as your appointment to and/or membership on the Growth and Transformation Team ("G&TT"), and/or for other good and valuable consideration, you ("Employee" or "you") agree to the terms and conditions of this Noncompetition Agreement (this "Agreement") as follows:

1. **Covenants**.

(a) You acknowledge and agree that your appointment to or continued membership on the G&TT and the compensation that you will receive in connection with this Agreement, including any equity awards, cash and other compensation, is consideration both for your work at IBM and for your compliance with the post-employment restrictive covenants included in Paragraph 1 of this Agreement.

(b) You acknowledge and agree that as a member of the G&TT (i) you will be exposed to some of the most sensitive IBM Confidential Information possessed by IBM and its affiliates (collectively, the "Company"), including global strategic plans, marketing plans, information regarding long-term business opportunities, and information regarding the development status of specific Company products, as well as extensive assessments of the global competitive landscape of the industries in which the Company competes; (ii) the IBM Confidential Information to which you will be exposed will pertain not only to the specific Company business or unit in which you are an executive, but also to confidential strategies, plans, and services that are Company-wide and that are specific to businesses and units other than your own; and (iii) this IBM

Confidential Information represents the product of the Company's substantial global investment in research and innovation, is critical to the Company's competitive success, is disclosed to the Company's senior leaders only on a strictly confidential basis, and is not made accessible to the public or to the Company's competitors.

(c) You further acknowledge and agree that: (i) the business in which the Company is engaged is intensely competitive and that, separate from your role as a member of the G&TT, your employment by IBM has required, and will continue to require, that you have access to, and knowledge of, IBM Confidential Information; (ii) you have been given access to, and developed relationships with, customers of the Company at the time and expense of the Company; and (iii) by your training, experience and expertise, your services to the Company are, and will continue to be, extraordinary, special and unique.

(d) You acknowledge and agree that: (i) the disclosure of IBM Confidential Information would place the Company at a serious competitive disadvantage and would do serious damage, financial and otherwise, to the business of the Company; (ii) you will keep in strict confidence, and will not, directly or indirectly, at any time during or after your employment with IBM, disclose, furnish, disseminate, make available or use, except in the course of performing your duties of employment, any IBM Confidential Information or any trade secrets or confidential business and technical information of the Company's customers or vendors, without limitation as to when or how you may have acquired such information; and (iii) all such information, whether reduced to writing, maintained on any form of electronic media, or maintained in your mind or memory and whether compiled by the Company, and/or you, derives independent economic value from not being readily known to or ascertainable by proper means by others who can obtain economic value from its disclosure or use, that reasonable efforts have been made by the Company to maintain the secrecy of such information, that such information is the sole property of the Company, and that any retention and use of such information by you during or after your employment with IBM (except in the course of performing your duties and

2

obligations to IBM) shall constitute a misappropriation of the Company's trade secrets.

(e) You acknowledge and agree that during your employment with IBM and for twelve (12) months following the termination of your employment either by you for any reason, by IBM for "Cause," or by IBM without Cause where IBM elects, pursuant to Paragraph 4 below, to make certain severance payments to you, that:

(i) you will not directly or indirectly within the "Restricted Area" "Engage in or Associate with" (a) any "Business Enterprise" or (b) any competitor of the Company, if performing the duties and responsibilities of such engagement or association could result in you intentionally or unintentionally using, disclosing, or relying upon IBM Confidential Information to which you had access by virtue of your job duties or other responsibilities with IBM; and

(ii) you will not directly or indirectly solicit, for competitive business purposes, any customer of the Company with which you were directly or indirectly involved as part of your job responsibilities during the last twelve (12) months of your employment with IBM.

(f) You further acknowledge and agree that during your employment with IBM and for two (2) years following the termination of your employment by either you or by IBM for any reason, you will not directly or indirectly within the "Restricted Area," hire, solicit or make an offer to, or attempt to or participate or assist in any effort to hire, solicit, or make an offer to, any employee of the Company to be employed or to perform services outside of the Company. For purposes of this subsection 1(f), "employee of the Company" includes any employee of the Company who worked within the Restricted Area at any time in the 12-month period immediately preceding any actual or attempted hiring, solicitation or making of an offer.

2. **Definitions.**

(a) For purposes of this Agreement, "Business Enterprise" shall mean any entity that engages in, or owns or controls an interest in any entity that

3

engages in, competition with any business unit or division of the Company in which you worked at any time during the three (3) year period prior to the termination of your employment.

(b)  For purposes of this Agreement, "Cause" shall mean, as reasonably determined by IBM, the occurrence of any of the following:  (i) embezzlement, misappropriation of corporate funds or other material acts of dishonesty; (ii) commission or conviction of any felony, or of any misdemeanor involving moral turpitude, or entry of a plea of guilty or nolo contendere to any felony or misdemeanor (other than a minor traffic violation or other minor infraction); (iii) engagement in any activity that you know or should know could harm the business or reputation of the Company; (iv) failure to adhere to the Company's corporate codes, policies or procedures; (v) a breach of any covenant in any employment agreement or any intellectual property agreement, or a breach of any other provision of your employment agreement, in either case if the breach is not cured to the Company's satisfaction within a reasonable period after you are provided with notice of the breach (no notice and cure period is required if the breach cannot be cured), provided, however, that the mere failure to achieve performance objectives shall not constitute Cause; (vi) failure by you to perform your duties or follow management direction, which failure is not cured to the Company's satisfaction within a reasonable period of time after a written demand for substantial performance is delivered to you (no notice or cure period is required if the failure to perform cannot be cured); or (vii) violation of any statutory, contractual or common law duty or obligation to the Company, including without limitation, the duty of loyalty.

(c)  For purposes of this Agreement, "Engage in or Associate with" shall include, without limitation, engagement or association as a sole proprietor, owner, employer, director, partner, principal, joint venture, associate, employee, member, consultant, or contractor.  The phrase also shall include engagement or association as a shareholder or investor during the course of your employment with IBM, and shall include beneficial ownership of 5% or more of any class of outstanding stock of a Business Enterprise or competitor of the Company

4

following the termination of your employment with IBM.

(d)  For purposes of this Agreement, "IBM Confidential Information" shall include, without limitation, the Company's formulae, patterns, compilations, programs, devices, methods, techniques, software, tools, systems, and processes, the Company's selling, manufacturing, servicing methods and business techniques, implementation strategies, and information about any of the foregoing, the Company's training, service, and business manuals, promotional materials, training courses and other training and instructional materials, vendor and product information, customer and prospective customer lists, other customer and prospective customer information, client data, global strategic plans, marketing plans, information about the Company's management techniques and management strategies, information regarding long-term business opportunities, information regarding the development status of specific Company products, assessments of the global competitive landscape of the industries in which the Company competes, plans for acquisition or disposition of products or companies or business units, expansion plans, financial status and plans, compensation information, personnel information, and other business information and trade secrets of the Company, and also as defined by the Uniform Trade Secrets Act, as amended from time to time.

(e)  For purposes of this Agreement, "G&TT" shall mean the Growth and Transformation Team or any successor team or group constituted by the Company from time to time.

(f)  For purposes of this Agreement, "Restricted Area" shall mean any geographic area in the world in which you worked or for which you had job responsibilities, including supervisory responsibilities, during the last twelve (12) months of your employment with IBM.  You acknowledge that as a result of your membership in the G&TT your job responsibilities with the Company are global in scope.

3.    **Acknowledgements**.

You acknowledge that a mere agreement not to disclose, use, or rely on IBM Confidential Information after your employment by IBM ends would be inadequate, standing alone, to protect IBM's legitimate business interests. You further acknowledge that disclosure of, use of, or reliance on IBM Confidential Information, whether or not intentional, is often difficult or impossible for the Company to detect until it is too late to obtain any effective remedy. You further acknowledge that the Company would suffer irreparable harm if you fail to comply with Paragraph 1 or otherwise improperly disclose, use, or rely on IBM Confidential Information. You acknowledge that the restrictions set forth in Paragraph 1 are reasonable as to geography, scope and duration.

4.    **Termination without Cause**.

In the event that IBM terminates your employment without Cause, IBM may elect in its sole discretion to offer to you severance payments (in an amount and on terms that IBM will determine, and disclose to you, prior to your termination of employment) in accordance with IBM's regular payroll practices and subject to all applicable foreign, federal, state and local withholdings or other taxes that IBM may from time to time be required to withhold. In the event you agree to such payments and without limiting the generality of the foregoing, IBM may cease making such payments under this Paragraph 4 if IBM believes that you are in breach of any of your obligations in this Agreement. Without prejudice to any other remedies under this Agreement or under applicable law, IBM may also recoup any payments made to you under this Paragraph 4 if you breach any of your obligations under this Agreement

5.    **Injunctive Relief**.

You agree that the Company would suffer irreparable harm if you were to breach, or threaten to breach, any provision of this Agreement and that the Company would by reason of such breach, or threatened breach, be entitled to injunctive relief in a court of appropriate jurisdiction, without the need to post any

6

bond, and you further consent and stipulate to the entry of such injunctive relief in such a court prohibiting you from breaching this Agreement. This Paragraph 5 shall not, however, diminish the right of the Company to claim and recover damages in addition to injunctive relief.

6. **Severability**.

In the event that any one or more of the provisions of this Agreement shall be held to be invalid or unenforceable, the validity and enforceability of the remaining provisions shall not in any way be affected or impaired thereby. Moreover, if any one or more of the provisions contained in this Agreement shall be held to be excessively broad as to duration, activity or subject, such provisions shall be construed by limiting and reducing them so as to be enforceable to the maximum extent allowed by applicable law. Furthermore, a determination in any jurisdiction that this Agreement, in whole or in part, is invalid or unenforceable shall not in any way affect or impair the validity or enforceability of this Agreement in any other jurisdiction.

7. **Captions**.

The captions in this Agreement are inserted for convenience and reference only and shall in no way affect, define, limit or describe the scope, intent or construction of any provision hereof.

8. **Waiver**.

The failure of IBM to enforce any terms, provisions or covenants of this Agreement shall not be construed as a waiver of the same or of the right of IBM to enforce the same. Waiver by IBM of any breach or default by you (or by any other employee or former employee of IBM) of any term or provision of this Agreement (or any similar agreement between IBM and you or any other employee or former employee of IBM) shall not operate as a waiver of any other breach or default.

7

9.     **Successors and Assigns.**

This Agreement shall inure to the benefit of and be binding upon IBM, any successor organization which shall succeed to IBM by acquisition, merger, consolidation or operation of law, or by acquisition of assets of IBM and any assigns. You may not assign your obligations under this Agreement.

10.     **Disclosure of Existence of Covenants.**

You agree that while employed by IBM and for two (2) years thereafter, you will communicate the contents of this Agreement to any person, firm, association, partnership, corporation or other entity which you intend to be employed by, associated with or represent, prior to accepting such employment, association, or representation.

11.     **Notice to IBM of Prospective Position.**

You agree that if, at any time during your employment or within twelve (12) months following the termination of your employment with IBM, you are offered and intend to accept a position to Engage in or Associate with any person, firm, association, partnership, corporation or other entity other than the Company, you will provide the Senior Vice President of Human Resources for IBM Corporation with two weeks' written notice prior to accepting any such position. If for any reason you cannot, despite using your best efforts, provide the two weeks' notice prior to accepting any such position, you agree that you will provide two weeks' notice prior to commencing that new position. You acknowledge and agree that a two week notice period is appropriate and necessary to permit IBM to determine whether, in its view, your proposed new position could lead to a violation of this Agreement, and you agree that you will provide IBM with such information as IBM may request to allow IBM to complete its assessment (except that you need not provide any information that would constitute confidential or trade secret information of any entity other than the Company). If you are offered and intend to accept such a position while you are still employed by IBM, you further acknowledge and agree that during the two-

8

week notice period required by this Paragraph, IBM may choose, in its sole discretion, to limit your duties in your position with IBM and to restrict your access to IBM's premises, systems, products, information, and employees.

12.    **No Oral Modification**.

This Agreement may not be changed orally, but may be changed only in a writing signed by the Employee and a duly authorized representative of IBM.

13.    **Entire Agreement**.

Although this Agreement sets forth the entire understanding between the Employee and IBM concerning the restrictive covenants herein, this Agreement does not impair, diminish, restrict or waive any other restrictive covenant, nondisclosure obligation or confidentiality obligation of the Employee to the Company under any other agreement, policy, plan or program of the Company.  The Employee and IBM represent that, in executing this Agreement, the Employee and IBM have not relied upon any representations or statements made, other than those set forth herein, with regard to the subject matter, basis or effect of this Agreement.

14.    **Governing Law and Choice of Forum**.

This Agreement shall be governed by, and construed in accordance with, the laws of the State of New York, without regard to its conflict of law rules.  The parties acknowledge that the state and federal courts in New York and Westchester Counties have substantial experience in commercial disputes, including noncompetition and other employment related matters.  For this reason, the parties agree that any action or proceeding with respect to this Agreement shall be brought exclusively in the state and federal courts sitting in New York County or Westchester County, New York.  The parties agree to the personal jurisdiction thereof, and irrevocably waive any objection to the venue of such

9

action, including any objection that the action has been brought in an inconvenient forum.

_Jeff Smith_

Jeff Smith (Print)

_[signature]_

Jeff Smith (Signature)

_6-7-2014_

Date

INTERNATIONAL BUSINESS MACHINES CORPORATION

By: _Diane Gherson_     10/1/2014

Diane J. Gherson
Senior Vice President - Human Resources

10

# Exhibit B

**PROSPECTUS**

### International Business Machines Corporation

### 1999 Long-Term Performance Plan

118,671,300 shares

Capital Stock, $.20 Par Value

**THE SECURITIES AND EXCHANGE COMMISSION AND STATE SECURITIES REGULATORS HAVE NOT APPROVED OR DISAPPROVED THESE SECURITIES, OR DETERMINED IF THIS PROSPECTUS IS TRUTHFUL OR COMPLETE. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.**

This document constitutes part of a prospectus covering securities that have been registered under the Securities Act of 1933.

============

March 15, 2000, as amended through August 1, 2007

============

1

## GENERAL INFORMATION ABOUT THE PLAN

For detailed information regarding the 1999 Long-Term Performance Plan, reference is made to the terms of the Plan itself, which is included in this Prospectus in its entirety. The Plan was approved by the Company's stockholders at the Company's 1999 Annual Meeting on April 27, 1999. All share references in the Plan have been adjusted to reflect a two-for-one stock split as of May 10, 1999. Terms used herein without definition shall have the definitions set forth in the Plan. IBM has also filed a registration statement with the SEC (SEC File 333-30424) registering the shares of IBM common stock to be offered under the Plan.

You should rely only on the information contained in this prospectus. We have not authorized anyone to provide you with information different from that contained in this prospectus. The information contained in this prospectus is accurate only as of the date of this prospectus, regardless of the time of delivery of this prospectus.

Administration

The Plan is administered by a Committee designated by the IBM Board of Directors, currently the Executive Compensation and Management Resources Committee. This Committee is composed entirely of outside directors, who are elected to hold office until the next Annual Meeting of Stockholders and until their successors shall have qualified. The Plan is not subject to the Employee Retirement Income Security Act of 1974 and is not qualified under Section 401(a) of the Code. Additional information about the Plan and its administration may be obtained from the Vice President, Compensation & Benefits, IBM Corporation, New Orchard Road, Armonk, New York 10504, (914) 499-4148.

WHERE YOU CAN FIND MORE INFORMATION

We file annual, quarterly and current reports, proxy statements and other information with the SEC. You may read and copy any document we file at the SEC's public reference rooms in Washington, D.C. Please call the SEC at 1-800-SEC-0330 for further information on the public reference rooms. Our SEC filings are also available to the public at the SEC's web site at (http://www.sec.gov).

The SEC allows us to "incorporate by reference" into this prospectus the information we file with it, which means that we can disclose important information to you by referring you to those documents. The information incorporated by reference is considered to be part of this prospectus, and later information that we file with the SEC will automatically update and supersede this information. We incorporate by reference the documents listed below and any future filings made with the SEC under Section 13(a), 13(c), 14 or 15(d) of the Securities Exchange Act of 1934 until our offering is completed:

i. Annual Report on Form 10-K for the year ended December 31, 2006;

ii. Quarterly Reports on Form 10-Q, filed on April 24, 2007 and July 31, 2007; and

2

iii. Current Reports on Form 8-K, filed on January 18, 2007, January 19, 2007, January 25, 2007, January 31, 2007, February 5, 2007, March 21, 2007, April 17, 2007, April 18, 2007, April 24, 2007, April 27, 2007, May 29, 2007, June 4, 2007, June 26, 2007, July 18, 2007 July 19, 2007, and August 1, 2007.

You may request a copy of these filings at no cost, by writing to or telephoning our transfer agent at the following address:

Computershare Trust Company, N.A.
P.O. Box 43072
Providence, Rhode Island 02940
(781) 575-2727

===============================================================

IBM 1999 Long-Term Performance Plan

1. Objectives.

The IBM 1999 Long-Term Performance Plan (the "Plan") is designed to attract, motivate and retain selected employees of, and other individuals providing services to, the Company. These objectives are accomplished by making long-term incentive and other awards under the Plan, thereby providing Participants with a proprietary interest in the growth and performance of the Company.

2. Definitions.

(a) "Awards"—The grant of any form of stock option, stock appreciation right, stock or cash award, whether granted singly, in combination or in tandem, to a Participant pursuant to such terms, conditions, performance requirements, limitations and restrictions as the Committee may establish in order to fulfill the objectives of the Plan.

(b) "Award Agreement"—An agreement between the Company and a Participant that sets forth the terms, conditions, performance requirements, limitations and restrictions applicable to an Award.

(c) "Board"—The Board of Directors of International Business Machines Corporation ("IBM").

(d) "Capital Stock" or "stock"—Authorized and issued or unissued Capital Stock of IBM, at such par value as may be established from time to time.

(e) "Code"—The Internal Revenue Code of 1986, as amended from time to time.

(f) "Committee"—The committee designated by the Board to administer the Plan.

(g) "Company"—IBM and its affiliates and subsidiaries including subsidiaries of subsidiaries and partnerships and other business ventures in which IBM has an equity interest.

(h) "Fair Market Value"—The average of the high and low prices of Capital Stock on the New York Stock Exchange for the date in question, provided that, if no sales of Capital Stock were made on said exchange on that date, the average of the high and low prices of Capital Stock as reported for the most recent preceding day on which sales of Capital Stock were made on said exchange.

(i) "Participant"—An individual to whom an Award has been made under the Plan. Awards may be made to any employee of, or any other individual providing services to, the Company. However, incentive stock options may be granted only to individuals who are employed by IBM or by a subsidiary corporation (within the meaning of section 424(f) of the Code) of IBM, including a subsidiary that becomes such after the adoption of the Plan.

4

(j) "Performance Period"—A multi-year period of no more than five consecutive calendar years over which one or more of the performance criteria listed in Section 6 shall be measured pursuant to the grant of Long-Term Performance Incentive Awards (whether such Awards take the form of stock, stock units or equivalents or cash). Performance Periods may overlap one another, but no two Performance Periods may consist solely of the same calendar years.

3. Capital Stock Available for Awards.

The number of shares that may be issued under the Plan for Awards granted wholly or partly in stock during the term of the Plan is 118,671,300. In addition, any shares previously authorized by stockholders for awards under prior Company long-term performance plans which are still available for issuance or which either wholly or in part were not earned or that expired or were forfeited, terminated, canceled, settled in cash, payable solely in cash or exchanged for other awards shall be available for issuance under the Plan. Shares of Capital Stock may be made available from the authorized but unissued shares of the Company or from shares held in the Company's treasury and not reserved for some other purpose. For purposes of determining the number of shares of Capital Stock issued under the Plan, no shares shall be deemed issued until they are actually delivered to a Participant, or such other person in accordance with Section 10. Shares covered by Awards that either wholly or in part are not earned, or that expire or are forfeited, terminated, canceled, settled in cash, payable solely in cash or exchanged for other awards, shall be available for future issuance under Awards. Further, shares tendered to or withheld by the Company in connection with the exercise of stock options, or the payment of tax withholding on any Award, shall also be available for future issuance under Awards.

4. Administration.

The Plan shall be administered by the Committee, which shall have full power to select Participants, to interpret the Plan, to grant waivers of Award restrictions, to continue, accelerate or suspend exercisability, vesting or payment of an Award and to adopt such rules, regulations and guidelines for carrying out the Plan as it may deem necessary or proper. These powers include, but are not limited to, the adoption of modifications, amendments, procedures, subplans and the like as necessary to comply with provisions of the laws and regulations of the countries in which the Company operates in order to assure the viability of Awards granted under the Plan and to enable Participants regardless of where employed to receive advantages and benefits under the Plan and such laws and regulations.

5. Delegation of Authority.

The Committee may delegate to officers of the Company its duties, power and authority under the Plan pursuant to such conditions or limitations as the Committee may establish, except that only the Committee or the Board may select, and grant Awards to, Participants who are subject to Section 16 of the Securities Exchange Act of 1934.

## 6. Awards.

The Committee shall determine the type or types of Award(s) to be made to each Participant and shall set forth in the related Award Agreement the terms, conditions, performance requirements, and limitations applicable to each Award. Awards may include but are not limited to those listed in this Section 6. Awards may be granted singly, in combination or in tandem. Awards may also be made in combination or in tandem with, in replacement or payment of, or as alternatives to, grants, rights or compensation earned under any other plan of the Company, including the plan of any acquired entity. During any five-year period, no Participant may receive, under the Plan, stock options or stock appreciation rights with respect to an aggregate of more than 10,000,000 shares. With regard to any "covered employee" (as defined by section 162(m) of the Code), the maximum number of shares of Capital Stock or share equivalents of Capital Stock (stock units) that can be earned by any Participant for any Performance Period is 400,000 shares, subject to adjustment for changes in corporate capitalization, such as a stock split, and if an Award is denominated in cash rather than in shares of Capital Stock or stock units, the share equivalent for purposes of the maximum will be determined by dividing the highest amount that the Award could be under the formula for such Performance Period by the closing price of a share of Capital Stock on the first trading day of the Performance Period.

(a) Stock Option—A grant of a right to purchase a specified number of shares of Capital Stock the exercise price of which shall be not less than 100% of Fair Market Value on the date of grant of such right, as determined by the Committee, provided that, in the case of a stock option granted retroactively in tandem with or as substitution for another award granted under any plan of the Company, the exercise price may be the same as the purchase or designated price of such other award. A stock option may be in the form of an incentive stock option ("ISO") which, in addition to being subject to applicable terms, conditions and limitations established by the Committee, complies with section 422 of the Code. The number of shares of stock that shall be available for issuance under ISOs granted under the Plan is limited to twenty million.

(b) Stock Appreciation Right—A right to receive a payment, in cash and/or Capital Stock, equal in value to the excess of the Fair Market Value of a specified number of shares of Capital Stock on the date the stock appreciation right (SAR) is exercised over the grant price of the SAR, which shall not be less than 100% of the Fair Market Value on the date of grant of such SAR, as determined by the Committee, provided that, in the case of a SAR granted retroactively in tandem with or as substitution for another award granted under any plan of the Company, the grant price may be the same as the exercise or designated price of such other award.

(c) Stock Award—An Award made in stock and denominated in units of stock. All or part of any stock award may be subject to conditions established by the Committee, and set forth in the Award Agreement, which may include, but are not limited to, continuous service with the Company, achievement of specific business objectives, increases in specified indices, attaining growth rates, and other comparable measurements of Company performance. An Award made in stock or denominated in units of stock that is subject to restrictions on transfer and/or forfeiture provisions may be referred to as an Award of "Restricted Stock," "Restricted Stock Units" or "Long-Term Performance Incentive" units.

(d) Cash Award—An Award denominated in cash with the eventual payment amount subject to future service and such other restrictions and conditions as may be established by the Committee, and as set forth in the Award Agreement, including, but not limited to, continuous service with the Company, achievement of specific business objectives, increases in specified indices, attaining growth rates, and other comparable measurements of Company performance.

(e) Performance Criteria under section 162(m) of the Code for Long-Term Performance Incentive Awards—The performance criteria for Long-Term Performance Incentive Awards (whether such Awards take the form of stock, stock units or equivalents or cash) made to any "covered employee" (as defined by section 162(m) of the Code) shall consist of objective tests based on one or more of the following: earnings, cash flow, customer satisfaction, revenues, financial return ratios, market performance, shareholder return and/or value, operating profits (including EBITDA), net profits, earnings per share, profit returns and margins, stock price and working capital. Performance criteria may be measured solely on a corporate, subsidiary or business unit basis, or a combination thereof. Further, performance criteria may reflect absolute entity performance or a relative comparison of entity performance to the performance of a peer group of entities or other external measure of the selected performance criteria. The formula for any Award may include or exclude items to measure specific objectives, such as losses from discontinued operations, extraordinary gains or losses, the cumulative effect of accounting changes, acquisitions or divestitures, foreign exchange impacts and any unusual, nonrecurring gain or loss. Nothing herein shall preclude the Committee from making any payments or granting any Awards whether or not such payments or Awards qualify for tax deductibility under section 162(m) of the Code.

7. Payment of Awards.

Payment of Awards may be made in the form of cash, stock or combinations thereof and may include such restrictions as the Committee shall determine. Further, with Committee approval, payments may be deferred, either in the form of installments or as a future lump-sum payment, in accordance with such procedures as may be established from time to time by the Committee. Any deferred payment, whether elected by the Participant or specified by the Award Agreement or the Committee, may require the payment to be forfeited in accordance with the provisions of Section 13. Dividends or dividend equivalent rights may be extended to and made part of any Award denominated in stock or units of stock, subject to such terms, conditions and restrictions as the Committee may establish. The Committee may also establish rules and procedures for the crediting of interest on deferred cash payments and dividend equivalents for deferred payments denominated in stock or units of stock. At the discretion of the Committee, a Participant may be offered an election to substitute an Award for another Award or Awards of the same or different type.

7

8. Stock Option Exercise.

The price at which shares of Capital Stock may be purchased under a stock option shall be paid in full in cash at the time of the exercise or, if permitted by the Committee, by means of tendering Capital Stock or surrendering another Award or any combination thereof.
The Committee shall determine acceptable methods of tendering Capital Stock or other Awards and may impose such conditions on the use of Capital Stock or other Awards to exercise a stock option as it deems appropriate.

9. Tax Withholding.

Prior to the payment or settlement of any Award, the Participant must pay, or make arrangements acceptable to the Company for the payment of, any and all federal, state and local tax withholding that in the opinion of the Company is required by law. The Company shall have the right to deduct applicable taxes from any Award payment and withhold, at the time of delivery or vesting of shares under the Plan, an appropriate number of shares for payment of taxes required by law or to take such other action as may be necessary in the opinion of the Company to satisfy all obligations for withholding of such taxes.

10. Transferability.

No Award shall be transferable or assignable, or payable to or exercisable by, anyone other than the Participant to whom it was granted, except (i) by law, will or the laws of descent and distribution, (ii) as a result of the disability of a Participant or (iii) that the Committee (in the form of an Award Agreement or otherwise) may permit transfers of Awards by gift or otherwise to a member of a Participant's immediate family and/or trusts whose beneficiaries are members of the Participant's immediate family, or to such other persons or entities as may be approved by the Committee.

Notwithstanding the foregoing, in no event shall ISOs be transferable or assignable other than by will or by the laws of descent and distribution.

11. Amendment, Modification, Suspension or Discontinuance of the Plan.

The Board may amend, modify, suspend or terminate the Plan for the purpose of meeting or addressing any changes in legal requirements or for any other purpose permitted by law. Subject to changes in law or other legal requirements that would permit otherwise, the Plan may not be amended without the consent of the holders of a majority of the shares of Capital Stock then outstanding, to (i) increase the aggregate number of shares of Capital Stock that may be issued under the Plan (except for adjustments pursuant to Section 14 of the Plan), or (ii) permit the granting of stock options or SARs with exercise or grant prices lower than those specified in Section 6.

8

12. Termination of Employment.

If the employment of a Participant terminates, other than as a result of the death or disability of a Participant, all unexercised, deferred and unpaid Awards shall be canceled immediately, unless the Award Agreement provides otherwise. In the event of the death of a Participant or in the event a Participant is deemed by the Company to be disabled and eligible for benefits under the terms of the IBM Long-Term Disability Plan (or any successor plan or similar plan of another employer), the Participant's estate, beneficiaries or representative, as the case may be, shall have the rights and duties of the Participant under the applicable Award Agreement.

13. Cancellation and Rescission of Awards.

(a) Unless the Award Agreement specifies otherwise, the Committee may cancel, rescind, suspend, withhold or otherwise limit or restrict any unexpired, unpaid, or deferred Awards at any time if the Participant is not in compliance with all applicable provisions of the Award Agreement and the Plan, or if the Participant    engages in any "Detrimental Activity." For purposes of this Section 13, "Detrimental Activity" shall include: (i) the rendering of services for any organization or engaging directly or indirectly in any business which is or becomes competitive with the Company, or which organization or business, or the rendering of services to such organization or business, is or becomes otherwise prejudicial to or in conflict with the interests of the Company; (ii) the disclosure to anyone outside the Company, or the use in other than the Company's business, without prior written authorization from the Company, of any confidential information or material, as defined in the Company's Agreement Regarding Confidential Information and   Intellectual Property, relating to the business of the Company, acquired by the Participant either during or after employment with the Company; (iii) the failure or refusal to disclose promptly and to assign to the Company, pursuant to the Company's Agreement Regarding Confidential Information and Intellectual Property, all right, title and interest in any invention or idea, patentable or not, made or conceived by the Participant during employment by the Company, relating in any manner to the actual or anticipated business, research or development work of the Company or the failure or refusal to do anything reasonably necessary to enable the Company to secure a patent where appropriate in the United States and in other countries; (iv) activity that results in termination of the Participant's employment for cause; (v) a violation of any rules,    policies, procedures or guidelines of the Company, including but not limited to the Company's Business Conduct Guidelines; (vi) any attempt directly or indirectly to induce any employee of the Company to be employed or perform services elsewhere or any attempt directly or indirectly to solicit the trade or business of any current or prospective customer, supplier or partner of the Company; (vii) the Participant being convicted of, or entering a guilty plea with respect to, a crime, whether or not connected with the Company; or (viii) any other conduct or act determined to be injurious, detrimental or prejudicial to any interest of the Company.

(b) Upon exercise, payment or delivery pursuant to an Award, the Participant shall certify in a manner acceptable to the Company that he or she is in compliance with the terms and conditions of the Plan. In the event a Participant fails to comply with the provisions of paragraphs (a)(i)-(viii) of this Section 13 prior to, or during the Rescission Period, then any exercise, payment or delivery may be rescinded within two years after such exercise, payment or delivery. In the event of any such rescission, the Participant shall pay to the Company the amount of any gain realized or payment received as a result of the rescinded exercise, payment or delivery, in such manner and on such terms and conditions as may be required, and the Company shall be entitled to set-off against the amount of any such gain any amount owed to the Participant by the Company. As used herein, Rescission Period shall mean that period of time established by the Committee which shall not be less than 6 months after any exercise, payment or delivery pursuant to an Award.

14. Adjustments.

In the event of any change in the outstanding Capital Stock of the Company by reason of a stock split, stock dividend, combination or reclassification of shares, recapitalization, merger, or similar event, the Committee may adjust proportionately: (a) the number of shares of Capital Stock (i) available for issuance under the Plan, (ii) available for issuance under ISOs, (iii) for which Awards may be granted to an individual Participant set forth in Section 6, and (iv) covered by outstanding Awards denominated in stock or units of stock; (b) the exercise and grant prices related to outstanding Awards; and (c) the appropriate Fair Market Value and other price determinations for such Awards. Notwithstanding the foregoing, in the event of any change in the outstanding Capital Stock of the Company by reason of a stock split or a reverse stock split, the above-referenced proportionate adjustments, if applicable, shall be mandatory.

In the event of any other change affecting the Capital Stock or any distribution (other than normal cash dividends) to holders of Capital Stock, such adjustments in the number and kind of shares and the exercise, grant and conversion prices of the affected Awards as may be deemed equitable by the Committee, including adjustments to avoid fractional shares, shall be made to give proper effect to such event. In the event of a corporate merger, consolidation, acquisition of property or stock, separation, reorganization or liquidation, the   Committee shall be authorized to cause IBM to issue or assume stock options, whether or not in a transaction to which section 424(a) of the Code applies, by means of substitution of new stock   options for previously issued stock options or an assumption of previously issued stock options. In such event, the aggregate number of shares of Capital Stock available for issuance under awards under Section 3, including the individual Participant maximums set forth in Section 6 will be increased to reflect such substitution or assumption.

15. Miscellaneous.

(a) Any notice to the Company required by any of the provisions of the Plan shall be addressed to the chief human resources officer of IBM in writing, and shall become effective when it is received.

10

(b) The Plan shall be unfunded and the Company shall not be required to establish any special account or fund or to otherwise segregate or encumber assets to ensure payment of any Award.

(c) Nothing contained in the Plan shall prevent the Company from adopting other or additional compensation arrangements or plans, subject to shareholder approval if such approval is required, and such arrangements or plans may be either generally applicable or applicable only in specific cases.

(d) No Participant shall have any claim or right to be granted an Award under the Plan and nothing contained in the Plan shall be deemed or be construed to give any Participant the right to be retained in the employ of the Company or to interfere with the right of the Company to discharge any Participant at any time without regard to the effect such discharge may have upon the Participant under the Plan. Except to the extent otherwise provided in any plan or in an Award Agreement, no Award under the Plan shall be deemed compensation for purposes of computing benefits or contributions under any other plan of the Company.

(e) The Plan and each Award Agreement shall be governed by the laws of the State of New York, excluding any conflicts or choice of law rule or principle that might otherwise refer construction or interpretation of the Plan to the substantive law of another jurisdiction. Unless otherwise provided in the Award Agreement, recipients of an Award under the Plan are deemed to submit to the exclusive jurisdiction and venue of the federal or state courts of New York, County of Westchester, to resolve any and all issues that may arise out of or relate to the Plan or any related Award Agreement.

(f) In the event that a Participant or the Company brings an action to enforce the terms of the Plan or any Award Agreement and the Company prevails, the Participant shall pay all costs and expenses incurred by the Company in connection with that action, including reasonable attorneys' fees, and all further costs and fees, including reasonable attorneys' fees incurred by the Company in connection with collection.

(g) The Committee and any officers to whom it may delegate authority under Section 5 shall have full power and authority to interpret the Plan and to make any determinations thereunder, including determinations under Section 13, and the Committee's or such officer's determinations shall be binding and conclusive. Determinations made by the Committee or any such officer under the Plan need not be uniform and may be made selectively among individuals, whether or not such individuals are similarly situated.

(h) If any provision of the Plan is or becomes or is deemed invalid, illegal or unenforceable in any jurisdiction, or would disqualify the Plan or any Award under any law deemed applicable by the Committee, such provision shall be construed or deemed amended or limited in scope to conform to applicable laws or, in the discretion of the Committee, it shall be stricken and the remainder of the Plan shall remain in full force and effect.

(i) The Plan shall become effective on the date it is approved by the requisite vote of the stockholders of the Company.

IBM 1999 Long-Term Performance Plan — Federal Income Tax Consequences

The Company has been advised by counsel that, in general, under the Internal Revenue Code, as presently in effect, a Participant will not be deemed to recognize any income for federal income tax purposes at the time an option or SAR is granted or a restricted stock award is made, nor will the Company be entitled to a tax deduction at that time. However, when any part of an option or SAR is exercised, when restrictions on restricted stock lapse, or when an unrestricted stock award is made, the federal income tax consequences may be summarized as follows:

1. In the case of an exercise of a stock option other than an ISO, the optionee will generally recognize ordinary income in an amount equal to the excess of the fair market value of the shares on the exercise date over the option price.

2. In the case of an exercise of a SAR, the Participant will generally recognize ordinary income on the exercise date in an amount equal to any cash and the fair market value of any unrestricted shares received.

3. In the case of an exercise of an option or SAR payable in restricted stock, or in the case of an award of restricted stock, the immediate federal income tax effect for the recipient will depend on the nature of the restrictions. Generally, the fair market value of the stock will not be taxable to the recipient as ordinary income until the year in which his or her interest in the stock is freely transferable or is no longer subject to a substantial risk of forfeiture. However, the recipient may elect to recognize income when the stock is received, rather than when his or her interest in the stock is freely transferable or is no longer subject to a substantial risk of forfeiture. If the recipient makes this election, the amount taxed to the recipient as ordinary income is determined as of the date of receipt of the restricted stock.

4. In the case of ISOs, there is generally no tax liability at time of exercise. However, the excess of the fair market value of the stock on the exercise date over the option price is included in the optionee's income for purposes of the alternative minimum tax. If no disposition of the ISO stock is made before the later of one year from the date of exercise and two years from the date of grant, the optionee will realize a capital gain or loss upon a sale of the stock, equal to the difference between the option price and the sale price. If the stock is not held for the required period, ordinary income tax treatment will generally apply to the excess of the fair market value of the stock on the date of exercise (or, if less, the amount of gain realized on the disposition of the stock) over the option price, and the balance of any gain or any loss will be treated as capital gain or loss. In order for ISOs to be treated as described above, the Participant must remain employed by the Company (or a subsidiary in which the Company holds at least 50 percent of the voting power) from the ISO grant date until three months before the ISO is exercised. The three-month period is extended to one year if the Participant's employment terminates on account of disability. If the Participant does not meet the employment requirement, the option will be treated for federal income tax purposes as an option as described in paragraph 5 below. A Participant who exercises an ISO might also be subject to an alternative minimum tax.

12

5. Upon the exercise of a stock option other than an ISO, the exercise of a SAR, the award of stock, or the recognition of income on restricted stock, the Company will generally be allowed an income tax deduction equal to the ordinary income recognized by a Participant. The Company will not receive an income tax deduction as a result of the exercise of an ISO, provided that the ISO stock is held for the required period as described above. When a cash payment is made pursuant to the Award, the recipient will recognize the amount of the cash payment as ordinary income, and the Company will generally be entitled to a deduction in the same amount.

6. Pursuant to section 162(m) of the Code and underlying guidance, the Company may not deduct compensation of more than $1,000,000 that is paid in a taxable year to an individual who, on the last day of the taxable year, is the Company's chief executive officer or among one of its three other highest compensated officers for that year, not including the Company's chief financial officer. The deduction limit, however, does not apply to certain types of compensation, including qualified performance-based compensation. The Company believes that compensation attributable to stock options and stock appreciation rights granted under the Plan should qualify as performance-based compensation and therefore should not be subject to the deduction limit. The Plan also authorizes the grant of long-term performance incentive awards utilizing the performance criteria set forth in the Plan that may likewise qualify as performance-based awards.

[END OF PROSPECTUS]

# Exhibit C

# IBM

# TERMS AND CONDITIONS OF YOUR EQUITY AWARD: EFFECTIVE JUNE 8, 2016

## Terms and Conditions of Your Equity Award
## Table of Contents

|  | Page |
|---|---|
| 1. **Introduction** ............................................................................ | **2** |
| 2. **How to Use This Document** ..................................................... | **2** |
| 3. **Definition of Terms** .................................................................. | **3** |
| 4. **Provisions that apply to all Award types and all countries**............. | **4** |
| 5. **Provisions that apply to all Award types but not all countries**....... | **5** |
| 6. **Provisions that apply to specific Award types for all countries** |  |
|     *a. Restricted Stock Units ("RSUs") including Cash-Settled RSUs* |  |
|      *and Retention RSUs ("RRSUs")*....................................................... | *6* |
|        *i. All RSUs* |  |
|        *ii. RSUs Other Than Cash-Settled RSUs and Cash-Settled RRSUs* |  |
|        *iii. Cash-Settled RSUs including Cash-Settled RRSUs* |  |
|     *b. Restricted Stock* ........................................................................... | *7* |
|     *c. Stock Options ("Options") and Stock Appreciation Rights ("SARs")..* | *9* |
|        *i. All Option and SAR Awards* |  |
|        *ii. All SAR Awards* |  |
|     *d. Performance Share Units ("PSUs")*………………………………….. | *11* |
| 7. **Provisions that apply to specific countries**................................... | **12** |
|     *a. Denmark* |  |
|     *b. Israel* |  |

# Terms and Conditions of Your Equity Award

**Introduction**

This document provides you with the terms and conditions of your Award that are in addition to the terms and conditions contained in your Equity Award Agreement for your specific Award. Also, your Award is subject to the terms and conditions in the governing plan document; the applicable document is indicated in your Equity Award Agreement and can be found at http://w3.ibm.com/hr/exec/comp/eq_prospectus.shtml.

As an Award recipient, you can see a personalized summary of all your outstanding equity grants in the "Personal statement" section of the IBM executive compensation web site (http://w3.ibm.com/hr/exec/comp). This site also contains other information about long-term incentive awards, including copies of the prospectus (the governing plan document). If you have additional questions and you are based in the U.S., you can call the Employee Service Center at 800-796-9876 (or 919-784-8646) weekdays, from 8:00 a.m. to 8:00 p.m. Eastern time (TTY available at 800-426-6537). If you are based in another country you can call your local IBM Employee Service Center.

**How to Use This Document**
Terms and conditions that apply to all awards in all countries can be found on page 4. Review these in addition to any award- or country-specific terms and conditions that may be listed. Once you have reviewed these general terms, check in your Equity Award Agreement for any award-specific and/or country-specific terms that apply to your Award.

# Terms and Conditions of Your Equity Award:
## Definition of Terms

The following are defined terms in the Long-Term Performance Plan and/or your Equity Award Agreement. These are provided for your information. See the Plan prospectus and your Equity Award Agreement for more details.

"Awards" -- The grant of any form of stock option, stock appreciation right, stock or cash award, whether granted singly, in combination or in tandem, to a Participant pursuant to such terms, conditions, performance requirements, limitations and restrictions as the Committee may establish in order to fulfill the objectives of the Plan.

"Board" -- The Board of Directors of International Business Machines Corporation ("IBM").

"Capital Stock" -- Authorized and issued or unissued Capital Stock of IBM, at such par value as may be established from time to time.

"Committee" -- The committee designated by the Board to administer the Plan.

"Company" -- IBM and its affiliates and subsidiaries including subsidiaries of subsidiaries and partnerships and other business ventures in which IBM has an equity interest.

"Equity Award Agreement" -- The document provided to the Participant which provides the grant details.

"Fair Market Value" -- The average of the high and low prices of Capital Stock on the New York Stock Exchange for the date in question, provided that, if no sales of Capital Stock were made on said exchange on that date, the average of the high and low prices of Capital Stock as reported for the most recent preceding day on which sales of Capital Stock were made on said exchange.

"Participant" -- An individual to whom an Award has been made under the Plan. Awards may be made to any employee of, or any other individual providing services to, the Company. However, incentive stock options may be granted only to individuals who are employed by IBM or by a subsidiary corporation (within the meaning of section 424(f) of the Code) of IBM, including a subsidiary that becomes such after the adoption of the Plan.

"Plan" -- Any IBM Long-Term Performance Plan.

## Terms and Conditions of Your Equity Award:
## Provisions that apply to all Award types and all countries

The following terms apply to all countries and for all Award types (Restricted Stock Units, Cash-Settled Restricted Stock Units, Restricted Stock, Stock Options, Stock Appreciation Rights and Performance Share Units).

### Cancellation and Rescission

All determinations regarding enforcement, waiver or modification of the cancellation and rescission and other provisions of the Plan and your Equity Award Agreement (including the provisions relating to termination of employment, death and disability) shall be made in IBM's sole discretion. Determinations made under your Equity Award Agreement and the Plan need not be uniform and may be made selectively among individuals, whether or not such individuals are similarly situated.

You agree that the cancellation and rescission provisions of the Plan and your Equity Award Agreement are reasonable and agree not to challenge the reasonableness of such provisions, even where forfeiture of your Award is the penalty for violation.

### Jurisdiction, Governing Law, Expenses and Taxes

Your Equity Award Agreement shall be governed by the laws of the State of New York, without regard to conflicts or choice of law rules or principles. You submit to the exclusive jurisdiction and venue of the federal or state courts of New York, County of Westchester, to resolve all issues that may arise out of or relate to your Equity Award Agreement.

If any court of competent jurisdiction finds any provision of your Equity Award Agreement, or portion thereof, to be unenforceable, that provision shall be enforced to the maximum extent permissible so as to effect the intent of the parties, and the remainder of your Equity Award Agreement shall continue in full force and effect.

If you or the Company brings an action to enforce your Equity Award Agreement and the Company prevails, you will pay all costs and expenses incurred by the Company in connection with that action and in connection with collection, including reasonable attorneys' fees.

If the Company, in its sole discretion, determines that it has incurred or will incur any obligation to withhold taxes as a result of your Award, without limiting the Company's rights under Section 9 of the Plan, the Company may withhold the number of shares that it determines is required to satisfy such liability and/or the Company may withhold amounts from other compensation to the extent required to satisfy such liability under federal, state, provincial, local, foreign or other tax laws. To the extent that such amounts are not withheld, the Company may require you to pay to the Company any amount demanded by the Company for the purpose of satisfying such liability.

## Terms and Conditions of Your Equity Award:
## Provisions that apply to all Award types but not all countries

The following provision applies to all Award types (Restricted Stock Units, Cash-Settled Restricted Stock Units, Restricted Stock, Stock Options, Stock Appreciation Rights and Performance Share Units) granted to all individuals in all countries except those with a home country of Latin America, specifically: Argentina, Bolivia, Brazil, Chile, Columbia, Costa Rica, Ecuador, Mexico, Paraguay, Peru, Uruguay, and Venezuela.

**Non-Solicitation**

In consideration of your Award, you agree that during your employment with the Company and for two years following the termination of your employment for any reason, you will not directly or indirectly hire, solicit or make an offer to any employee of the Company to be employed or perform services outside of the Company. Also, you agree that during your employment with the Company and for one year following the termination of your employment for any reason, you will not directly or indirectly, solicit, for competitive business purposes, any customer of the Company with which you were involved as part of your job responsibilities during the last year of your employment with the Company. By accepting your Award, you acknowledge that the Company would suffer irreparable harm if you fail to comply with the foregoing, and that the Company would be entitled to any appropriate relief, including money damages, equitable relief and attorneys' fees.

## Terms and Conditions of Your Equity Award:
## Provisions that apply to specific Award types for all countries

### a. Restricted Stock Units ("RSUs") including Cash-Settled RSUs and Retention RSUs ("RRSUs")

All references in this document to RSUs include RRSUs, unless explicitly stated otherwise

#### *i. All RSUs*

**Termination of Employment including Death, Disability and Leave of Absence**

*Termination of Employment*
In the event you cease to be an employee (other than on account of death or are disabled as described in Section 12 of the Plan) prior to the Vesting Date(s) set in your Equity Award Agreement, all then unvested RSUs, including RRSUs, under your Award shall be canceled.

However, your unvested and/or outstanding RSUs, but not RRSUs, will continue to vest upon the termination of employment if all of the following criteria are met:

- You are on the performance team, or any successor team thereto, at the time of termination of employment;
- You have completed at least one year of active service since the award date of grant;
- You have reached age 55 with 15 years of service at the time of termination of employment (age 60 with 15 years of service for the Chairman and CEO); and
- Appropriate senior management, the Committee or the Board, as appropriate, do not exercise their discretion to cancel or otherwise limit the vesting of the RSUs.

*Death or Disability*
Upon your death all RSUs covered by this Agreement shall vest immediately and your Vesting Date shall be your date of death. If you are disabled as described in Section 12 of the Plan, your RSUs shall continue to vest according to the terms of your Award.

*Leave of Absence*
In the event of a management approved leave of absence, any unvested RSUs shall continue to vest as if you were an active employee of the Company, subject to the terms in this document and your Equity Award Agreement. If you return to active status, your unvested RSUs will continue to vest in accordance with the terms in this document and your Equity Award Agreement.

## Terms and Conditions of Your Equity Award:
## Provisions that apply to specific Award types for all countries

**Dividend Equivalents**
IBM shall not pay dividend equivalents on cash-settled or stock-settled unvested RSU awards.

### ii. RSUs Other Than Cash-Settled RSUs and Cash-Settled RRSUs

**Settlement of Award**
Subject to Sections 12 and 13 of the Plan and the section "Termination of Employment including Death, Disability and Leave of Absence" above, upon the Vesting Date(s), or as soon thereafter as may be practicable but in no event later than March 15 of the following calendar year, IBM shall make a payment to Participant in shares of Capital Stock equal to the number of vested RSUs, subject to any applicable tax withholding requirements as described in Section 9 of the Plan, and the respective RSUs shall thereupon be canceled. RSUs are not shares of Capital Stock and do not convey any stockholder rights.

### iii. Cash-Settled RSUs including Cash-Settled RRSUs

**Settlement of Award**
Subject to Sections 12 and 13 of the Plan and the section entitled "Termination of Employment including Death, Disability and Leave of Absence" above, upon the Vesting Date(s), or as soon thereafter as may be practicable but in no event later than March 15 of the following calendar year, the Company shall make a payment to Participant in cash equal to the Fair Market Value of the vested RSUs, subject to any applicable tax withholding requirements as described in Section 9 of the Plan, and the respective RSUs shall thereupon be canceled. Fair Market Value will be calculated in your home country currency at the exchange rate on the applicable Vesting Date using a commercially reasonable measure of exchange rate. RSUs are not shares of Capital Stock and do not convey any stockholder rights.

## b. Restricted Stock

**Settlement of Award**
Subject to Sections 12 and 13 of the Plan and the paragraph entitled "Termination of Employment including Death, Disability or Leave of Absence" below, upon the Vesting Date(s), or as soon thereafter as may be practicable but in no event later than March 15 of the following calendar year, the shares of Restricted Stock awarded under your Equity Award Agreement will be deliverable to you, subject to any applicable tax withholding requirements as described in Section 9 of the Plan.

---

## Terms and Conditions of Your Equity Award:
## Provisions that apply to specific Award types for all countries

**Termination of Employment including Death, Disability and Leave of Absence**

*Termination of Employment*
In the event you cease to be an employee (other than on account of death or are disabled as described in Section 12 of the Plan) prior to the Vesting Date(s) in your Equity Award Agreement, all then unvested shares of Restricted Stock under your Award shall be canceled (unless your Equity Award Agreement provides otherwise).

*Death or Disability*
Upon your death all unvested shares of Restricted Stock covered by your Equity Award Agreement shall vest immediately and your Vesting Date shall be your date of death. If you are disabled as described in Section 12 of the Plan, your unvested shares of Restricted Stock shall continue to vest according to the terms of your Equity Award Agreement.

*Leave of Absence*
In the event of a management approved leave of absence, any unvested shares of Restricted Stock shall continue to vest as if you were an active employee of the Company, subject to the terms in this document and your Equity Award Agreement. If you return to active status, your unvested shares of Restricted Stock will continue to vest in accordance with the terms in this document and your Equity Award Agreement.

**Dividends and Other Rights**
During the period that the Restricted Stock is held by IBM hereunder, such stock will remain on the books of IBM in your name, may be voted by you, and any applicable dividends shall be paid to you. Shares issued in stock splits or similar events which relate to Restricted Stock then held by IBM in your name shall be issued in your name but shall be held by IBM under the terms hereof.

**Transferability**
Shares of Restricted Stock awarded under your Equity Award Agreement cannot be sold, assigned, transferred, pledged or otherwise encumbered prior to the vesting of your Award as set forth in your Equity Award Agreement and any such sale, assignment, transfer, pledge or encumbrance, or any attempt thereof, shall be void.

## Terms and Conditions of Your Equity Award:
## Provisions that apply to specific Award types for all countries

### c. Stock Options ("Options") and Stock Appreciation Rights ("SARs")

#### i. All Option and SAR Awards

**Termination of Employment including Death, Disability and Leave of Absence**

*Termination of Employment*
In the event you cease to be an employee (other than on account of death or are disabled as described in Section 12 of the Plan):

- Any Options or SARs that are not exercisable as of the date your employment terminates shall be canceled immediately (unless your Equity Award Agreement provides otherwise), and

- Any Options or SARs that are exercisable as of the date your employment terminates (other than for cause) will remain exercisable for 90 days (not three months) after the date of termination, after which any unexercised Options or SARs are canceled; provided, however, if you are a banded executive when your employment with the Company terminates (other than for cause) after you have attained age 55 and completed at least 15 years of service with the Company at the time of termination, any Options or SARs that are exercisable as of the date your employment terminates shall remain exercisable for the full term as in your Equity Award Agreement (unless your Equity Award Agreement provides otherwise).

*Death or Disability*
In the event of your death, all Options or SARs shall become fully exercisable and remain exercisable for their full term.

In the event you are disabled (as described in Section 12 of the Plan), any unvested Options or SARs shall continue to vest and be exercisable.

# Terms and Conditions of Your Equity Award:
# Provisions that apply to specific Award types for all countries

*Leave of Absence*

In the event of a management approved leave of absence, any unvested Options or SARs shall continue to vest and be exercisable as if you were an active employee of the Company, subject to the terms in this document and your Equity Award Agreement. If you return to active status, your Options or SARs will continue to vest and be exercisable in accordance with their terms. If you do not return to active status,

- Your unvested Options or SARs will be canceled immediately; and

- Your vested Options or SARs will be canceled on the later of the 91st day following your last day of active employment or the date of the termination of your leave of absence; provided, however, if you are a banded executive when your employment terminates (other than for cause) after you have attained age 55 and completed at least 15 years of service with the Company at the time of termination, any Options or SARs that are exercisable as of the date your employment terminates shall remain exercisable for the full term as in your Equity Award Agreement.

## Termination of Employment for Cause

If your employment terminates for cause, all exercisable and not exercisable Options or SARs are canceled immediately.

### *ii. All SAR Awards*

#### Settlement of Award

Upon exercise, the Company shall deliver an aggregate amount, in cash, equal to the excess of the Fair Market Value of a share of Capital Stock on the date of exercise over the Exercise Price set forth in your Equity Award Agreement multiplied by the number of SARs exercised, subject to any applicable tax withholding requirements as described in Section 9 of the Plan. The value of the Award will be calculated in your home country currency at the exchange rate on the date the Award becomes fully vested using a commercially reasonable measure of exchange rate.

## Terms and Conditions of Your Equity Award:
## Provisions that apply to specific Award types for all countries

### d. Performance Share Units ("PSUs")

#### Termination of Employment, including Death and Disability, and Leave of Absence

*Termination of Employment and Leave of Absence*
If you cease to be an active, full-time employee for any reason (other than on account of death or are disabled as described in Section 12 of the Plan) before the Date of Payout (in the case of a recipient in the United States, at year end of the applicable PSU Performance Period), all PSUs are canceled immediately provided, however, if you are a banded executive when your employment terminates (other than for cause) after you have attained age 55, completed at least 15 years of service with the Company at the time of termination, and completed at least one year of active service during the PSU Performance Period (as set forth in your Equity Award Agreement), the PSUs granted hereunder shall be paid out on the Date of Payout (as set forth in your Equity Award Agreement) based on IBM performance over the entire applicable Performance Period(s), in an amount that will be prorated for the number of months completed as an active executive during the PSU Performance Period, adjusted for the performance score.

However, your unvested PSUs will continue to vest upon termination of employment or the time you cease to be an active, full-time employee if all of the following criteria are met:

- You are on the performance team, or any successor team thereto, at the time of termination of employment or the time you cease to be an active, full-time employee;
- You have completed at least one year of active service during the PSU Performance Period (as set forth in your Equity Award Agreement);
- You have reached age 55 with 15 years of service at the time of termination of employment or the time you cease to be an active, full-time employee (age 60 with 15 years of service for the Chairman and CEO);
- The Committee has certified that all performance conditions have been met; and
- Appropriate senior management, the Committee or the Board, as appropriate, do not exercise their discretion to cancel or otherwise limit the payout.

*Death or Disability*
Prior to the Date of Payout, (i) in the event of your death or (ii) if you are disabled (as described in Section 12 of the Plan), all PSUs shall continue to vest according to the terms of your Equity Award Agreement and the PSUs will be paid out at the end of the Performance Period based on IBM performance over the entire applicable Performance Period(s).

## Terms and Conditions of Your Equity Award:
## Provisions that apply to specific countries

## a. Denmark

### *i. All Awards*

**Non-Solicitation**
The following part of the above non-solicitation provision does not apply to those individuals with the home country of Denmark: "In consideration of your Award, you agree that during your employment with the Company and for two years following the termination of your employment for any reason, you will not directly or indirectly hire, solicit or make an offer to any employee of the Company to be employed or perform services outside of the Company."

## b. Israel

### *i. All Awards*

**Data Privacy**
In addition to the data privacy provisions in your Equity Award Agreement, you agree that data, including your personal data, necessary to administer this Award may be exchanged among IBM and its subsidiaries and affiliates as necessary (including transferring such data out of the country of origin both in and out of the EEA), and with any vendor engaged by IBM to administer this Award.

# Exhibit D

## Long-Term Incentive Award Acceptance Information

Dear Jeff Smith:

IBM's grants to you become effective only after, and are conditioned upon your accepting the terms and conditions of the award agreements, the accompanying "Terms and Conditions of Your Equity Award: Effective June 8, 2016" ("Terms and Conditions") document attached below and the Long-Term Performance Plan ("LTPP") under which these long-term incentive awards are granted, including those provisions relating to the cancellation and rescission of awards.

IBM's grants to you become effective only after, and are conditioned upon your accepting the terms and conditions of the award agreements, the accompanying "Terms and Conditions of Your Equity Award: Effective June 8, 2016" ("Terms and Conditions") document attached below and the Long-Term Performance Plan ("LTPP") under which these long-term incentive awards are granted, including those provisions relating to the cancellation and rescission of awards.

If you have not read the LTPP prospectus that governs your equity awards, please do so by viewing the "Prospectuses" section of the executive compensation web site (http://w3.ibm.com/hr/exec/comp/eq_prospectus.html). The prospectus contains the terms of the LTPP and is the legal offering document covering IBM's stock-based awards, and you should read it before accepting your grant. In the event of any conflict between the terms of the LTPP and the information provided on this screen, the LTPP shall govern.

To record your acceptance and agreement to the terms and conditions of your award, you must press the ACCEPT button below. By pressing the ACCEPT button below, you are certifying that you have read and understand the terms and conditions of each award agreement, the Terms and Conditions document and the LTPP covering each stock-based award listed here, and that you accept and agree to all the relevant terms and conditions.

**Until you formally accept your award, Restricted Stock Units and/or Performance Share Units will not be released to you or settled at vesting and Stock Options will not be exercisable. In addition, after you accept your award and your RSU or PSU award vests, the shares (net of taxes where applicable) will typically be available for sale, and/or transfer at https://www.stockplanconnect.com/ within 2 business days from the vesting and/or payout date, as applicable. As described in the plan documents, the Company withholds taxes from your award (and/or reports income) as required by local laws. In some countries, the Company does not withhold taxes because there is no requirement to do so. Irrespective of any withholding and/or reporting by the Company, it is important for you to consult with your personal tax advisor to satisfy your individual tax obligations.**

| Award Type | Award Date |
|---|---|
| Restricted Stock Units | June 8, 2016 |
| Shares / Units | Long-Term Performance Plan |
| 346 | 1999 |

**Agreements**

# International Business Machines Corporation ("IBM")

## Equity Award Agreement
IBM Confidential

| | |
|---|---|
| **Plan** | **IBM 1999 Long-Term Performance Plan (the "Plan")** |
| **Award Type** | **Restricted Stock Units** |
| **Purpose** | The purpose of this Award is to retain selected employees and executives. You recognize that this Award represents a potentially significant benefit to you and is awarded for the purpose stated here. |
| **Awarded to Home Country** | **Jeff Smith**<br>**United States (USA) 0043126** |
| **Award Agreement** | This Equity Award Agreement, together with the "Terms and Conditions of Your Equity Award: Effective June 8, 2016" ("Terms and Conditions") document and the Plan **http://w3.ibm.com/hr/exec/comp/eq_prospectus.html**, both of which are incorporated herein by reference, together constitute the entire agreement between you and IBM with respect to your Award. This Equity Award Agreement shall be governed by the laws of the State of New York, without regard to conflicts or choice of law rules or principles. |
| **Grant** | Date of Grant: **June 8, 2016**<br>Number of Units Awarded: **346** |
| **Vesting** | This Award vests as set forth below, subject to your continued employment with the Company as described in the Terms and Conditions document. |

| Units | Date |
|---|---|
| 86 | **June 8, 2017** |
| 86 | **June 8, 2018** |
| 86 | **June 8, 2019** |
| 88 | **June 8, 2020** |

| | |
|---|---|
| **Terms and Conditions of Your Equity Award** | Refer to the Terms and Conditions document **http://w3.ibm.com/hr/exec/comp/eq_prospectus.html** for an explanation of the terms and conditions applicable to your Award, including those relating to: |

- Cancellation and rescission of awards (also see below)
- Jurisdiction, governing law, expenses and taxes
- Non-solicitation of Company employees and clients, if applicable
- Treatment of your Award in the event of death or disability or leave of absence
- Treatment of your Award upon termination of employment, including retirement or for cause, (i) if you are on the performance team, or any successor team thereto, and (ii) under all other circumstances.

It is strongly recommended that you print the Terms and Conditions document for later reference.

# International Business Machines Corporation ("IBM")
# Equity Award Agreement

| | |
|---|---|
| **Cancellation and Rescission** | You understand that IBM may cancel, modify, rescind, suspend, withhold or otherwise limit or restrict this Award in accordance with the terms of the Plan, including, without limitation, canceling or rescinding this Award if you render services for a competitor prior to, or during the Rescission Period. You understand that the Rescission Period that has been established is 12 months. Refer to the Terms and Conditions document and the Plan for further details. |
| **Data Privacy, Electronic Delivery** | By accepting this Award, you agree that data, including your personal data, necessary to administer this Award may be exchanged among IBM and its subsidiaries and affiliates as necessary, and with any vendor engaged by IBM to administer this Award, subject to the Terms and Conditions document; you also consent to receiving information and materials in connection with this Award or any subsequent awards under IBM's long-term performance plans, including without limitation any prospectuses and plan documents, by any means of electronic delivery available now and/or in the future (including without limitation by e-mail, by Web site access and/or by facsimile), such consent to remain in effect unless and until revoked in writing by you. |
| **Extraordinary Compensation** | Your participation in the Plan is voluntary. The value of this Award is an extraordinary item of income, is not part of your normal or expected compensation and shall not be considered in calculating any severance, redundancy, end of service payments, bonus, long-service awards, pension, retirement or other benefits or similar payments. The Plan is discretionary in nature. This Award is a one-time benefit that does not create any contractual or other right to receive additional awards or other benefits in the future. Future grants, if any, are at the sole grace and discretion of IBM, including but not limited to, the timing of the grant, the number of units and vesting provisions. This Equity Award Agreement is not part of your employment agreement, if any. |
| **Accept Your Award** | This Award is considered valid when you accept it. This Award will be cancelled unless you accept it by 11:59 p.m. Eastern time two business days prior to the first vesting date in the "Vesting" section of this Agreement. By pressing the Accept button below to accept your Award, you acknowledge having received and read this Equity Award Agreement, the Terms and Conditions document and the Plan under which this Award was granted and you agree (i) not to hedge the economic risk of this Award or any previously-granted outstanding awards, which includes entering into any derivative transaction on IBM securities (e.g., any short sale, put, swap, forward, option, collar, etc.), (ii) to comply with the terms of the Plan, this Equity Award Agreement and the Terms and Conditions document, including those provisions relating to cancellation and rescission of awards and jurisdiction and governing law, and (iii) that by your acceptance of this Award, all awards previously granted to you under the Plan or other IBM Long-Term Performance Plans are subject to the "Cancellation and Rescission" section of this Agreement (unless your previous award agreement(s) specified a longer Rescission Period, in which case such longer period will apply) and the "Cancellation and Rescission" section of the Terms and Conditions document. |

EXHIBIT  B

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| INTERNATIONAL BUSINESS MACHINES CORPORATION, | |
| Plaintiff, | 17 Civ. _5808_ |
| v. | |
| JEFF S. SMITH, | |
| Defendant. | |

## PLAINTIFF IBM'S MEMORANDUM OF LAW IN SUPPORT OF ITS APPLICATION FOR A TEMPORARY RESTRAINING ORDER AND MOTION FOR A PRELIMINARY INJUNCTION

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

Robert A. Atkins
Steven C. Herzog
Pietro J. Signoracci
1285 Avenue of the Americas
New York, New York 10019-6064
(212) 373-3000

*Attorneys for Plaintiff*
*International Business Machines Corporation*

# TABLE OF CONTENTS

|  |  | Page |
|---|---|---|

TABLE OF AUTHORITIES .................................................................................................. ii

PRELIMINARY STATEMENT ........................................................................................... 1

STATEMENT OF FACTS ................................................................................................... 4

ARGUMENT ........................................................................................................................ 8

    I.      IBM WILL SUFFER IRREPARABLE INJURY ABSENT INJUNCTIVE
          RELIEF .................................................................................................................. 9

           A.    This Court Has Found Irreparable Harm Under IBM's
                 Noncompetition Agreements Before ......................................................... 13

           B.    The Risk of Disclosure of Trade Secrets Constitutes Irreparable
                 Harm ......................................................................................................... 14

           C.    The Risk of Exploiting Customer Goodwill Constitutes Irreparable
                 Harm ......................................................................................................... 16

           D.    Smith Stipulated That a Violation of His Noncompetition
                 Agreement Would Irreparably Harm IBM .............................................. 17

    II.     IBM IS LIKELY TO PREVAIL ON THE MERITS ........................................... 18

           A.    The Limitations on Smith's Post-IBM Employment Are
                 Reasonable ............................................................................................... 19

           B.    IBM Has a Legitimate Interest in Safeguarding its Confidential
                 Information ............................................................................................... 20

    III.    IN THE ALTERNATIVE, SUFFICIENTLY SERIOUS QUESTIONS GO
          TO THE MERITS AND THE BALANCE OF THE EQUITIES WEIGHS
          IN IBM'S FAVOR .............................................................................................. 22

    IV.    A TEMPORARY RESTRAINING ORDER SHOULD BE ISSUED AND
          AN EXPEDITED SCHEDULE FOR THE MOTION SHOULD BE SET ........... 23

CONCLUSION .................................................................................................................. 24

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Alside Div. of Associated Materials Inc.* v. *Leclair*,
    743 N.Y.S.2d 898 (N.Y. App. Div. 3d Dep't 2002) ...............................................19

*Ashland Mgmt. Inc.* v. *Janien*, 624 N.E.2d 1007 (N.Y. 1993) .......................................21

*Amazon.com Inc.* v. *Powers*,
    No. 2:12-CV-1911 (W.D. Wash., filed Oct. 30, 2012)...........................................7

*Ayco Co., L.P.* v. *Feldman*,
    No. 1:10-CV-1213, 2010 WL 4286154 (N.D.N.Y. Oct. 22, 2010) .........................18

*Battenkill Veterinary Equine P.C.* v. *Cangelosi*,
    768 N.Y.S.2d 504 (N.Y. App. Div. 3d Dep't 2003) ...............................................19

*BDO Seidman* v. *Hirshberg*,
    93 N.Y.2d 382 (N.Y. 1999) ...........................................................................17, 21

*Bus. Intelligence Servs., Inc.* v. *Hudson*,
    580 F. Supp. 1068 (S.D.N.Y. 1984).....................................................................20

*Cont'l Grp., Inc.* v. *Kinsley*,
    422 F. Supp. 838 (D. Conn. 1976) (Newman, J.) .................................................14

*Covenant Aviation Sec., LLC* v. *Berry*,
    15 F. Supp. 3d 813 (N.D. Ill. 2014) .....................................................................12

*DoubleClick, Inc.* v. *Henderson*,
    No. 116914/97, 1997 WL 731413 (N.Y. Sup. Ct. Nov. 7, 1997)...........................22

*EarthWeb, Inc.* v. *Schlack*, 71 F. Supp. 2d 299 (S.D.N.Y. 1999) ................................14

*Estee Lauder Cos. Inc.* v. *Batra*,
    430 F. Supp. 2d 158 (S.D.N.Y. 2006).............................................................. passim

*Global Switching Inc.* v. *Kasper*,
    No. CV 06 412(CPS), 2006 WL 1800001 (E.D.N.Y. Jun. 28, 2006).....................16

*Global Telesys., Inc.* v. *KPNQwest*, 151 F. Supp. 2d 478 (S.D.N.Y. 2001) ..................8

*IBM Corp.* v. *Papermaster*,
    No. 08-CV-9078 (KMK), 2008 WL 4974508 (S.D.N.Y. Nov. 21, 2008)....................... passim

**Page(s)**

*IBM Corp.* v. *Visentin*, No. 11 Civ. 399 (LAP), 2011 WL 672025 (S.D.N.Y. Feb.
    16, 2011) ......................................................................................................21

*IDG USA, LLC* v. *Schupp*,
    No. 10-CV-76S, 2010 WL 3260046 (W.D.N.Y. Aug. 18, 2010) ...........................18

*Ikon Office Solutions, Inc.* v. *Usherwood Office Tech., Inc.*,
    No. 9202–08, 2008 WL 5206291 (N.Y. Sup. Ct. Dec. 12, 2008)..........................18

*Int'l Creative Mgmt., Inc.* v. *Abate*,
    No. 07-CV-1979 (PKL), 2007 WL 950092 (S.D.N.Y. Mar. 28, 2007) .................18

*Johnson Controls, Inc.* v. *A.P.T. Critical Sys., Inc.*,
    323 F. Supp. 2d 525 (S.D.N.Y. 2004)...............................................................17

*Lumex, Inc.* v. *Highsmith*,
    919 F. Supp. 624 (E.D.N.Y. 1996) ...........................................................*passim*

*Lusk* v. *Vill. of Cold Spring*, 475 F.3d 480 (2d Cir. 2007) ..........................................9

*N. Atl. Instruments, Inc.* v. *Haber*,
    188 F.3d 38 (2d Cir. 1999)..........................................................................18, 21

*Natsource LLC* v. *Paribello*,
    151 F. Supp. 2d 465 (S.D.N.Y. 2001)....................................................19, 20, 22

*Payment Alliance Intern., Inc.* v. *Ferreira*, 530 F. Supp. 2d 477 (S.D.N.Y. 2007) ..........14, 16,19

*Reed, Roberts Assocs., Inc.* v. *Strauman*, 353 N.E.2d 590 (N.Y. 1976) ......................21

*Softel, Inc.* v. *Dragon Med. & Scientific Commc'ns, Inc.*,
    118 F.3d 955 (2d Cir. 1997)..............................................................................21

*Synthes, Inc.* v. *Emerge Med., Inc.*,
    25 F. Supp. 3d 617 (E.D. Pa. 2014) ..................................................................12

*Ticor Title Ins. Co.* v. *Cohen*, 173 F.3d 63 (2d Cir. 1999).....................................18, 22

*Wal-Mart Stores, Inc.* v. *Mullany*,
    C.A. No. 6040-VCL (Del. Ch. Dec. 15, 2010) ...................................................12

*Youtie* v. *Macy's Retail Holding, Inc.*,
    653 F. Supp. 2d 612 (E.D. Pa. 2009) .................................................................12

## STATUTES

Pennsylvania Uniform Trade Secrets Act.................................................................12

**Page(s)**

## OTHER AUTHORITIES

Fed. R. Civ. P. 65(b) ......................................................................................................23

Gartner, *Magic Quadrant for Cloud Infrastructure as a Service, Worldwide* (last
   visited June 29, 2017), https://www.gartner.com/doc/reprints?id=1-
   2G2O5FC&ct=150519 .............................................................................................10

Investor's Business Daily, *Amazon Cloud Services Under Growing Threat From
   Microsoft, Google, IBM* (last visited July 10, 2017)
   http://www.investors.com/news/technology/amazon-cloud-services-under-
   growing-threat-from-microsoft-google-ibm ............................................................10

Restatement of Torts § 757 cmt. b .................................................................................21

Plaintiff International Business Machines Corporation ("IBM" or the "Company") respectfully submits this memorandum of law in support of its application for a temporary restraining order and a preliminary injunction to prevent its former senior executive, defendant Jeff Smith, from commencing employment at IBM's direct competitor, Amazon Web Services ("AWS"), in violation of his one-year Noncompetition Agreement with IBM (the "Noncompetition Agreement").

## PRELIMINARY STATEMENT

Until he resigned from IBM on May 5, 2017, Jeff Smith was one of the most senior executives of IBM and had direct knowledge of some of IBM's most secret product development plans. He was IBM's Chief Information Officer and a member of two select groups of high ranking IBM executives that developed and debated IBM's commercial strategies, financial plans and technological innovations ███████████████████████ .
Because he was privy to such highly confidential and competitively valuable information, Smith agreed not to take a similar position at a competitor without waiting one year after leaving IBM.

Smith now threatens to do just that. Having waited only 3 months, Smith should be enjoined to comply with the remaining 9 months of his Noncompetition Agreement. Despite having the talent and experience as a CIO to work in any industry—he was CIO at a bank and a phone company before coming to IBM—Smith announced that he is going to become Vice President of AWS, IBM's largest competitor in Cloud Computing. The competition in Cloud Computing is intense, with *Forbes* reporting just last week that "IBM Beats Amazon" in the "Cloud Wars" by becoming the first enterprise technology provider to surpass $15 billion in cloud revenue for a 12-month period. Smith is threatening to change sides in that competition and, just like his position at IBM, Smith will be a senior executive reporting directly to the CEO, but now at AWS.

In breach of both the terms and purpose of the Noncompetition Agreement, Smith wants to immediately switch sides in the competition between IBM and AWS, and bring with him IBM's current (but secret) plans for that competition. In particular, Smith knows the details about several Cloud Computing products and services currently in development

. As a member of IBM's

, Smith was briefed about and discussed the design, functions and capabilities of brand new software and hardware products scheduled to be released in late 2017 and early 2018.

Perhaps most sensitive of all to IBM, Smith knows what it will cost IBM to provide this new Cloud Computing service to customers in head-to-head competition against AWS. Since the cost of Cloud Computing service is one of the key factors in competing for customers, the                                    was directed not to keep copies of certain written materials—a confidentiality directive Smith violated. As one of the colleagues to whom Smith gave the confidential product development materials exclaimed, "Wow, this is amazing stuff."

Smith also was responsible for meeting with IBM's top customers and prospective customers on a near daily basis, with the goal of persuading those customers to select IBM's hardware, software and service offerings over those of its competitors, including AWS. In the last 12 months alone, Smith met with nearly 200 of IBM's top customers, and he attended numerous industry events as IBM's highest ranking customer goodwill representative.

Smith's Noncompetition Agreement is enforceable under New York law for precisely this situation: to protect highly valuable trade secrets, such as new products in development set to be launched during the remaining 9 months of the restricted period—in particular, products designed

2

The threat that Smith will disclose or use trade secrets at AWS is inherent in the high level executive position he seeks to take. Smith's role at AWS will involve him in the development of AWS's competitive strategies and product initiatives reporting directly to the CEO. The risk of inevitable disclosure is confirmed by Smith's personal relationship with AWS CEO Andrew Jassy—a relationship he cultivated while working at IBM by sending private emails to Jassy                                                                 Smith also did not comply with his duty of confidentiality as a                        member. And he wiped information off his electronic devices before returning them to IBM.

If Smith was not fully faithful to IBM as an IBM executive, there is no reason to trust that he will protect IBM's interests and secrets as an AWS executive. The Noncompetition Agreement is in place so that IBM does not have to trust Smith to be a vigilant guardian of IBM's competitive secrets while working for the competition.

Smith accepted when he signed that agreement that, when he left IBM, he would have to take a short break from the competition or, as he had done before, work outside the competition. He even stipulated that if he did not abide by his employment restrictions, IBM would suffer irreparable harm and be entitled to injunctive relief. In fact, when Smith resigned from IBM in May 2017, Smith initially declined an employment offer from AWS after IBM raised concerns regarding Smith's noncompetition and confidentiality obligations. IBM then approved Smith's request to become a consultant to a non-competitive business. But Smith subsequently informed IBM that he had accepted an offer to become AWS's Vice President on August 7, 2017, leading key areas of AWS's Cloud Computing business.

IBM merely seeks to have Smith honor the balance of his agreement for the next 9 months.

## STATEMENT OF FACTS

A full statement of the facts regarding Smith, his responsibilities in his former role at IBM, his departure from IBM, and the competition between IBM and AWS is set forth in the declaration of Arvind Krishna, Senior Vice President of IBM Hybrid Cloud and Director of IBM Research, and the declaration of Pietro Signoracci, counsel for IBM.

### Smith's Noncompetition Agreement with IBM

Smith joined IBM as its CIO in August 2014. Until his resignation in May 2017, Smith was a member of IBM's                                                    . Of IBM's more than 380,000 employees, only the top 65 senior executives sit on the                           and only 12 sit on the                    . Smith also was a member of IBM's Growth & Transformation Team, a leadership group of about 300 high-level executives from all areas of IBM tasked with solving critical challenges and focusing on transforming the Company and its strategies.

These roles exposed Smith to some of IBM's most highly confidential and competitively sensitive trade secrets and confidential information, including details about the functionality, costs, and projected launch dates of IBM Cloud Computing products in development. Precisely because of his exposure to highly confidential and commercially sensitive information, Smith was one of IBM's senior executives who the Company asked to sign a noncompetition agreement, to restrict the potential disclosure of confidential IBM information in the event that he left the Company.

Smith executed his Noncompetition Agreement with IBM on June 7, 2014. (Cmplt. Ex. A.) In that agreement, Smith acknowledged and agreed that:

> during [his] employment with IBM and for twelve (12) months following the termination of [his] employment . . . , [he] will not directly or indirectly within the "Restricted Area" "Engage in or Associate with" (a) any "Business Enterprise" or (b) any competitor of the Company, if performing the duties and responsibilities of such engagement or association could result in [his] intentionally or

4

unintentionally using, disclosing, or relying upon IBM Confidential Information to which [he] had access by virtue of [his] job duties or other responsibilities with IBM; [or] (ii) . . . solicit, for competitive business purposes, any customer of the Company with which [he was] directly or indirectly involved as part of [his] job responsibilities during the last twelve (12) months of [his] employment with IBM." (Noncompetition Agreement § 1(e)(i), 1(e)(ii).)

"Restricted Area" is "any geographic area in the world in which [he] worked or for which [he] had job responsibilities, including supervisory responsibilities, during the last twelve (12) months of [his] employment with IBM." (*Id.* § 2(f).) "Business Enterprise" means "any entity that engages in, or owns or controls an interest in any entity that engages in, competition with any business unit or division of the Company in which [he] worked at any time during the three (3) year period prior to the termination of [his] employment." (*Id.* § 2(a).)

In sum, Smith agreed in the Noncompetition Agreement that, for a period of one year following the termination of his employment from IBM, he would not work for any competitor of IBM in any geographic area in the world for which he had job responsibilities in the last 12 months of his employment with IBM if such employment could result in the intentional or unintentional use or disclosure of IBM Confidential Information to which he was exposed in his IBM employment, and he would not directly or indirectly solicit, for competitive business purposes, any customer of the Company with which he was directly or indirectly involved in the last year of his employment with IBM.

Additionally, in the Noncompetition Agreement, Smith agreed and acknowledged that (a) "the business in which the Company is engaged is intensely competitive" (*id.* § 1(c)); (b) his "employment by IBM has required . . . that [he] have access to, and knowledge of, IBM Confidential Information" (*id.*); (c) "the Company would suffer irreparable harm if [he failed] to comply with [the noncompetition and the nonsolicitation covenants]" (*id.* § 3); and (d) "the restrictions set forth in [the covenants] are reasonable as to geography and duration" (*id.*).

5

**Smith Violates the Noncompetition Agreement**
**by Accepting Employment with AWS As Its Vice President**

Notwithstanding the promises he made in his Noncompetition Agreement, Smith told IBM on March 28, 2017 that he intended to accept a job at AWS, with a proposed start date of April 24, 2017. Smith later informed IBM that the proposed role was Vice President of AWS, and would include responsibility for managing the overall strategy and operations of key segments of AWS's Cloud Computing business.

As a result of discussions among counsel for IBM, counsel for Smith, and counsel for AWS, Smith announced his resignation from IBM effective May 5, 2017, without accepting employment from AWS. (*See* Signoracci Decl. ¶ 5.) Smith informed IBM that he would pursue other opportunities, including offers he had received to join the boards of, and potentially receive employment from, companies that did not compete against IBM. (*Id.*) Shortly after his resignation, Smith informed IBM that he had been offered a consulting role at a non-competitor, ANZ Bank. IBM approved Smith's acceptance of this offer. (*Id.*)

On June 9, 2017, counsel for Smith informed IBM that Smith had accepted a new offer to join AWS, with his employment commencing on August 7, 2017. Counsel for AWS eventually informed IBM that AWS intends for Smith to be a Vice President and AWS's senior leader in major areas of its Cloud Computing business, including global marketplace, developer tools, and global support and managed services.

AWS is on record in litigation it has brought itself to enforce its own non-compete agreements describing the role of AWS Vice Presidents:

- Directing the development of many of AWS's Cloud Computing business strategies;

- Participating in the highest levels of decision-making in the Cloud Computing business;

- Attending AWS Weekly Business Metrics Meetings, at which senior management discuss goals and metrics across all of AWS's products and services; and

- Participating in AWS's semi-annual formal operations planning processes.[1]

The IBM confidential information and competitive business secrets Smith knows, and the IBM customers Smith knows by virtue of his responsibilities as IBM CIO, will all be relevant to these AWS strategy, planning and decision-making activities.

As Vice President, Smith also will report directly to AWS's CEO, Andrew Jassy. Emails uncovered since his departure reveal that Smith ingratiated himself to Jassy by

█████████████████████████████████████████████████████

███████—all while working as an IBM executive. In emails he sent to Jassy using his

personal (non-IBM) Gmail account, ███████████████████████████████

█████████████████████████████████████████████████████

██████. Smith shared with Jassy his opinions about ███████████████████

█████████████████████████████████████████████

██████████ These emails show that Smith had little allegiance to IBM, even when he was

purporting to serve as one of IBM's most senior and trusted executives.[2]

Smith also disregarded IBM's internal confidentiality policies. Like all

█████████████████ members, Smith received repeated instructions that the █████████████

meeting materials were not to be distributed to other IBM employees, precisely because of the

sensitivity of the confidential information those materials contained. (Krishna Decl. ¶ 31.)

IBM's review of Smith's server mail proves that Smith violated this policy on multiple

---

[1]  *See* Plaintiff Amazon.com Inc.'s Motion for Temporary Restraining Order, *Amazon.com Inc.* v. *Powers*, No. 2:12-CV-1911 (W.D. Wash., filed Oct. 30, 2012) [Docket No. 4] Ex. A pp. 6–8.

[2]  IBM discovered Smith's personal emails to Jassy through a review of Smith's IBM server mail, as Smith forwarded a number of his communications with Jassy to his IBM email. (Signoracci Decl. ¶ 8.)

7

occasions, circulating          materials to other IBM employees who were not
members of the group for their review and discussion. (Signoracci Decl. Ex. 12.) And when
Smith was instructed to delete all local copies of a          Powerpoint presentation he
had received in September 2016, he failed to do so—and he made no effort to ensure that the
IBM employees to whom he had sent the presentation (against the          's stated
policy) deleted the copies he had given them. (Krishna Decl. ¶ 40.) This disregard for IBM's
confidentiality policies, even while an IBM employee, proves that Smith cannot be trusted to
safeguard the Company's secrets while he is working for an IBM competitor.

Smith's departure confirms his contempt for IBM. Apart from taking a job to
compete directly against IBM, Smith has not acted like a loyal custodian of IBM's confidential
information. After Smith first announced his intention to join AWS, IBM asked Smith to turn in
his mobile work devices to the Company. (Signoracci Decl. ¶ 8.) When Smith did so, IBM
discovered that Smith had wiped his IBM-issued mobile phone and his IBM-issued tablet of all
data, making it impossible for IBM to determine whether Smith had downloaded or transferred
any IBM confidential information from those devices to other locations in violation of his
confidentiality obligations. (Id.)

On July 31, 2017, counsel for IBM advised Max Garfield of Schulte Roth &
Zabel LLP, counsel for Smith, that IBM would seek a temporary restraining order from this
Court on August 1, 2017, to enjoin Smith from commencing employment with AWS prior to the
expiration of the restrictive period in his Noncompetition Agreement. (Id. ¶ 13.)

## ARGUMENT

Smith should be enjoined from commencing his proposed employment with AWS
during the remaining 9 months of his noncompetition period. Both a temporary restraining order
and a preliminary injunction are appropriate here because IBM can demonstrate "'(1) that [it]

8

will be irreparably harmed if an injunction is not granted, and (2) either (a) a likelihood of success on the merits or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation, and a balance of the hardships tipping decidedly in its favor.'" *IBM Corp.* v. *Papermaster*, No. 08-CV-9078 (KMK), 2008 WL 4974508, at *6 (S.D.N.Y. Nov. 21, 2008) ("*Papermaster*") (quoting *Lusk* v. *Vill. of Cold Spring*, 475 F.3d 480, 485 (2d Cir. 2007)).

## I. IBM WILL SUFFER IRREPARABLE INJURY ABSENT INJUNCTIVE RELIEF

As set forth in the accompanying Declaration of Arvind Krishna, Smith has knowledge about, *inter alia*, IBM's ⬛⬛⬛; another proposed product offering under development called Agile Accelerate; and new offerings under development in regulatory and compliance technology. These forthcoming product launches will directly compete against AWS. Smith has knowledge of these forthcoming products and services, and he has knowledge of the competitive strategies that IBM will use to market and implement those offerings to customers and prospective customers that are being pursued by both IBM and AWS. IBM has spent tens of millions of dollars developing these offerings and strategies, and the information that Smith knows about them is highly confidential and closely guarded, even within the Company. IBM would be severely harmed if AWS become privy to the information that Smith knows.

Smith's knowledge of ⬛⬛⬛ is particularly sensitive, as those projects involve the introduction of hardware and software that constitutes a "next generation" technology that IBM anticipates will increase competition against AWS in providing Cloud Computing services to enterprise and other customers. Indeed, one of the colleagues to whom Smith gave the confidential product development materials about these Projects exclaimed, "Wow, this is amazing stuff." (Signoracci Decl. Ex. 12.)

9

These technologies are at the core of the competition between IBM and AWS. The information that Smith knows about the anticipated costs to IBM of providing services to customers of          is so sensitive and closely guarded that all members, including Smith, were instructed to delete any copies of written materials they were provided. It is crucial that AWS have no knowledge of IBM's costs, as AWS could use that information to improperly undercut IBM's Cloud Computing business.

        This is confirmed by industry reports describing the competition between IBM and AWS in Cloud Computing, which focus on the costs of the competitors' offerings. For example, a report published on June 15, 2017 from Gartner, a leading industry commentator, compared offerings from IBM and AWS in the business area of "Cloud Infrastructure as a Service, Worldwide."[3] The report stated that "AWS is perceived as a cost leader" in the Cloud Computing market, but suggested that IBM's forthcoming Cloud Computing offerings could make IBM even more competitive on costs. The report concludes: "The eventual rollout of [IBM's new Cloud Computing offerings] is likely to help IBM evolve beyond its current status as a hosting-scale provider, making it more viable for IBM to *match the cost economics of the market leaders*," including AWS.

        The Gartner report also confirms that industry analysts and IBM's competitors, like AWS, are closely watching IBM's next moves in Cloud Computing. The report notes that, "IBM is in the midst of a 'Next-Generation Infrastructure (NGI)' engineering project, but it has not announced a release date." Indeed, IBM recently surpassed AWS in the area of cloud-

---

[3]   *See, e.g.*, Gartner, *Magic Quadrant for Cloud Infrastructure as a Service, Worldwide* (last visited June 29, 2017), https://www.gartner.com/doc/reprints?id=1-2G2O5FC&ct=150519; *see also* Investor's Business Daily, *Amazon Cloud Services Under Growing Threat From Microsoft, Google, IBM* (last visited July 10, 2017) http://www.investors.com/news/technology/amazon-cloud-services-under-growing-threat-from-microsoft-google-ibm (identifying IBM and AWS as among the top competitors in Cloud Computing and stating that "IBM continues to lead in hosted private cloud" based on report from Synergy Research Group).

10

computing revenue, making it the first enterprise-tech vendor to make over \$15 billion in fully recognized cloud revenue for a 12-month period.

The risk that Smith may disclose or use some of this confidential IBM information at AWS (even if inadvertently) is not only likely but inevitable, because the position that AWS has offered him will place Smith at the table for the same high-level competitive strategy discussions at AWS that he participated in at IBM. AWS is proposing that Smith participate in AWS's plans to develop and market offerings, and design and implement competitive strategies, that will target the same business and government customers for which Smith was responsible in his recent role at IBM. The market is the same. The customers are the same. And the competition is the same, except that now Smith would be on AWS's side instead of IBM's.

It is impossible to believe that Smith will be able to wall off within his own mind his knowledge of IBM's hardware, software and services product development plans from his responsibility for developing and implementing AWS's product development and other competitive strategies. Smith will be responsible for meeting with AWS's highest ranking executives, including its CEO, to decide how AWS can best compete against IBM—including in the same business area and for the same customers that IBM is targeting with its upcoming
▮▮▮▮▮▮ launch. Smith and AWS thus will have an opportunity to develop pre-emptive marketing strategies and product development initiatives to blunt the competitive advantage of these product launches from IBM.

The risk that Smith will exploit his knowledge of what it will cost IBM to deliver its new Cloud Computing services in competition with AWS's services is reason enough to enjoin him. *See, e.g.*, *Lumex, Inc.* v. *Highsmith*, 919 F. Supp. 624, 631 (E.D.N.Y. 1996)

11

(granting preliminary injunction to enforce noncompetition agreement where employee had access to highly sensitive information concerning costs, pricing and new products).[4] For example, if AWS knows IBM's cost—whether in absolute terms or relative to AWS's own cost—then AWS can price its Cloud Computing services to beat IBM when competing in bidding contests for large corporate customers and financial institutions. In addition, Smith was responsible for directly supervising IBM's Global Chief Information Security Officer. (Krishna Decl. ¶ 64.) In his role as CIO, Smith attended certain steering committee meetings to discuss IBM's most sensitive data. (*Id.*) This highly confidential information is kept closely secret within IBM, and it could cause the Company irreparable harm if this information were disclosed to anyone outside the Company—especially a competitor like AWS.

Smith's knowledge of IBM's confidential information, including IBM's costs and new product strategy, together with the similarity between his job at IBM and his new job at AWS, creates a risk of inevitable disclosure of trade secrets that satisfies the criteria for finding irreparable injury in a noncompete case under New York law. *See, e.g.*, *Lumex*, 919 F. Supp. at 631. "'A trade secret once lost is, of course, lost forever' and, therefore, such a loss 'cannot be measured in money damages.'" *Estee Lauder Cos. Inc.* v. *Batra*, 430 F. Supp. 2d 158, 174 (S.D.N.Y. 2006) (quoting *FMC Corp.* v. *Taiwan Tainan Giant Indus. Co.*, 730 F.2d 61, 63 (2d Cir. 1984)); *accord Papermaster*, 2008 WL 4974508, at *7.

Applying comparable law to a noncompete agreement, the Delaware Court of Chancery enjoined an executive vice president of Wal-Mart from becoming a division president at CVS Caremark. *Wal-Mart Stores, Inc.* v. *Mullany*, C.A. No. 6040-VCL (Del. Ch. Dec. 15,

---

[4]    Costs are protectable trade secrets. *See, e.g.*, *Youtie* v. *Macy's Retail Holding, Inc.*, 653 F. Supp. 2d 612, 623 (E.D. Pa. 2009) (finding that manufacturer's costs constituted trade secret information under the Pennsylvania Uniform Trade Secrets Act); *Synthes, Inc.* v. *Emerge Med., Inc.*, 25 F. Supp. 3d 617, 706 (E.D. Pa. 2014) (same); *Covenant Aviation Sec., LLC* v. *Berry*, 15 F. Supp. 3d 813, 818–19 (N.D. Ill. 2014) (holding that internal costs were adequately alleged as protectable trade secrets).

2010). The court held that claiming not to be "a salesperson or a scientist" does not immunize a senior executive with confidential strategic information:

> If noncompetes apply effectively anywhere, they apply to the senior, big dog, alpha male and female individuals who are actually running the corporation, and have knowledge of its strategies and tactics and deepest secrets. The fact that these folks are perhaps multiple steps removed from a particular customer list or secret formula that might be the focus of analysis if you were dealing with noncompete involving, say, a salesperson or a scientist doesn't mean that these noncompetes are suddenly unenforceable as to senior executives because they can claim not to know anything.

*Id.* at 69-70.

## A. This Court Has Found Irreparable Harm Under IBM's Noncompetition Agreements Before

In *Papermaster*, this Court preliminarily enjoined another IBM employee from working for another competitor, Apple, based on the prospective violation of his noncompetition agreement. *See* 2008 WL 4974508, at *7-9. Although the ex-employee had not yet disclosed any confidential information to the rival, professed no intention to make such disclosure, and did not act in bad faith in any way, the Court found that "it is likely that Mr. Papermaster inevitably will draw upon his experience and expertise" at IBM. *Id.* at *9.

Here, Smith is knowledgeable about IBM's confidential information and trade secrets, including its confidential product development plans

. Like Papermaster, Smith agreed that IBM would suffer irreparable harm if he violated his Noncompetition Agreement. *Id.* (citing *Lumex* for the proposition that risk of irreparable harm exists "where employee was a 'member of the elite strategic planning committee' and therefore 'privy to discussions' involving marketing strategy and product lines"). And like Papermaster, since Smith has been "inculcated" with IBM trade secrets concerning the company's plans in the growing and highly competitive Cloud Computing market, "it is no great leap for the Court to find that [IBM] has met its burden of showing a likelihood of irreparable harm." *Id.* at *8.

13

But unlike Papermaster, there is substantial evidence and reason to believe that Smith is not loyal to IBM—and that his loyalty was compromised even while he was still working at IBM. This is clearly a case where preliminary injunctive relief is appropriate.

**B.      The Risk of Disclosure of Trade Secrets Constitutes Irreparable Harm**

Courts find irreparable harm where there is a risk that a former employer's trade secrets likely will inevitably be disclosed because "'the movant competes directly with the prospective employer and the transient employee possesses highly confidential or technical knowledge concerning . . . marketing strategies, or the like.'" *Estee Lauder*, 430 F. Supp. 2d at 174 (quoting *EarthWeb, Inc.* v. *Schlack*, 71 F. Supp. 2d 299, 309 (S.D.N.Y. 1999)). The factors that guide courts in determining whether there is a risk of inevitable disclosure include:

> (1) the extent to which the new employer is a direct competitor of the former employer; (2) whether the employee's new position is nearly identical to his old one, such that he could not reasonably be expected to fulfill his new job responsibilities without utilizing the trade secrets of his former employer; (3) the extent to which the trade secrets at issue would be valuable to the new employer; and (4) the nature of the industry and its trade secrets.

*Papermaster*, 2008 WL 4974508, at *7 (quoting *Payment Alliance Intern., Inc.* v. *Ferreira*, 530 F. Supp. 2d 477, 482 (S.D.N.Y. 2007)).

The "inevitable disclosure" test is based on the *risk* of disclosure. It does not require proof that the new employer will for certain use the trade secret in the same way as the former employer. As one court held:

> Of course, the nature of the subsequent employer's work is relevant to determining the risk of disclosure. But I find no requirement in the New York decisions that the first employer's secrets be readily usable by the second employer. <u>It is enough if the second employer's work is sufficiently similar to that of the first employer to make likely the risk of disclosure</u> by the employee in the course of his subsequent employment.

*Cont'l Grp., Inc.* v. *Kinsley*, 422 F. Supp. 838, 845 (D. Conn. 1976) (Newman, J.) (emphasis added).

Thus, the law does not require proof that the defecting employee intends to

disclose trade secrets prior to issuance of an injunction. As the court in *Papermaster* observed:

> [T]he Court has no evidence before it that Mr. Papermaster has disclosed any
> IBM trade secrets to date. The harm to IBM, however, is more likely to derive
> from inadvertent disclosure of the IBM trade secrets that have defined
> Mr. Papermaster's long career. . . . Thus, while the Court ascribes no ill-will to
> Mr. Papermaster, the Court finds that the likely inevitability of even inadvertent
> disclosure is sufficient to establish a real risk of irreparable harm to IBM.

2008 WL 4974508, at *10 (citations omitted and emphasis added).

Here, given the breadth, depth and duration of Smith's tenure at IBM and his high

ranking executive role and responsibilities, his knowledge of IBM's product plans and costs, and

his proposed position at AWS, there is a "likely inevitability of even inadvertent disclosure"

sufficient to establish a real risk of irreparable harm and sustain an injunction even if Smith had

the best intentions.

Smith's behavior to date demonstrates a lack of loyalty to IBM and, thus, makes it

doubtful that he has the ability and willingness to keep IBM's confidential information a secret.

Smith has ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. To cultivate his relationship with Jassy, Smith ▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮—acts which cast serious doubt

upon any promises by Smith to be the guardian of IBM's confidential information. Also, upon

resigning and prior to returning his IBM-issued mobile devices, Smith wiped all data from his

IBM-issued mobile devices, preventing IBM from determining through forensics review whether

Smith had copied, downloaded, or transferred any IBM confidential information from his work-

issued mobile devices to another location. (*See* Signoracci Decl. ¶ 8.)

In *Estee Lauder*, 430 F. Supp. 2d at 182, the court enjoined a product marketing

manager at Estee Lauder from working for a cosmetics rival on the basis that the executive new

about his former employer's products in development.  The defecting employee was responsible

for developing marketing strategies, and had "a general idea of the plans for launch of new

products, including the marketing and geographic plans and the channels of distribution for these

products." *Id.* at 163.  Rejecting the argument that the plaintiff-employer could not suffer

irreparable harm because the employee had no "technical expertise" and "was not the scientist

behind the formulas and the development of new products," the court in *Estee Lauder* granted a

preliminary injunction based upon the risk of inevitable disclosure of marketing trade secrets—

specifically, information about upcoming product launches.  *Id.* at 175-76.[5]

Because an injunction is appropriate where there is a likelihood that the former

employer's confidential information will inevitably (even if inadvertently) be used or disclosed,

the Court should issue an injunction here, barring Smith from working at AWS during the

remaining 9 months of his non-competition agreement.

### C.    The Risk of Exploiting Customer Goodwill Constitutes Irreparable Harm

Courts also find irreparable harm where there is a risk that a former employee

might exploit or expropriate the goodwill of client or customer relationships cultivated through

the former employee's job responsibilities.  *See, e.g.*, *Global Switching Inc.* v. *Kasper*, No. CV

---

[5]    In *Lumex*, the court issued a preliminary injunction enjoining a former product manager for a manufacturer of weightlifting equipment from going to work for a competitor.  919 F. Supp. at 636.  The court found that the employee's confidential information, including information about the costs to Lumex of providing products to customers, was "confidential and constituted trade secrets" and that "the disclosure of these trade secrets and confidential information would seriously and irreparably damage the future interests of Lumex." *Id.* at 630.  The court also noted that the employee "was a member of the elite strategic planning committee together with the top personnel of [his business unit] and attended high level meetings in which future restructuring of [the business unit] was discussed, together with detailed financial information, including costs and [] profit margins." *Id.*

In *Payment Alliance*, the court issued a preliminary injunction to bar violation of a noncompetition agreement by an executive who was knowledgeable about the marketing of a software application that his former employer had launched.  530 F. Supp. 2d at 482, 485.  The court explained, "even if [the employee] acted with the best of intentions, he may unintentionally transmit information gained through his association with [his former employer] during his day to day contact with his new employer." *Id.*

06 412(CPS), 2006 WL 1800001, at *13 (E.D.N.Y. Jun. 28, 2006) ("The loss of customer

goodwill constitutes an irreparable injury."); *Johnson Controls, Inc.* v. *A.P.T. Critical Sys., Inc.*,

323 F. Supp. 2d 525, 532 (S.D.N.Y. 2004) (finding that "[employee's] actions threaten to cause

[employer] irreparable harm by luring away the business of a number of long-term [] clients" of

employer).

Smith nurtured close personal relationships with major IBM customers in his two

and a half years as IBM's CIO. (*See* Krishna Decl. ¶¶ 23, 63.) As CIO of the Company, Smith

attended numerous industry events as IBM's highest ranking customer goodwill representative,

driving sales opportunities to all of IBM's business lines. In addition to these industry events,

Smith met with over 60 of some of IBM's most important customers on a one-on-one basis in the

last 12 months of his employment with Company alone. By moving to AWS, Smith threatens to

exploit and/or expropriate the customer relationships he cultivated on IBM's time and with the

benefit of IBM's resources, all to the detriment of IBM. IBM thus is entitled to an injunction

protecting the customer goodwill that Smith developed throughout his tenure as IBM's CIO.

*See, e.g.*, *BDO Seidman* v. *Hirshberg*, 93 N.Y.2d 382, 392 (N.Y. 1999) ("The employer has a

legitimate interest in preventing former employees from exploiting or expropriating the goodwill

of a client or customer, which has been created and maintained at the employer's expense, to the

employer's competitive detriment.").

### D. Smith Stipulated That a Violation of His Noncompetition Agreement Would Irreparably Harm IBM

In determining whether a threat of irreparable harm exists, "the existence of the

Noncompetition Agreement is highly relevant." *Papermaster*, 2008 WL 4974508, at *7. Smith

agreed that disclosing the IBM confidential information he possesses to a competitor would

cause irreparable injury to IBM, and that an injunction is the appropriate remedy for that threat.

(*See* Noncompetition Agreement §§ 1(b)(1), 5.) Smith expressly consented to an injunction in the event of breach: "you further consent and stipulate to the entry of such injunctive relief in such a court prohibiting you from breaching this Agreement." (*Id.*)

According to the Second Circuit, contractual provisions that acknowledge such harm "might arguably be viewed as an admission by [the defendant] that plaintiff will suffer irreparable harm were [s]he to breach the contract's non-compete provision." *Ticor Title Ins. Co.* v. *Cohen*, 173 F.3d 63, 69 (2d Cir. 1999); *cf. N. Atl. Instruments, Inc.* v. *Haber*, 188 F.3d 38, 49 (2d Cir. 1999) (relying on similar clause in confidentiality agreement in finding irreparable injury to support injunctive relief). In *Papermaster*, the court relied on the same acknowledgments made by Smith in his IBM Noncompetition Agreement—*i.e.*, "that IBM would suffer 'irreparable harm' if he violated" his obligations—finding that this "'explicit provision in the agreement' and 'common sense' indicate that IBM will be irreparably harmed by the disclosure of the important technical and proprietary information that Mr. Papermaster carries in his head." 2008 WL 4974508, at *9 (quoting *Global Telesys., Inc.* v. *KPNQwest*, 151 F. Supp. 2d 478, 482 (S.D.N.Y. 2001)).[6]

## II.   <u>IBM IS LIKELY TO PREVAIL ON THE MERITS</u>

IBM is likely to prevail on its claims for breach of contract and misappropriation of trade secrets. The same facts that support a finding of irreparable harm in the absence of a preliminary injunction also demonstrate IBM's likelihood of success on the merits. "'In non-compete cases, such as this one, the irreparable harm analysis and the likelihood of success on the merits analysis are closely related and often conflated.'" *Papermaster*, 2008 WL 4974508, at

---

[6]    *Accord Ticor Title*, 173 F.3d at 68-69; *Ayco Co., L.P.* v. *Feldman*, No. 1:10-CV-1213 (GLS/DRH), 2010 WL 4286154, at *8 (N.D.N.Y. Oct. 22, 2010); *IDG USA, LLC* v. *Schupp*, No. 10-CV-76S, 2010 WL 3260046, at *9 (W.D.N.Y. Aug. 18, 2010), *aff'd in part, vacated in part and remanded on other grounds by* 416 F. App'x 86 (2d Cir. 2011); *Estee Lauder*, 430 F. Supp. 2d at 174; *Ikon Office Solutions, Inc.* v. *Usherwood Office Tech., Inc.*, No. 9202–08, 2008 WL 5206291, at *17 (N.Y. Sup. Ct. Dec. 12, 2008).

*6 (quoting *Int'l Creative Mgmt., Inc.* v. *Abate*, No. 07-CV-1979 (PKL), 2007 WL 950092, at *2

(S.D.N.Y. Mar. 28, 2007)).

### A.     <u>The Limitations on Smith's Post-IBM Employment Are Reasonable</u>

Under New York law, "there are no *per se* lines demarcating what constitutes an

unreasonable durational or geographic scope" in a noncompetition agreement.  *See Estee Lauder*,

430 F. Supp. 2d at 180.  The "durational reasonableness of a non-compete agreement is judged

by the length of time for which the employer's confidential information will be competitively

valuable."  *Id.*  In the *Papermaster* case, the court found that the same one-year prohibition on

competition and customer solicitation that Smith agreed to was "very limited in time."  2008 WL

4974508, at *11 (quoting *Natsource LLC* v. *Paribello*, 151 F. Supp. 2d 465, 471-72 (S.D.N.Y.

2001)).  The court also found that IBM had established, in that case, that "the trade secrets that

[Papermaster] has been exposed to during his long tenure at IBM are likely to remain

competitively valuable to IBM and its competitors for more than a year."  *Id.*  Other courts

applying New York law have upheld two- and three-year noncompete periods.  *See, e.g.*,

*Payment Alliance*, 530 F. Supp. 2d at 485; *Battenkill Veterinary Equine P.C.* v. *Cangelosi*,

768 N.Y.S.2d 504, 506-07 (N.Y. App. Div. 3d Dep't 2003); *Alside Div. of Associated Materials

Inc.* v. *Leclair*, 743 N.Y.S.2d 898, 898-99 (N.Y. App. Div. 3d Dep't 2002).

The overlap between Smith's positions and responsibilities at IBM and his

proposed position and responsibilities at AWS also makes enforcement reasonable.  The business

secrets and confidential information Smith has in his possession will be valuable to AWS, and

thus detrimental to IBM, for at least a year.  He is familiar with both the specific product

development and marketing strategies that IBM is currently employing and the directions in

which it is heading in the near future, including the development, design, and marketing plans for

offerings that have not been released and which the marketplace recognizes as increasing IBM's

19

competition in the Cloud Computing business in which AWS competes directly against IBM. (*See* Krishna Decl. ¶¶ 5, 28, 38–42.) The information that Smith knows will remain part of the competitive battleground between IBM and AWS throughout the next 12 months. (*Id.* ¶ 39.)

The geographical scope of Smith's restriction is worldwide, which, too, is reasonable because the employer (IBM) and the competitor (AWS) compete globally and Smith's job responsibilities (at IBM and AWS) are global. In *Papermaster*, the court found that "the nature of IBM's business 'requires that the restriction be unlimited in geographic scope.'" 2008 WL 4974508, at *11 (quoting *Natsource*, 151 F. Supp. 2d at 471-72). Other courts have upheld worldwide limits on post-employment competition. *See, e.g.*, *Estee Lauder*, 430 F. Supp. 2d at 181; *Bus. Intelligence Servs., Inc.* v. *Hudson*, 580 F. Supp. 1068, 1073 (S.D.N.Y. 1984).

Finally, before joining IBM as the CIO of the Company, Smith had served as the CIO for several companies in other industries and geographies, including a large Australian financial institution, a major Australian telecommunications company, an aerospace and automotive company based in New Jersey, and a hardware manufacturing company. The Noncompetition Agreement Smith entered into with IBM would not prevent him from working as the CIO of a company that does not compete against IBM, like those where he previously worked—indeed, IBM approved Smith's plans to provide consultation to an Australian bank after his IBM employment terminated. (*See* Signoracci Decl. ¶ 5.) The Noncompetition Agreement does, however prevent Smith from switching sides and joining IBM's primary adversary in the Cloud Computing business in which Smith was involved at IBM. That restriction is reasonable under applicable law, and should be enforced.

### B. IBM Has a Legitimate Interest in Safeguarding its Confidential Information

An employer has a "legitimate interest" in "safeguarding that which has made his business successful and to protect himself against deliberate surreptitious commercial piracy."

*Estee Lauder*, 430 F. Supp. 2d at 177 (quoting *Reed, Roberts Assocs., Inc.* v. *Strauman*, 353 N.E.2d 590, 593 (N.Y. 1976)); *see also BDO Seidman*, 93 N.Y.2d at 391 (explaining that an employer has a "legitimate interest" in preventing the "competitive use, for a time, of *information* or *relationships* which pertain peculiarly to the employer and which the *employee acquired* in the course of the employment" (emphasis in original)). Therefore, "restrictive covenants will be enforceable to the extent necessary to prevent the disclosure or use of trade secrets or confidential customer information." *Estee Lauder,* 430 F. Supp. 2d at 177 (quoting *Reed, Roberts*, 353 N.E.2d at 593).

The confidential business information that Smith knows constitutes protectable trade secrets under New York law, which considers a trade secret "'any formula, pattern, device or compilation of information which is used in one's business, and which gives [the owner of such secrets] an opportunity to obtain an advantage over competitors who do not know or use it.'" *Softel, Inc.* v. *Dragon Med. & Scientific Commc'ns, Inc.*, 118 F.3d 955, 968 (2d Cir. 1997) (quoting Restatement of Torts § 757 cmt. b); *IBM Corp.* v. *Visentin*, No. 11 Civ. 399 (LAP), 2011 WL 672025, at *8 (S.D.N.Y. Feb. 16, 2011) (same); *see also Papermaster*, 2008 WL 4974508, at *8 (noting Papermaster's knowledge of "strategic plans, product development, technical recruitment, and long-term business opportunities for IBM").[7]

New York cases confirm that IBM has a "legitimate interest" in protecting the types of confidential business and marketing information and strategies Smith acquired at IBM.

---

[7] New York courts consider the following factors in determining whether information constitutes a trade secret: "(1) the extent to which the information is known outside of the business; (2) the extent to which it is known by employees and others involved in the business; (3) the extent of measures taken by the business to guard the secrecy of the information; (4) the value of the information to the business and its competitors; (5) the amount of effort or money expended by the business in developing the information; [and] (6) the ease or difficulty with which the information could be properly acquired or duplicated by others." *N. Atl. Instruments*, 188 F.3d at 44 (quoting *Ashland Mgmt. Inc.* v. *Janien*, 624 N.E.2d 1007, 1013 (N.Y. 1993)). A review of each factor confirms that Smith's knowledge of IBM's future product offerings and the cost of those products are protected trade secrets.

*See, e.g.*, *id.* at 175-76 (knowledge of confidential brand strategies, products in development, and planned innovations); *Lumex*, 919 F. Supp. at 629-31 (knowledge of confidential strategic plans, future product offerings, and pricing and cost information); *DoubleClick, Inc.* v. *Henderson*, No. 116914/97, 1997 WL 731413, at *4-5 (N.Y. Sup. Ct. Nov. 7, 1997) (knowledge of confidential revenue projections, future plans, pricing and product strategies).

## III.   IN THE ALTERNATIVE, SUFFICIENTLY SERIOUS QUESTIONS GO TO THE MERITS AND THE BALANCE OF THE EQUITIES WEIGHS IN IBM'S FAVOR

Even if this Court were not satisfied that IBM is likely to prevail on the merits, IBM has raised sufficiently serious questions going to the merits of the dispute and shown that the balance of the equities weighs in its favor to warrant the issuance of a preliminary injunction. In balancing the equities, a court "must weigh the need to protect the employer's legitimate business interests against the employee's concern regarding the possible loss of livelihood." *Natsource*, 151 F. Supp. 2d at 470 (quoting *Ticor Title*, 173 F.3d at 69).

Here, the balance of equities tips decidedly in IBM's favor. Smith *agreed* to wait a year before working for one of IBM's competitors, and he did so in exchange for career opportunities and equity compensation at IBM. (*See* Noncompetition Agreement § 1(e).) After benefiting from those opportunities and that compensation, he left IBM voluntarily. Smith chose to start a new phase of his career at a company that competes against IBM for the very same business, revenue and future growth. There is no inequity in compelling Smith to honor his contractual undertaking to wait before beginning that job, and certainly no inequity in delaying his employment by AWS while the Court considers IBM's motion for a preliminary injunction. This is particularly so where Smith's skills can be and have been directly applied in CIO positions for companies that do not directly compete against IBM, and such positions are readily available to him.

In contrast, IBM faces immediate and irremediable damage, including the disclosure of highly confidential and proprietary information, and loss of substantial business, should AWS gain access to the knowledge Smith has about IBM's confidential plans and strategies. In *Papermaster,* the court found that the balance of equities favored IBM because "IBM's need to protect its legitimate business interests substantially outweighs the harm resulting to Mr. Papermaster from temporarily not working for Apple." *Papermaster*, 2008 WL 4974508, at *13. Similarly, any prejudice to Smith is substantially outweighed by the prejudice IBM would suffer absent injunctive relief.

## IV. A TEMPORARY RESTRAINING ORDER SHOULD BE ISSUED AND AN EXPEDITED SCHEDULE FOR THE MOTION SHOULD BE SET

The immediacy of Smith's intended employment at AWS justifies a temporary restraining order. *See* Fed. R. Civ. P. 65(b). Smith intends to compete against IBM by becoming AWS's CIO and the face of AWS to its customers and prospective customers as early as August 7, 2017. Unless enjoined, Smith will become an AWS executive soon, creating a real risk that "immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition." *Id.*

23

## CONCLUSION

For the foregoing reasons, IBM respectfully submits that this Court should enter a

temporary restraining order and a preliminary injunction prohibiting defendant Jeff Smith from

commencing employment at AWS prior to May 5, 2018, in accordance with the Noncompetition

Agreement.

Dated: New York, New York
      July 31, 2017

               PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

           By: _____

               Robert A. Atkins
               Steven C. Herzog
               Pietro J. Signoracci

               1285 Avenue of the Americas
               New York, New York 10019-6064
               (212) 373-3000
               ratkins@paulweiss.com
               sherzog@paulweiss.com
               psignoracci@paulweiss.com

               *Attorneys for Plaintiff*
               *International Business Machines Corporation*

EXHIBIT  C

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

INTERNATIONAL BUSINESS MACHINES
CORPORATION,

                Plaintiff,

           v.

JEFF S. SMITH,

                Defendant.

17 Civ. 5808

---

**DECLARATION OF PIETRO J. SIGNORACCI IN SUPPORT OF
INTERNATIONAL BUSINESS MACHINES CORPORATION'S
APPLICATION FOR A TEMPORATY RESTRAINING ORDER
AND A PRELIMINARY INJUNCTION**

        Pietro J. Signoracci declares, under penalty of perjury, pursuant to 28

U.S.C. § 1746, as follows:

        1.      I am admitted to practice before this Court and am associated with

the law firm of Paul, Weiss, Rifkind, Wharton & Garrison LLP, attorneys for Plaintiff

International Business Machines Corporation ("IBM") in this action.  As such, I am

personally familiar with the facts set forth herein.  I respectfully submit this declaration in

support of IBM's motion for a preliminary injunction and a temporary restraining order.

        2.      Attached as **Exhibit 1** is a true and correct copy of the Complaint

in this action.

        3.      Attached as **Exhibit 2** is a true and correct copy of the Declaration

of Arvind Krishna, executed on July 31, 2017.

1

4. As alleged in the Complaint, the purpose of this litigation is to enjoin Defendant Jeff S. Smith, who was a senior executive at IBM until his resignation effective May 2, 2017, from violating his fiduciary and contractual obligations to IBM.

5. On March 28, 2017, Mr. Smith informed IBM that he intended to accept an offer to join AWS as Vice President, reporting directly to AWS's CEO. IBM learned that Mr. Smith intended to commence employment with AWS on April 24, 2017. As a result of conversations among counsel, Mr. Smith decided to resign from IBM effective May 5, 2017, without accepting AWS's offer of employment. Mr. Smith informed IBM that he would pursue other opportunities, including offers he had received to join the boards of, and potentially receive employment from, companies that did not compete against IBM. Shortly after his resignation, Mr. Smith informed IBM that he had been offered a consulting role at a non-competitor, ANZ Bank. IBM approved Mr. Smith's acceptance of this offer.

6. Mr. Smith gave notice to IBM on June 13, 2017 that he had accepted employment with Amazon Web Services ("AWS"). Mr. Smith stated that he intended to commence employment with AWS on August 7, 2017.

7. IBM, together with its counsel, conducted a review of Mr. Smith's IBM server mail. Attached as **Exhibits 3** through **12** are true and correct copies of certain of Mr. Smith's IBM emails.

8. IBM, together with its counsel, collected Mr. Smith's work-issued electronic devices and performed forensic review on those devices. This review revealed that, before returning his work-issued phone and tablet computer, Mr. Smith had wiped each device of all data, making it impossible for IBM to determine whether Mr. Smith

had downloaded or transferred any IBM confidential information from those devices to other locations.

       9.     On June 15, 2017, counsel for IBM made a written request to Mr. Smith's counsel, Ronald Richman and Max Garfield of Schulte Roth & Zabel LLP, for information regarding Mr. Smith's proposed role at AWS.  Over the course of the next few weeks, counsel for IBM, counsel for Mr. Smith, and counsel for AWS (Sarah Bouchard at Morgan Lewis & Bockius LLP) participated in discussions regarding a potential resolution of this matter outside of court.

       10.    On July 5, 2017, IBM delivered to counsel for Mr. Smith a proposed confidentiality agreement to cover settlement discussions.  On July 6, 2017, counsel for Mr. Smith returned a signed confidentiality agreement.  On July 14, 2017, Mr. Smith's counsel delivered to IBM a written description of Mr. Smith's proposed role at AWS (in response to IBM's request of June 15, 2017).  On July 17, 2017, counsel for IBM and counsel for Mr. Smith met to discuss potential resolution of the matter.

       11.    On Friday, July 21, counsel for IBM, counsel for Mr. Smith, and counsel for AWS had a telephone conference to discuss potential resolution of the matter.  On Monday, July 24, counsel for IBM requested additional information from counsel for AWS and counsel for Mr. Smith.  On Saturday, July 29, 2017 IBM received in response a written proposal for a resolution of this matter from counsel for AWS and counsel for Mr. Smith.

       12.    On Monday, July 31, 2017, at 1:30 pm, counsel for IBM, counsel for Mr. Smith, and counsel for AWS had a telephone conference continuing discussions

for a potential resolution of this matter. At the end of that conference call, counsel for IBM stated that the parties appeared to have reached an impasse.

13.     At 4:37 pm on Monday, July 31, 2017, I called Ronald Richman of Schulte Roth & Zabel LLP, counsel for Mr. Smith. Mr. Richman was unavailable, and his assistant informed me that he would call me back. At 4:54 pm on the same day, Max Garfield of Schulte Roth & Zabel LLP, counsel for Mr. Smith, returned my call. I informed him that IBM would seek a temporary restraining order and preliminary injunction from this Court at 9:00 am on Tuesday, August 1, 2017, to enjoin Mr. Smith from violating his fiduciary and contractual obligations to IBM.

14.     To my knowledge, no prior application for this or similar relief has been made in this or any other action.

I declare under penalty of perjury that the foregoing is true and correct.

_____
                                Pietro J. Signoracci

Executed on July 31, 2017
New York, New York

EXHIBIT  D

# Exhibit 4

**UNITED STATES DISTRICT COURT**
SOUTHERN DISTRICT OF NEW YORK
----------------------------------x
INTERNATIONAL BUSINESS MACHINES
**CORPORATION,**

                        **Plaintiff,**

             v.                    17 CV 5808 (CS)

**JEFF S. SMITH,**

                        **Defendant.**
----------------------------------x
                        U.S. Courthouse
                        White Plains, N.Y.
                        August 1, 2017
                        11:20 a.m.


**Before:**         **HON. CATHY SEIBEL,**
                  United States District Judge


APPEARANCES

**PAUL WEISS RIFKIND WHARTON & GARRISON, LLP**
**BY:  ROBERT A. ATKINS, Esq.**
     **PIETRO SIGNORACCI, Esq.**
     **KRISTEN-ELISE DEPIZZO, Esq.**
**1285 Avenue of the Americas**
**New York, N.Y.  10019-6064**
**Attorneys for Plaintiff**

MORGAN LEWIS
**BY:  SARAH E. BOUCHARD, Esq.**
     **BRANDON J. BRIGHAM, Esq.**
**1701 Market Street**
**Philadelphia, PA  19103-2921**
**Attorneys for Defendant Smith**

**SCHULTE ROTH & ZABEL, LLP**
**BY:  RONALD E. RICHMAN, Esq.**
     **MAX GARFIELD, Esq.**
**919 Third Avenue**
**New York, NY  10022**
**Attorneys for**


**Sue Ghorayeb, R.P.R., C.S.R.**
Official Court Reporter

1          THE COURT:  Let me cut you off.

2          MS. BOUCHARD:  Sure.

3          THE COURT:  I'm leaving on vacation tomorrow.

4          MS. BOUCHARD:  Okay, Your Honor.

5          THE COURT:  Your timing is -- Plaintiff's timing is

6    impeccable.

7          MS. BOUCHARD:  Yes, as it usually is in these

8    things.  We would like to have the opportunity to at least

9    review the briefs before we're able to argue.  There were many

10   misrepresentations just in the Complaint alone.

11         THE COURT:  Give me a for instance.

12         MS. BOUCHARD:  Certainly.  We have proposed a very

13   scoped role for Mr. Smith, in a narrow area of cloud services.

14   That was not shared in the Complaint.  I can pass up the

15   proposal.

16         Most importantly, that proposal keeps him out of

17   sales, it keeps him out of pricing.  It prevents him from

18   soliciting customers that he engaged with at IBM.  It also

19   prohibits him from soliciting employees at IBM, and, most

20   importantly, it confirms his agreement not to share

21   confidential and trade secret information.

22         THE COURT:  So, what will he be doing?

23         MS. BOUCHARD:  He'll be working in an area leading

24   internal teams in a marketplace, developer tools, and support

25   and manage service provider offerings.

                Sue Ghorayeb,  Official Court Reporter

1          MR. RICHMAN:  I'm sorry.  I'm sorry, Your Honor.

2          THE COURT:  -- Mr. Richman.

3          MS. BOUCHARD:  So, Your Honor, may I pass something

4    up.

5          THE COURT:  Sure.

6          MS. BOUCHARD:  Because they referenced the Gartner

7    report and they referenced in their Complaint that Amazon and

8    IBM are neck and neck.  Okay.  That was the impression that

9    they left in that Complaint, in that publicly filed Complaint.

10          In the same Gartner report, you will see that

11   Gartner prepared a chart and that chart has four quartiles,

12   and you will see where Amazon Web Services falls in that

13   quartile.  Do you see it?  It's on the top.

14          THE COURT:  Yes, but I don't see why it's relevant.

15   I don't care if Amazon Web Services is kicking IBM's behind,

16   that's not --

17          MS. BOUCHARD:  Your Honor --

18          THE COURT:  So what?

19          MS. BOUCHARD:  It does matter, because the

20   information that Mr. Smith would have at IBM would have to be

21   of use to Amazon.  It is of no use.  The Gartner report speaks

22   about the maturity of Amazon's product.

23          THE COURT:  That I'm not buying.  It's of no use?

24          MS. BOUCHARD:  It is of no use, Your Honor.

25          THE COURT:  Zero use?  That they have absolutely no

                Sue Ghorayeb,  Official Court Reporter

1    interest in IBM -- what IBM is doing?

2           When we go to discovery in this case, they are not

3    going to find a single document in the possession of Amazon

4    Web Services where anybody at Amazon Web Services talks about

5    or wonders or expresses a concern or curiosity about what IBM

6    is doing?

7           MS. BOUCHARD:  Maybe Microsoft.

8           THE COURT:  That's really hard to believe.

9           MS. BOUCHARD:  Yeah.  Actually, it's going to be

10   more about Microsoft and it's going to be more about Google,

11   who are their actual competitors.

12          THE COURT:  Well, I don't know.  According to this

13   document, IBM is a visionary, not a leader.

14          MS. BOUCHARD:  No.  It's a, it's a middle of the

15   road visionary.

16          THE COURT:  It's a middle of the road visionary.

17   So, when we --

18          MS. BOUCHARD:  And it can't execute.

19          THE COURT:  When we go through discovery in this

20   case, nobody is going to find any documents in Amazon Web

21   Services' computers or anywhere where they say, "I wonder what

22   IBM is working on," or, "I hear IBM is working on something,"

23   or, "we should do this because IBM can't do it," or, "we

24   should do this because we want to take customers from IBM."

25          MS. BOUCHARD:  So, maybe there is a document, but

EXHIBIT  E

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

INTERNATIONAL BUSINESS MACHINES
CORPORATION,

                         Plaintiff,

                 v.

JEFF S. SMITH,

                         Defendant.

17 Civ. _5808_ (CS)

~~[PROPOSED]~~ ORDER TO SHOW
CAUSE FOR AN ORDER FOR A
PRELIMINARY INJUNCTION AND
TEMPORARY RESTRAINING
ORDER

---

        Upon the Summons and Complaint of Plaintiff International Business Machines Corporation ("IBM"), the Declaration of Pietro Signoracci, executed on _July 31_, 2017, the Declaration of Arvind Krishna, executed on _July 31_ 2017, and the accompanying Memorandum of Law in Support of Plaintiff's Application for a Temporary Restraining Order and Preliminary Injunction, and good and sufficient reason appearing to me therefor, it is hereby

        ORDERED that Defendant Jeff S. Smith or his counsel show cause at a hearing to be held in this Court before the Honorable _Cathy Seibel_, United States District Judge, in Courtroom _621_, United States Courthouse, 300 Quarropas Street, White Plains, New York, on _August 21_, 2017 at _9:30_ a.m., or as soon thereafter as counsel may be heard, why the Court should not enter an order for a preliminary injunction pursuant to Rule 65(a) of the Federal Rules of Civil Procedure and the Court's inherent powers, pending final determination of this action:

(a) enjoining and restraining Defendant Smith from commencing employment with Amazon Web Services ("AWS") or otherwise associating with AWS prior to May 2, 2018;

(b) enjoining Defendant Smith, prior to May 2, 2018, from soliciting for competitive business purposes any customer of IBM with which Defendant Smith was involved as part of his job responsibilities at IBM during the last twelve months of his employment at IBM;

(c) enjoining Defendant Smith, prior to May 2, 2019, from directly or indirectly hiring, soliciting, or making an offer to any employee of IBM to be employed or perform services outside IBM;

(d) enjoining Defendant Smith from using, disclosing, or transmitting for any purpose records, documents, or information containing any confidential or proprietary information of IBM; and

(e) ordering such further relief the Court deems just and proper;

AND it being shown by the above-referenced declarations and memorandum of law that Plaintiff will suffer immediate and irreparable harm unless, pending the hearing of the motion brought on by this Order to Show Cause, a temporary restraining order be in effect, providing the relief requested by Plaintiff on this motion for a preliminary injunction, pursuant to Rule 65(b) of the Federal Rules of Civil Procedure, it is hereby

ORDERED that Defendant Jeff S. Smith is temporarily ENJOINED AND RESTRAINED, until the hearing and determination of Plaintiff's motion for a preliminary injunction, from: (i) working at, or providing any services for, AWS (ii) soliciting any customer of IBM with which Defendant Smith was involved as part of his job

2

*except to the extent allowed under a "listen & learn" order to be entered separately*

responsibilities at IBM during the last year of his employment at IBM; (iii) contacting any

current employees of IBM for the purpose of influencing them to leave IBM; and (iv)

retaining, using, or disclosing IBM confidential or proprietary information; and it is further

ORDERED that security in the sum of $100,000 shall be posted by Plaintiff on

or before 8/4/17; and it is further

ORDERED that Plaintiff shall effect personal delivery of a copy of this order

and supporting papers, by hand delivery service and email to Defendant or Defendant's

counsel, no later than 5 p.m. on August 1, 2017, which shall be deemed good

and sufficient service and notice thereof; and it is further

ORDERED that Defendant shall file with the Court and serve any responsive

papers by overnight delivery and email on Plaintiff's counsel, Robert A. Atkins, Esq., Paul,

Weiss, Rifkind, Wharton & Garrison LLP, 1285 Avenue of the Americas, New York, New

York 10019-6064, ratkins@paulweiss.com, on or before _____ .m. on _____,

2017 and that Plaintiff shall file with the Court and serve any reply papers by overnight

delivery and email on Defendant or Defendant's counsel, on or before _____ _.m. on

_____, 2017.

SO ORDERED:

Dated: 8/1/17 _____
U.S.D.J.

The parties should submit affidavits of direct testimony
and proposed findings of fact + conclusions of law to
the Court by 9 am on 8/14/17.

Plus The schedule will be modified if Defendant opts
for a hearing before M-J. Davison before 8/21/17.

EXHIBIT  F

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

INTERNATIONAL BUSINESS
MACHINES CORPORATION,

              Plaintiff,

    v.

JEFF SMITH,

              Defendant.

Civil Action No. 17-cv-5808

~~[PROPOSED]~~ **FURTHER ORDER REGARDING PLAINTIFF'S MOTION FOR
TEMPORARY RESTRAINING ORDER**

        **AND NOW** this 1st day of August 1, 2017, upon consideration of the papers

submitted by Plaintiff International Business Machines Corporation ("IBM," or "Plaintiff") for a

Temporary Restraining Order and Preliminary Injunction and Other Relief (the "Motion"), and

in conjunction with the Order granting Plaintiff's Motion in part, **IT IS HEREBY FURTHER**

**ORDERED,** until further Order of this Court following an evidentiary hearing, that:

        1.    Defendant Jeff Smith may begin working for Amazon Web

Services ("AWS") on August 7, 2017 with the following duties and restrictions.

        2.    Mr. Smith may go through AWS's general onboarding process, [write or otherwise provide information or opinions]

including any and all employee training.

        3.    Mr. Smith may be in "listen and learn" mode only, including that he

may review AWS materials and learn about AWS and its business, as well as attend

meetings and meet with AWS employees, so long as he does not speak about business-

related matters, or perform substantive functions or provide services.

4.    Mr. Smith shall adhere to the confidentiality provisions in the Noncompetition Provision he signed with IBM on or about June 7, 2014.

5.    For sake of clarity, Mr. Smith will not engage in the following:

a.    Mr. Smith will not lead the internal teams of global marketplace, developer tools, and global support and managed services provider offerings.

b.    Mr. Smith will have no role in designing the infrastructure of the AWS cloud, including as to the physical design of data centers or the operating system that runs the AWS cloud. He will have no role with respect to designing the network, the usage of compute, or the usage of storage

c.    Mr. Smith will have no role in setting AWS cloud storage pricing.

d.    Mr. Smith will have no role in AWS cloud storage commercial sales.

e.    Mr. Smith will not solicit any customers.

f.    Mr. Smith will not solicit any IBM employee to leave IBM's employ.

DATE: August 1, 2017              BY THE COURT

_____
THE HONORABLE JUDGE SEIBEL

EXHIBIT  G

## Signoracci, Pietro J

| | |
|---|---|
| **From:** | Signoracci, Pietro J |
| **Sent:** | Wednesday, August 02, 2017 5:34 PM |
| **To:** | Bouchard, Sarah E.; 'Brigham, Brandon J.' |
| **Cc:** | Atkins, Robert A; Herzog, Steven C; DePizzo, Kristen-Elise F |
| **Subject:** | IBM v. Smith -- Subpoena to AWS |
| **Attachments:** | IBM v. Smith -- Subpoena to AWS.pdf |

Counsel,

Please see the attached Subpoena.

Pursuant to our discussion earlier today, please acknowledge receipt and acceptance on behalf of AWS.

Thank you,
Pietro

**Pietro J. Signoracci** | Associate
**Paul, Weiss, Rifkind, Wharton & Garrison LLP**
1285 Avenue of the Americas | New York, NY 10019-6064
+1 212 373 3481 (Direct Phone) | +1 212 492 0481 (Direct Fax)
psignoracci@paulweiss.com | www.paulweiss.com

AO 88B  (Rev 12/13) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

# UNITED STATES DISTRICT COURT

for the

Southern District of New York ▼

|  |  |
|---|---|
| International Business Machines Corporation | ) |
| _Plaintiff_ | ) |
| v. | ) |
| Jeff S. Smith | ) |
| _Defendant_ | ) |

Civil Action No.  17-cv-5808

## SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS
## OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

To:
Amazon Web Services, Inc.

_(Name of person to whom this subpoena is directed)_

☑ _Production:_ **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and to permit inspection, copying, testing, or sampling of the material:

> See Attachment

| Place: Paul, Weiss, Rifkind, Wharton & Garrison LLP c/o Pietro J. Signoracci 1285 Avenue of the Americas New York, NY 10019 | Date and Time: 08/08/2017 5:00 pm |
|---|---|

☐ _Inspection of Premises:_ **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
|---|---|

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date: _____

| CLERK OF COURT | OR | _signature_ |
|---|---|---|
| _Signature of Clerk or Deputy Clerk_ | | _Attorney's signature_ |

The name, address, e-mail address, and telephone number of the attorney representing _(name of party)_ _____
International Business Machines Corporation _____ , who issues or requests this subpoena, are:
Pietro J. Signoracci, Paul, Weiss, Rifkind, Wharton & Garrison LLP, 1285 Avenue of the Americas, New York, NY
psignoracci@paulweiss.com, 212-373-3481

## Notice to the person who issues or requests this subpoena
A notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

# Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

**(1) *For a Trial, Hearing, or Deposition.*** A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
  **(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person, or
  **(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
    **(i)** is a party or a party's officer; or
    **(ii)** is commanded to attend a trial and would not incur substantial expense.

**(2) *For Other Discovery.*** A subpoena may command:
  **(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
  **(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

**(1) *Avoiding Undue Burden or Expense; Sanctions.*** A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

**(2) *Command to Produce Materials or Permit Inspection.***
  **(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
  **(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
    **(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
    **(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

**(3) *Quashing or Modifying a Subpoena.***
  **(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
    **(i)** fails to allow a reasonable time to comply;
    **(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
    **(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
    **(iv)** subjects a person to undue burden.
  **(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:
    **(i)** disclosing a trade secret or other confidential research, development, or commercial information; or

    **(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
  **(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
    **(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
    **(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

**(1) *Producing Documents or Electronically Stored Information.*** These procedures apply to producing documents or electronically stored information:
  **(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
  **(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
  **(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
  **(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

**(2) *Claiming Privilege or Protection.***
  **(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
    **(i)** expressly make the claim; and
    **(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
  **(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

## EXHIBIT A

This subpoena calls for the recipient to produce the documents described under the heading "Requests" below in accordance with the accompanying "Definitions" and "Instructions" above.

### Requests

1.    All documents concerning Smith, including, but not limited to all communications with Smith and all documents concerning the hiring, recruitment, employment, actual or potential positions or jobs, and compensation of Smith.

2.    All documents concerning Smith's proposed job responsibilities at AWS, including responsibilities for global marketplace, developer tools, and support and managed services.

3.    All documents concerning any and all positions, jobs and/or responsibilities AWS or Andrew Jassy has considered for Smith in connection with the potential or actual recruitment, hiring and/or employment of Smith, including descriptions of such positions, jobs and/or responsibilities.

4.    Copies of all descriptions of the position of Vice President at AWS.

5.    All documents concerning Smith's proposed responsibilities as Vice President of AWS.

6.    Documents sufficient to show the organizational structure and reporting lines at AWS, including Smith's proposed position.

7.    Documents sufficient to show the names of, and general subject matters discussed by, any and all committees, teams, and/or groups of AWS executives

and/or employees Smith is expected to participate in, including any and all regular or specific meetings with Andrew Jassy.

8.    All documents concerning IBM's next generation cloud infrastructure.

9.    All documents concerning competition with IBM.

10.    All documents concerning any actual or potential remuneration or compensation of Smith, including any and all bonuses, benefits, payment of expenses, payment of or reimbursement for legal expenses, and/or equity compensation.

11.    Documents explaining and describing each of these areas of AWS: global marketplace, developer tools, and support and managed services.

12.    All documents concerning communications between Smith and Andrew Jassy.

13.    Any IBM documents or information received by AWS from Smith.

14.    Documents concerning any offers by, or any obligations of, AWS to reimburse or indemnify Smith for his actual or potential loss or forfeiture of, or the actual or potential cancellation, rescission, or clawback of, IBM compensation or benefits, or for the amount of any judgment, settlement, or payment in an action.

## Definitions

A.    Subject to the additional specifications contained in the definitions set forth below, the Plaintiff incorporates by reference the uniform definitions and rules of construction contained in Rule 26.3 of the Local Rules of the United States District Courts for the Southern and Eastern Districts of New York (the "Local Civil Rules").

2

B.      "Document" or "documents" includes, without limitation, electronically stored information; all drafts; communications; correspondence; emails; text messages; imessages; messaging files; memoranda; records; reports; books; diaries; graphs; charts; diagrams; tables; photographs; images; sound recordings; tapes; microfilms; stenographic, handwritten or any other notes; work papers and any paper or writing.  A draft or non-identical copy of any document, whether due to the addition of notes or other change, is a separate document within the meaning of this term.  Where the electronic and hard copy versions of any document are separate documents pursuant to this definition, both the electronic and hard copy versions shall be produced.

C.      "Including" means including without limitation.

D.      "IBM" means International Business Machines Corporation.

E.      "AWS" means Amazon Web Services.

F.      "Smith" means Jeff Smith, Defendant in the above-captioned case.

### Instructions

A.      Unless otherwise specified in a particular Request, the documents requested are limited to those created, generated or received after August 1, 2014 to the present.

B.      These Requests cover all documents in AWS's possession, custody, or control, regardless of where they are located.

C.      With respect to any document responsive to any request that is withheld from production or redacted based upon a claim of privilege, please provide a privilege log with the information required pursuant to Rule 26(b)(5) of the Federal Rules of Civil Procedure and Local Civil Rule 26.2.  Identify and produce each segregable

portion of any document withheld in part based upon a claim of privilege as to which the basis for withholding other portions of the document does not apply.

D.    These Requests are continuing requests, and to the extent that any time after the production of documents called for by these Requests, you become aware of or acquire documents responsive to these Requests, such documents shall be produced promptly pursuant to the terms of the Requests.

EXHIBIT  H

## Signoracci, Pietro J

| | |
|---|---|
| **From:** | Signoracci, Pietro J |
| **Sent:** | Wednesday, August 02, 2017 7:07 PM |
| **To:** | 'Bouchard, Sarah E.'; Richman, Ronald; Garfield, Max; Brigham, Brandon J. |
| **Cc:** | Atkins, Robert A; Herzog, Steven C; DePizzo, Kristen-Elise F |
| **Subject:** | RE: IBM v. Smith  IBM's First Set of Expedited RFPs to Smith and Notice of Subpoena |

Thank you, Sarah.

Best,
Pietro

**Pietro J. Signoracci** | Associate
**Paul, Weiss, Rifkind, Wharton & Garrison LLP**
1285 Avenue of the Americas | New York, NY 10019-6064
+1 212 373 3481 (Direct Phone) | +1 212 492 0481 (Direct Fax)
psignoracci@paulweiss.com | www.paulweiss.com

---

**From:** Bouchard, Sarah E. [mailto:sarah.bouchard@morganlewis.com]
**Sent:** Wednesday, August 02, 2017 6:40 PM
**To:** Signoracci, Pietro J <psignoracci@paulweiss.com>; Richman, Ronald <Ronald.Richman@srz.com>; Garfield, Max <Max.Garfield@srz.com>; Brigham, Brandon J. <brandon.brigham@morganlewis.com>
**Cc:** Atkins, Robert A <ratkins@paulweiss.com>; Herzog, Steven C <sherzog@paulweiss.com>; DePizzo, Kristen-Elise F <kdepizzo@paulweiss.com>
**Subject:** Re: IBM v. Smith IBM's First Set of Expedited RFPs to Smith and Notice of Subpoena

Thanks, Pietro.

Even though Amazon is not a party, and without waiver of objections, Amazon wants to cooperate and will endeavor to perform a search and produce on an expedited and voluntary basis non objectionable documents pursuant to the subpoena.

Sarah E. Bouchard
Morgan, Lewis & Bockius LLP
1701 Market Street | Philadelphia, PA 19103-2921
Direct: +1.215.963.5077 | Main: +1.215.963.5000 | Fax: +1.215.963.5001
sarah.bouchard@morganlewis.com | www.morganlewis.com
Assistant: Theresa M. Myers | +1.215.963.4917 | theresa.myers@morganlewis.com

---

**From:** "Signoracci, Pietro J" <psignoracci@paulweiss.com>
**Date:** Wednesday, August 2, 2017 at 5:33:59 PM
**To:** "Richman, Ronald" <Ronald.Richman@srz.com>, "Garfield, Max" <Max.Garfield@srz.com>, "Bouchard, Sarah E." <sarah.bouchard@morganlewis.com>, "Brigham, Brandon J." <brandon.brigham@morganlewis.com>
**Cc:** "Atkins, Robert A" <ratkins@paulweiss.com>, "Herzog, Steven C" <sherzog@paulweiss.com>, "DePizzo, Kristen-Elise

F" <kdepizzo@paulweiss.com>
**Subject:** IBM v. Smith IBM's First Set of Expedited RFPs to Smith and Notice of Subpoena

Counsel,

Please see the attached Requests and Notice.

Best,
Pietro

**Pietro J. Signoracci** | Associate
**Paul, Weiss, Rifkind, Wharton & Garrison LLP**
1285 Avenue of the Americas | New York, NY 10019-6064
+1 212 373 3481 (Direct Phone) | +1 212 492 0481 (Direct Fax)
psignoracci@paulweiss.com | www.paulweiss.com

This message is intended only for the use of the Addressee and may contain information that is privileged and confidential. If you are not the intended recipient, you are hereby notified that any dissemination of this communication is strictly prohibited. If you have received this communication in error, please erase all copies of the message and its attachments and notify us immediately.

DISCLAIMER
This e-mail message is intended only for the personal use of the recipient(s) named above. This message may be an attorney-client communication and as such privileged and confidential and/or it may include attorney work product. If you are not an intended recipient, you may not review, copy or distribute this message. If you have received this communication in error, please notify us immediately by e-mail and delete the original message.

EXHIBIT  I

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

1285 AVENUE OF THE AMERICAS
NEW YORK, NEW YORK 10019-6064
TELEPHONE (212) 373-3000

LLOYD K GARRISON   (1946-1991)
RANDOLPH E PAUL    (1946-1956)
SIMON H RIFKIND    (1950-1995)
LOUIS S WEISS      (1927-1950)
JOHN F WHARTON     (1927-1977)

WRITER'S DIRECT DIAL NUMBER

(212) 373-3183

WRITER'S DIRECT FACSIMILE

(212) 492-0183

WRITER'S DIRECT E-MAIL ADDRESS

ratkins@paulweiss.com

UNIT 3601 OFFICE TOWER A BEIJING FORTUNE PLAZA
NO 7 DONGSANHUAN ZHONGLU
CHAOYANG DISTRICT
BEIJING 100020
PEOPLE'S REPUBLIC OF CHINA
TELEPHONE (86-10) 5828-6300

12TH FLOOR HONG KONG CLUB BUILDING
3A CHATER ROAD CENTRAL
HONG KONG
TELEPHONE (852) 2846-0300

ALDER CASTLE
10 NOBLE STREET
LONDON EC2V 7JU  U K
TELEPHONE (44 20) 7367 1600

FUKOKU SEIMEI BUILDING
2-2 UCHISAIWAICHO 2-CHOME
CHIYODA-KU TOKYO 100-0011 JAPAN
TELEPHONE (81-3) 3597-8101

TORONTO-DOMINION CENTRE
77 KING STREET WEST SUITE 3100
PO BOX 226
TORONTO ONTARIO M5K 1J3
TELEPHONE (416) 504-0520

2001 K STREET NW
WASHINGTON DC 20006-1047
TELEPHONE (202) 223-7300

500 DELAWARE AVENUE SUITE 200
POST OFFICE BOX 32
WILMINGTON DE 19899-0032
TELEPHONE (302) 655-4410

MATTHEW W ABBOTT
EDWARD T ACKERMAN
ALLAN J ARFFA
ROBERT A ATKINS
DAVID J  BALL
JOHN F BAUGHMAN
LYNN B BAYARD
DANIEL J  BELLER
CRAIG A BENSON
MITCHELL L BERG
MARK S BERGMAN
BRUCE BIRENBOIM
H CHRISTOPHER BOEHNING
ANGELO BONVINO
JAMES L BROCHIN
RICHARD J BRONSTEIN
DAVID W BROWN
SUSANNA M BUERGEL
PATRICK S CAMPBELL*
JESSICA S CAREY
JEANETTE K CHAN
YVONNE Y F CHAN
LEWIS R CLAYTON
JAY COHEN
KELLEY A CORNISH
CHRISTOPHER J CUMMINGS
CHARLES E DAVIDOW
THOMAS V DE LA BASTIDE III
ARIEL J DECKELBAUM
ALICE BELISLE EATON
ANDREW J EHRLICH
GREGORY A EZRING
LESLIE GORDON FAGEN
MARC FALCONE
ROSS A FIELDSTON
ANDREW C FINCH
BRAD J FINKELSTEIN
BRIAN P FINNEGAN
ROBERTO FINZI
PETER E FISCH
ROBERT C FLEDER
MARTIN FLUMENBAUM
ANDREW J FOLEY
HARRIS B FREIDUS
ANDREW L GAINES
KENNETH A GALLO
MICHAEL E GERTZMAN
ADAM M GIVERTZ
SALVATORE GOGLIORMELLA
ROBERT D GOLDBAUM
NEIL GOLDMAN
CATHERINE L GOODALL
ERIC GOODISON
CHARLES H GOOGE JR
ANDREW G GORDON
UDI GROFMAN
NICHOLAS GROOMBRIDGE
BRUCE A GUTENPLAN
GAINES GWATHMEY III
ALAN S HALPERIN
JUSTIN G HAMILL
CLAUDIA HAMMERMAN
GERARD E HARPER
BRIAN S HERMANN
MICHELE HIRSHMAN
MICHAEL S HONG
DAVID S HUNTINGTON
AMRAN HUSSEIN
LORETTA A IPPOLITO
BRIAN M JANSON
JAREN JANGHORBANI
MEREDITH J KANE

ROBERTA A KAPLAN
BRAD S KARP
PATRICK N KARSNITZ
JOHN C KENNEDY
BRIAN KIM
ALAN W KORNBERG
DANIEL J KRAMER
DAVID K LAKHDHIR
STEPHEN P LAMB
JOHN E LANGE
DANIEL J LEFFELL
XIAOYU GREG LIU
JEFFREY D MARELL
MARCO V MASOTTI
EDWIN S MAYNARD
DAVID W MAYO
ELIZABETH R McCOLM
MARK F MENDELSOHN
WILLIAM B MICHAEL
TOBY S MYERSON
CATHERINE NYARADY
JANE B O'BRIEN
ALEX YOUNG K OH
BRAD R OKUN
KELLEY D PARKER
MARC E PERLMUTTER
VALERIE E RADWANER
CARL L REISNER
LORIN L REISNER
WALTER G RICCIARDI
WALTER RIEMAN
RICHARD A ROSEN
ANDREW N ROSENBERG
JACQUELINE P RUBIN
RAPHAEL M RUSSO
ELIZABETH M SACKSTEDER
JEFFREY D SAFERSTEIN
JEFFREY B SAMUELS
DALE M SARRO
TERRY E SCHIMEK
KENNETH M SCHNEIDER
ROBERT B SCHUMER
JOHN M SCOTT
STEPHEN J SHIMSHAK
DAVID R SICULAR
MOSES SILVERMAN
STEVEN SIMKIN
JOSEPH J SIMONS
AUDRA J SOLOWAY
SCOTT M SONTAG
TARUN M STEWART
ERIC ALAN STONE
AIDAN SYNNOTT
ROBYN F TARNOFSKY
MONICA K THURMOND
DANIEL J TOAL
LIZA M VELAZQUEZ
MARIA T VULLO
ALEXANDRA M WALSH*
LAWRENCE G WEE
THEODORE V WELLS JR
BETH A WILKINSON
STEVEN J WILLIAMS
LAWRENCE I WITDORCHIC
MARK B WLAZLO
JULIA MASON WOOD
JENNIFER H WU
JORDAN E YARETT
KAYE N YOSHINO
TONG YU
TRACEY A ZACCONE
TAURIE M ZEITZER
T ROBERT ZOCHOWSKI, JR

N  T ADMITTED TO THE NEW YORK BAR

August 7, 2017

**By ECF**

The Honorable Paul E. Davison
United States Magistrate Judge
The Honorable Charles L. Brieant Jr.
Federal Building and United States Courthouse
300 Quarropas Street
White Plains, NY 10601-4150

*International Business Machines Corporation* v. *Jeff S. Smith*, No. 17 Civ. 5808

Dear Judge Davison:

We represent Plaintiff International Business Machines Corporation ("IBM"). IBM commenced this action to prevent Defendant Jeff Smith, a former senior executive of IBM, from violating his agreement not to work for a competitor for twelve months after leaving IBM. Last week, IBM moved for a preliminary injunction to stop Smith from becoming Vice President of Amazon Web Services ("AWS"), one of IBM's main rivals in Cloud Computing, for the remaining nine months of his noncompetition agreement. On Tuesday, Judge Seibel issued a temporary restraining order and scheduled a preliminary injunction hearing to begin on August 21. On Wednesday, the parties conferred on expedited deposition and document discovery and were, for a short time, cooperating on the scheduling of depositions before the injunction hearing.

On Friday, however, for no reason known to us, Smith did an abrupt about-face by advising us that he would refuse to make *any* witnesses available for depositions before the hearing—including one of his principal witnesses, the CEO of AWS and his direct supervisor at AWS, Andrew Jassy. This was only two days after

Honorable Paul E. Davison                                                                                                     2

Smith's counsel volunteered that Mr. Jassy would be available for deposition, though only until August 9. It was also one day after IBM accommodated Mr. Jassy's tight schedule by agreeing to depose him (in Seattle) on August 9 (this Wednesday.)

After counsel raised this dispute with the Court on Friday, Smith offered to present Mr. Jassy on Wednesday, but only for two hours. As that is inadequate for such an important witness, we declined. In retaliation, Smith refused to accept service of a subpoena for Mr. Jassy, who we served later on Friday. After service had already been achieved, Smith did another turn-around Friday night and agreed to accept service—but again refused to make Mr. Jassy available for deposition.

In a final attempt at compromise, on Sunday IBM offered to limit Mr. Jassy's deposition to five hours on the record, provided that Smith was prepared to do the same for the two IBM witnesses he has sought to depose. We received no response.

As discussed below, Smith's excuses for his sudden obstructionism are fabricated and pre-textual. We respectfully request that the Court order that IBM may depose Mr. Jassy, on Wednesday, for the time provided in the Federal Rules.

## Factual Background

From 2014 until May 5, 2017, Jeff Smith was a senior executive and Chief Information Officer of IBM. In that role, Smith was privy to highly confidential trade secrets, including some of IBM's most significant product development plans, and was a member of two committees of high-ranking IBM executives responsible for developing and implementing IBM's corporate strategies. Because his position exposed him to competitively sensitive information, Smith signed a noncompetition agreement barring him from working for an IBM competitor for twelve months after departing IBM.

While serving as one of IBM's senior executives and the company's Chief Information Officer, Smith corresponded by private (non-IBM) email with Mr. Jassy, the CEO of one of IBM's biggest competitors. Smith ingratiated himself to Mr. Jassy, and Mr. Jassy, in turn, recruited Smith to leave IBM and work directly for him at AWS.

On May 5, 2017, Smith resigned from IBM, and on June 9, 2017, Smith, through counsel, informed IBM that he had accepted an offer of employment with AWS that would commence on August 7, 2017. IBM has since learned that Smith will be a Vice President and senior leader at AWS, and that he will report directly to Mr. Jassy.

On August 1, 2017, IBM filed this action seeking to enforce Smith's noncompetition agreement, and sought a temporary restraining order barring Smith from beginning work at AWS. After a hearing last Tuesday, Judge Seibel entered the requested order subject to limited carve-outs, scheduled the preliminary injunction hearing for August 21 and 24, and directed the parties to submit written testimony for any witness they intended to present, along with proposed findings of fact and conclusions of

Honorable Paul E. Davison                                             3

law, by August 14.  At the August 1 hearing, both parties agreed to cooperate on expedited discovery in advance of the August 21 injunction hearing.

### The Parties Agree to Expedited Depositions

Consistent with that agreement, the parties conferred last Wednesday, August 2, to discuss logistics and agreed that they would exchange document requests later that day and that each side would endeavor to produce documents by August 8.  We indicated that IBM would seek documents from AWS, Smith's new employer.  In response, Smith's counsel, including Morgan Lewis, which represents both Smith and AWS, told us that they were authorized to accept service of a subpoena to AWS and that AWS would endeavor to produce documents on the agreed-upon schedule.  Later that day, IBM sent Smith's counsel a subpoena directed to AWS via email.  Smith's counsel thereafter advised us that AWS "wants to cooperate and will endeavor to perform a search and produce on an expedited and voluntary basis."  (*See* Ex. A.)

During the same August 2 call, the parties agreed to exchange lists of intended witnesses for the hearing on August 4 (last Friday).  Smith's counsel stated, subject to supplementation, that they wished to depose three IBM executives:  Arvind Krishna, IBM's declarant in support of its motion for a TRO; Jim Kavanaugh, Smith's direct supervisor at IBM; and Fletcher Previn, who replaced Smith as IBM's Chief Information Officer.  We agreed, but reiterated—as we had informed the Court at the TRO hearing—that Mr. Krishna was out of the country until August 11.

As for Smith's witnesses, we stated IBM's intention to depose Smith and others, including any witnesses whose written direct testimony Smith intended to submit.  In response, Smith's counsel stated that if we intended to depose Mr. Jassy, we would need to do so *before* August 10 because he would be out of the country from August 10 through August 20 (the day before the injunction hearing.)

On Thursday, we told Smith's counsel that we were prepared to accommodate Mr. Jassy and take his deposition in Seattle on August 9.  Even though IBM would be disadvantaged by not seeing any of Smith's witness affidavits (including Mr. Jassy's) until August 14, we were (and are) prepared to depose Mr. Jassy on Wednesday to work around his travel schedule and keep things moving.

With respect to the IBM deponents, we advised Smith that, just like Mr. Jassy, Mr. Kavanaugh would be traveling for much of the next two weeks before the hearing (August 9 to August 19), so we would make him available for deposition on Tuesday, August 8.  As for Mr. Krishna, Smith asked to depose him on Friday, August 11, but since Mr. Krishna will be traveling back from abroad on August 11, we offered to produce Mr. Krishna that weekend.  We also noted that Mr. Krishna would be available for deposition during the following week, after submission of written testimony on August 14.  (*Id.*)

Honorable Paul E. Davison                                                                    4

### Smith Asks to Change the Schedule

Just before 7:00 p.m. on August 3 (Thursday), Smith's counsel sent us an email stating that IBM's proposed dates were not "workable" and that Smith and his counsel were "also facing some scheduling issues on [their] end as well." (*See* Ex. B.) Smith's counsel proposed that the parties jointly request that the Court move the dates for the hearing on the injunction to the first week of September. (*Id.*) Smith's counsel did not indicate that Mr. Jassy could or would no longer sit for a deposition on August 9.

On August 4 (Friday), we responded that IBM would be willing to move the hearing dates to September, but with one condition. Planning on an August 21 hearing, Judge Seibel permitted Smith to begin at AWS on August 7 in a "listen and learn" mode only. ECF No. 6. Thus, we proposed that if the hearing were to be moved, Smith's "listen and learn" period should be limited to seven days before the hearing—though he could remain on the payroll at AWS for the entire period from August 7 until the injunction hearing. We also requested that Smith confirm that he would not make any public postings about his intention to join AWS, as he had previously done when updating his online "LinkedIn" profile on August 2 to identify himself as a "Leader" of AWS, in violation of the TRO. Smith declined our proposal.

We were expecting on Friday that Smith would raise with the Court his request to adjust the schedule. But for our disagreement about the length of Smith's "listen and learn" period, IBM had no objection to moving the hearing date. When we did not hear anything further from Smith's counsel on Friday, we wrote to confirm the depositions for IBM's Kavanaugh (Tuesday) and AWS's Jassy (Wednesday.)

### Smith Declares There Will Be No Depositions

In an abrupt change of direction (and tone), Smith's counsel responded that they were "disappointed" with the proposed deposition dates for IBM's witnesses and that Smith would "not be offering any of [his] witnesses for depositions." (*See* Ex. C.) Smith's counsel also backed out of the agreement to exchange lists of intended witnesses for the hearing. (*Id.*)

In an effort to resolve this issue, we spoke with Smith's counsel later Friday afternoon to ask what had prompted Smith's unwillingness to produce witnesses for depositions and whether Mr. Jassy was no longer available on August 9. Smith's counsel told us that they were unwilling to make Mr. Jassy available because of what they characterized as IBM's unwillingness to cooperate on the scheduling of depositions, specifically citing the inability of IBM to provide its declarant (Mr. Krishna) before the August 14 pre-hearing submissions, and arguing that IBM was obligated to do so.

We had already made clear at the TRO hearing that Mr. Krishna was unavailable this week, which at the time prompted the Court to state that his absence would be a problem if the injunction *hearing* were scheduled for this week. Once the parties agreed to schedule the injunction hearing for August 21, however, that concern

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

Honorable Paul E. Davison                                                                    5

was resolved; indeed, Smith's counsel acknowledged that the later date "*would give Mr.
Atkins's witness time to enjoy his vacation and get back*." (Ex. E. (emphasis added).)

         Nor is there a reason Mr. Krishna absolutely has to be made available
before August 14. In fact, it is more sensible for him to be deposed after written
testimony is submitted, which is why IBM has noticed the deposition of Smith for August
17. Regardless, in an attempt to accommodate Smith's demand, we agreed to make Mr.
Krishna available on over the weekend. If that does not work, and Smith can make a
compelling argument that Mr. Krishna—unlike every other affiant—must be deposed
before proposed findings of fact and conclusions of law are due August 14, the solution
was to ask the Court for more time to make those submissions, not to unilaterally declare
that no depositions would take place at all.

### The Jassy Deposition Subpoena

         During this same conversation on Friday afternoon, Smith's counsel also
told us that they were not willing to accept service of a deposition subpoena for Mr.
Jassy. We informed Smith's counsel that, as a result, we would serve a subpoena on Mr.
Jassy and seek the Court's assistance. We then consulted with Your Honor's chambers,
and we were instructed to file a letter this morning setting out the dispute, and also that
the Court would contact Smith's counsel to provide the same instruction.

         Shortly thereafter, late Friday afternoon, Smith's counsel requested that
we wait one hour before attempting to serve Mr. Jassy, and that within that time they
would propose a "creative solution." We waited. Approximately one hour later, Smith's
counsel proposed that: (a) Smith would provide Mr. Jassy's direct written testimony on
August 8, (b) Mr. Jassy would sit for a deposition *limited to two hours* at his office in
Seattle on August 9, and (c) the parties agree that the direct and deposition testimony
could be used in lieu of Mr. Jassy's appearance in person at the upcoming hearing.

         In response, we explained that two hours would not be sufficient as Mr.
Jassy is a significant witness, especially in light of learning that he would be offering
written direct testimony. (We also did not agree that he would not need to appear at the
hearing.) No reason was provided for making us fly to Seattle on extremely short notice
to be given only two hours with this central witness. But Smith's counsel did not budge,
and reiterated their refusal to accept service of a subpoena for Mr. Jassy.

         Therefore, we advised that we would serve Mr. Jassy in the normal course,
which we did at 5:45 p.m. (Pacific time), 8:45 p.m. (Eastern time.) Even though we had
no other choice, particularly with Mr. Jassy absenting himself from August 10 to August
20, Smith's counsel sent an email at 8:50 p.m. (Eastern time) accusing us of "harassing"
Mr. Jassy and—after the subpoena had already been served—finally agreeing to accept
service of a subpoena. Smith's counsel did not, however, indicate whether Mr. Jassy
would appear for a full deposition (or at all) on August 9 (or any date.) (*See* Ex. D.)

On Sunday, August 6, we wrote to Smith's counsel with an offer to limit Mr. Jassy's deposition to five hours on the record, and to accommodate his schedule as necessary on August 9, provided that Smith agree to extend the same courtesy to the two IBM executives he intends to depose: Messrs. Kavanaugh and Krishna. We requested a response by 9:30 a.m. today, but received none as of this filing.

## **Argument**

As of today, only two weeks remain before the preliminary injunction hearing before Judge Seibel. There is much work to be done between now and then. But, no depositions have been scheduled and none can be scheduled in light of Smith's stated unwillingness to schedule any. To date, the only explanation Smith has proffered for his refusal to engage with us is IBM's supposed unwillingness to cooperate. But that is false: IBM has agreed to provide every witness Smith has requested in time for the hearing, one this week (Kavanaugh), and another over the upcoming weekend or the following week (Krishna.) Smith has not even asked for a date for the third (Previn.)

Both parties are operating under the same very tight time constraints, and are doing so during a time when many people are out of town. Mr. Jassy is available only early this week and then, we have been told, will be away until the date before the hearing on August 21. Mr. Kavanaugh has nearly the same travel schedule, which is why we immediately informed Smith when he asked to depose Mr. Kavanaugh, and offered to present him on Tuesday. And, as we told the Court, Mr. Krishna is away now but will be back in time to be deposed well before the hearing begins on August 21.

These circumstances are not ideal, but all the witnesses will be made available for deposition and the parties have to cooperate—just as they understood and agreed during and after last week's TRO hearing, and just as we have done with respect to Mr. Jassy's schedule. Smith did not learn anything new from the time he agreed to cooperate until the time he refused to make witnesses available for depositions. He simply changed his mind on Friday. That is not a sufficient reason to obstruct the discovery process. As such, Smith should be directed to abide by the parties' prior agreement to cooperate on discovery and to proceed with the scheduling of depositions on the dates available.

In addition, and of more immediate concern, Mr. Jassy should be made available for a deposition on August 9—and with no unreasonable conditions. We have already acquiesced to his scheduling needs (this Wednesday) and location (Seattle.) We have also offered to compromise by agreeing to shorten the depositions of all senior executive witnesses, including Mr. Jassy, to a reasonable five-hour period. The two-hour limitation Smith continues to demand, however, is contrary to the rules and unreasonable.

Mr. Jassy is a central witness, which is why counsel for Smith offered to schedule his deposition on the parties' very first discovery conference call on Wednesday. He also apparently intends to offer written direct testimony in opposition to IBM's motion. That is no surprise, as Mr. Jassy appears to be the person responsible for

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

Honorable Paul E. Davison                                                    7

hiring Smith and, as counsel has confirmed, will be Smith's direct supervisor. Mr. Jassy
is a witness (probably, the main witness) to Smith's communications with AWS about
why he was recruited and what he will be doing at AWS—the single most important
issue in the case. Given the undeniable IBM trade secrets Smith would be taking with
him, his primary defense is that AWS (*i.e.*, Mr. Jassy) has "narrowed" his job
responsibilities so that he will not need to use IBM's trade secrets, even inadvertently.
Thus, the exact nature and full scope of Smith's expected duties as Vice President of
AWS is crucial, and Mr. Jassy is the witness to that. He also is a key witness to the
competition between IBM and AWS, the relevance and value of IBM's trade secrets to
AWS, and of course his private email exchanges with Smith while Smith was still an
IBM executive.

            Even if Smith was not planning to call Mr. Jassy as a witness, his
deposition would be important. But Smith's willingness, *at the start*, to offer dates for
Mr. Jassy's deposition, and his intention to present Mr. Jassy as a witness, demonstrate
that Mr. Jassy is not a peripheral or reluctant witness for whom two hours might suffice.
Like Smith himself, Mr. Jassy is a central witness and IBM is entitled to a full deposition.

            IBM certainly should not be deprived of its right to a full deposition of
Mr. Jassy, as it would have pursued via subpoena immediately had Smith and his counsel
not indicated a willingness to voluntarily cooperate. Between the hearing on August 1
and Smith's August 4 pronouncement that he did not intend to participate in *any*
depositions in advance of the August 21 hearing, Smith's counsel, on behalf of both
Smith and AWS, (a) agreed to accept service of a document subpoena on AWS, (b)
informed us of Mr. Jassy's schedule and availability for a deposition, (c) agreed to
exchange the names of proposed witnesses for the hearing, (d) confirmed that Mr. Jassy
was Smith's intended direct report at AWS in the proposed role described at the August 1
hearing, (e) received notice of IBM's intention to depose Mr. Jassy on August 9, and (f)
sought an agreement to extend the current schedule to address their own purported
scheduling problems. At no time did counsel for Smith indicate that Mr. Jassy would
resist an effort to depose him, or condition his appearance upon concessions from IBM.
Having taken the above representations at face value, IBM should not now be forced to
accept last-minute conditions or restrictions.

            If Smith has legitimate and compelling concerns regarding the schedule
ordered by the Court, IBM remains willing to listen and cooperate. Nothing we have
heard so far, however, justifies the unilateral cessation of depositions declared by Smith
on Friday afternoon, or the unduly restrictive and prejudicial conditions sought to be
imposed on Mr. Jassy's deposition.

                              Respectfully submitted,

                              *Robert Atkins /jf*

                              Robert A. Atkins

cc (by ECF): Counsel of Record

# Exhibit A

## Signoracci, Pietro J

| | |
|---|---|
| **From:** | Signoracci, Pietro J |
| **Sent:** | Wednesday, August 02, 2017 7:07 PM |
| **To:** | 'Bouchard, Sarah E.'; Richman, Ronald; Garfield, Max; Brigham, Brandon J. |
| **Cc:** | Atkins, Robert A; Herzog, Steven C; DePizzo, Kristen-Elise F |
| **Subject:** | RE: IBM v. Smith  IBM's First Set of Expedited RFPs to Smith and Notice of Subpoena |

Thank you, Sarah.

Best,
Pietro

**Pietro J. Signoracci** | Associate
**Paul, Weiss, Rifkind, Wharton & Garrison LLP**
1285 Avenue of the Americas | New York, NY 10019-6064
+1 212 373 3481 (Direct Phone) | +1 212 492 0481 (Direct Fax)
psignoracci@paulweiss.com | www.paulweiss.com

---

**From:** Bouchard, Sarah E. [mailto:sarah.bouchard@morganlewis.com]
**Sent:** Wednesday, August 02, 2017 6:40 PM
**To:** Signoracci, Pietro J <psignoracci@paulweiss.com>; Richman, Ronald <Ronald.Richman@srz.com>; Garfield, Max <Max.Garfield@srz.com>; Brigham, Brandon J. <brandon.brigham@morganlewis.com>
**Cc:** Atkins, Robert A <ratkins@paulweiss.com>; Herzog, Steven C <sherzog@paulweiss.com>; DePizzo, Kristen-Elise F <kdepizzo@paulweiss.com>
**Subject:** Re: IBM v. Smith IBM's First Set of Expedited RFPs to Smith and Notice of Subpoena

Thanks, Pietro.

Even though Amazon is not a party, and without waiver of objections, Amazon wants to cooperate and will endeavor to perform a search and produce on an expedited and voluntary basis non objectionable documents pursuant to the subpoena.

Sarah E. Bouchard
Morgan, Lewis & Bockius LLP
1701 Market Street | Philadelphia, PA 19103-2921
Direct: +1.215.963.5077 | Main: +1.215.963.5000 | Fax: +1.215.963.5001
sarah.bouchard@morganlewis.com | www.morganlewis.com
Assistant: Theresa M. Myers | +1.215.963.4917 | theresa.myers@morganlewis.com

---

**From:** "Signoracci, Pietro J" <psignoracci@paulweiss.com>
**Date:** Wednesday, August 2, 2017 at 5:33:59 PM
**To:** "Richman, Ronald" <Ronald.Richman@srz.com>, "Garfield, Max" <Max.Garfield@srz.com>, "Bouchard, Sarah E." <sarah.bouchard@morganlewis.com>, "Brigham, Brandon J." <brandon.brigham@morganlewis.com>
**Cc:** "Atkins, Robert A" <ratkins@paulweiss.com>, "Herzog, Steven C" <sherzog@paulweiss.com>, "DePizzo, Kristen-Elise

F" <kdepizzo@paulweiss.com>
**Subject:** IBM v. Smith IBM's First Set of Expedited RFPs to Smith and Notice of Subpoena

Counsel,

Please see the attached Requests and Notice.

Best,
Pietro

**Pietro J. Signoracci** | Associate
**Paul, Weiss, Rifkind, Wharton & Garrison LLP**
1285 Avenue of the Americas | New York, NY 10019-6064
+1 212 373 3481 (Direct Phone) | +1 212 492 0481 (Direct Fax)
psignoracci@paulweiss.com | www.paulweiss.com

This message is intended only for the use of the Addressee and may contain information that is privileged and confidential. If you are not the intended recipient, you are hereby notified that any dissemination of this communication is strictly prohibited. If you have received this communication in error, please erase all copies of the message and its attachments and notify us immediately.

DISCLAIMER
This e-mail message is intended only for the personal use of the recipient(s) named above. This message may be an attorney-client communication and as such privileged and confidential and/or it may include attorney work product. If you are not an intended recipient, you may not review, copy or distribute this message. If you have received this communication in error, please notify us immediately by e-mail and delete the original message.

# Exhibit B

## Signoracci, Pietro J

| | |
|---|---|
| **From:** | Signoracci, Pietro J |
| **Sent:** | Thursday, August 03, 2017 7:21 PM |
| **To:** | 'Bouchard, Sarah E.'; Brigham, Brandon J.; Atkins, Robert A; Herzog, Steven C; Filburn, Christopher L; Laufer, Gregory; Banks, Michael L.; Rosenblatt, Richard G. |
| **Cc:** | Richman, Ronald; Garfield, Max |
| **Subject:** | RE: IBM v. Smith - Defendant's First Set of Expedited RFP |

Thanks, Sarah. We'll consider and discuss with our client and get back to you when we can.

Best,
Pietro


**Pietro J. Signoracci** | Associate
**Paul, Weiss, Rifkind, Wharton & Garrison LLP**
1285 Avenue of the Americas | New York, NY 10019-6064
+1 212 373 3481 (Direct Phone) | +1 212 492 0481 (Direct Fax)
psignoracci@paulweiss.com | www.paulweiss.com

---

**From:** Bouchard, Sarah E. [mailto:sarah.bouchard@morganlewis.com]
**Sent:** Thursday, August 03, 2017 6:57 PM
**To:** Signoracci, Pietro J <psignoracci@paulweiss.com>; Brigham, Brandon J. <brandon.brigham@morganlewis.com>; Atkins, Robert A <ratkins@paulweiss.com>; Herzog, Steven C <sherzog@paulweiss.com>; Filburn, Christopher L <cfilburn@paulweiss.com>; Banks, Michael L. <michael.banks@morganlewis.com>; Rosenblatt, Richard G. <richard.rosenblatt@morganlewis.com>
**Cc:** Richman, Ronald <Ronald.Richman@srz.com>; Garfield, Max <Max.Garfield@srz.com>
**Subject:** RE: IBM v. Smith - Defendant's First Set of Expedited RFP

Pietro –

Thanks for letting us know about Mr. Krishna's scheduling issues.  Mr. Krishna is IBM's lead declarant, and having his deposition on a Sunday, with the Findings of Fact and Conclusions of Law due the next day is not workable.  We are also facing some scheduling issues on our end as well.  We would be amenable to moving the hearing date to the first week of September, and moving all corresponding deadlines.  If the hearing date is moved to the first week of September, Mr. Smith would agree to an extension of the Orders currently in effect, assuming the Judge would agree.

If this works on your end, we can make a joint call tomorrow to the Judge's Deputy to look at her schedule.

Best,
Sarah

**Sarah E. Bouchard**
**Morgan, Lewis & Bockius LLP**
1701 Market Street | Philadelphia, PA 19103-2921
Direct: +1.215.963.5077 | Main: +1.215.963.5000 | Fax: +1.215.963.5001
sarah.bouchard@morganlewis.com | www.morganlewis.com
Assistant: Theresa M. Myers | +1.215.963.4917 | theresa.myers@morganlewis.com

**From:** Signoracci, Pietro J [mailto:psignoracci@paulweiss.com]
**Sent:** Thursday, August 03, 2017 5:39 PM
**To:** Brigham, Brandon J.; Atkins, Robert A; Herzog, Steven C; Filburn, Christopher L
**Cc:** Bouchard, Sarah E.; Richman, Ronald; Garfield, Max
**Subject:** RE: IBM v. Smith - Defendant's First Set of Expedited RFP

Brandon,

Arvind Krishna is returning to the country at the end of the day on Friday, August 11. He is available for a deposition in New York City on Sunday, August 13, or the following week.

Jim Kavanaugh is available Tuesday, August 8. He is on vacation beginning August 9 to August 19.

Thank you,
Pietro


**Pietro J. Signoracci** | Associate
**Paul, Weiss, Rifkind, Wharton & Garrison LLP**
1285 Avenue of the Americas | New York, NY 10019-6064
+1 212 373 3481 (Direct Phone) | +1 212 492 0481 (Direct Fax)
psignoracci@paulweiss.com | www.paulweiss.com


**From:** Brigham, Brandon J. [mailto:brandon.brigham@morganlewis.com]
**Sent:** Wednesday, August 02, 2017 5:05 PM
**To:** Signoracci, Pietro J <psignoracci@paulweiss.com>; DePizzo, Kristen-Elise F <kdepizzo@paulweiss.com>; Atkins, Robert A <ratkins@paulweiss.com>; Herzog, Steven C <sherzog@paulweiss.com>
**Cc:** Bouchard, Sarah E. <sarah.bouchard@morganlewis.com>; Richman, Ronald <Ronald.Richman@srz.com>; Garfield, Max <Max.Garfield@srz.com>
**Subject:** IBM v. Smith - Defendant's First Set of Expedited RFP

Counsel –

Please see the attached.

Separately, we would like to schedule Arvind Krishna's deposition for August 11 in light of his schedule. We will forward a notice of deposition tomorrow.

**Brandon J. Brigham**
**Morgan, Lewis & Bockius LLP**
1701 Market Street | Philadelphia, PA 19103-2921
Direct: +1.215.963.4780 | Cell: 215.901.7555 | Main: +1.215.963.5000 | Fax: +1.215.963.5001
brandon.brigham@morganlewis.com | www.morganlewis.com
Assistant: Nicole Christinzio | +1.215.963.5778 | nicole.christinzio@morganlewis.com


DISCLAIMER
This e-mail message is intended only for the personal use
of the recipient(s) named above. This message may be an
attorney-client communication and as such privileged and
confidential and/or it may include attorney work product.
If you are not an intended recipient, you may not review,
copy or distribute this message. If you have received this

communication in error, please notify us immediately by
e-mail and delete the original message.

This message is intended only for the use of the Addressee and may contain information that is privileged and confidential. If you are not the intended recipient, you are hereby notified that any dissemination of this communication is strictly prohibited. If you have received this communication in error, please erase all copies of the message and its attachments and notify us immediately.

# Exhibit C

## Signoracci, Pietro J

| | |
|---|---|
| **From:** | Signoracci, Pietro J |
| **Sent:** | Friday, August 04, 2017 5:58 PM |
| **To:** | 'Bouchard, Sarah E.'; Brigham, Brandon J.; Herzog, Steven C; Filburn, Christopher L; Laufer, Gregory; Banks, Michael L.; Rosenblatt, Richard G. |
| **Cc:** | Richman, Ronald; Garfield, Max |
| **Subject:** | RE: IBM v. Smith - Defendant's First Set of Expedited RFP |
| **Attachments:** | IBM v. Smith -- Notice of Deposition.pdf; IBM v. Smith -- Notice of Jassy Subpoena.pdf |

Sarah,

Pursuant to our discussions earlier today, please see the attached Notice of Deposition and Notice of Subpoena.

Best,
Pietro

**Pietro J. Signoracci** | Associate
**Paul, Weiss, Rifkind, Wharton & Garrison LLP**
1285 Avenue of the Americas | New York, NY 10019-6064
+1 212 373 3481 (Direct Phone) | +1 212 492 0481 (Direct Fax)
psignoracci@paulweiss.com | www.paulweiss.com

---

**From:** Bouchard, Sarah E. [mailto:sarah.bouchard@morganlewis.com]
**Sent:** Friday, August 04, 2017 2:16 PM
**To:** Signoracci, Pietro J <psignoracci@paulweiss.com>; Brigham, Brandon J. <brandon.brigham@morganlewis.com>; Herzog, Steven C <sherzog@paulweiss.com>; Filburn, Christopher L <cfilburn@paulweiss.com>; Laufer, Gregory <glaufer@paulweiss.com>; Banks, Michael L. <michael.banks@morganlewis.com>; Rosenblatt, Richard G. <richard.rosenblatt@morganlewis.com>
**Cc:** Richman, Ronald <Ronald.Richman@srz.com>; Garfield, Max <Max.Garfield@srz.com>
**Subject:** RE: IBM v. Smith - Defendant's First Set of Expedited RFP

Pietro –

We are disappointed that IBM is not making its witnesses available at reasonable times prior to August 14, the deadline for the Findings of Fact and Conclusions of Law.  As you will recall, the Court stated that IBM would need to find different declarants if your witnesses were unavailable, given that the burden is on IBM to establish all the elements for injunctive relief.  We are not going to engage in one sided discovery, to the detriment of Jeff Smith.  As a result, we will not be offering any of our witnesses for depositions.  There also is not a need to identify witnesses until both sides present their respective declarations on August 14.  We will proceed with the Court's deadlines, and see you at the hearing on August 21 and 24.

**Sarah E. Bouchard**
**Morgan, Lewis & Bockius LLP**
1701 Market Street | Philadelphia, PA 19103-2921
Direct: +1.215.963.5077 | Main: +1.215.963.5000 | Fax: +1.215.963.5001
sarah.bouchard@morganlewis.com | www.morganlewis.com
Assistant: Theresa M. Myers | +1.215.963.4917 | theresa.myers@morganlewis.com

**From:** Signoracci, Pietro J [mailto:psignoracci@paulweiss.com]
**Sent:** Friday, August 04, 2017 12:51 PM
**To:** Bouchard, Sarah E.; Brigham, Brandon J.; Herzog, Steven C; Filburn, Christopher L; Laufer, Gregory; Banks, Michael L.; Rosenblatt, Richard G.
**Cc:** Richman, Ronald; Garfield, Max
**Subject:** RE: IBM v. Smith - Defendant's First Set of Expedited RFP

Sarah,

Please let us know by 3:00 PM today whether you intend to take Mr. Kavanaugh's deposition on Tuesday, August 8.

Please also confirm that you and AWS will be producing documents by Tuesday, August 8 in advance of Mr. Jassy's deposition on Wednesday, August 9. We did not receive a response to the attached email from yesterday afternoon.

Thank you,
Pietro


**Pietro J. Signoracci** | Associate
**Paul, Weiss, Rifkind, Wharton & Garrison LLP**
1285 Avenue of the Americas | New York, NY 10019-6064
+1 212 373 3481 (Direct Phone) | +1 212 492 0481 (Direct Fax)
psignoracci@paulweiss.com | www.paulweiss.com


**From:** Signoracci, Pietro J
**Sent:** Thursday, August 03, 2017 7:21 PM
**To:** 'Bouchard, Sarah E.' <sarah.bouchard@morganlewis.com>; Brigham, Brandon J. <brandon.brigham@morganlewis.com>; Atkins, Robert A <ratkins@paulweiss.com>; Herzog, Steven C <sherzog@paulweiss.com>; Filburn, Christopher L <CFilburn@paulweiss.com> Laufer, Gregory <GLaufer@paulweiss.com>; Banks, Michael L. <michael.banks@morganlewis.com>; Rosenblatt, Richard G. <richard.rosenblatt@morganlewis.com>
**Cc:** Richman, Ronald <Ronald.Richman@srz.com>; Garfield, Max <Max.Garfield@srz.com>
**Subject:** RE: IBM v. Smith - Defendant's First Set of Expedited RFP

Thanks, Sarah. We'll consider and discuss with our client and get back to you when we can.

Best,
Pietro


**Pietro J. Signoracci** | Associate
**Paul, Weiss, Rifkind, Wharton & Garrison LLP**
1285 Avenue of the Americas | New York, NY 10019-6064
+1 212 373 3481 (Direct Phone) | +1 212 492 0481 (Direct Fax)
psignoracci@paulweiss.com | www.paulweiss.com


**From:** Bouchard, Sarah E. [mailto:sarah.bouchard@morganlewis.com]
**Sent:** Thursday, August 03, 2017 6:57 PM
**To:** Signoracci, Pietro J <psignoracci@paulweiss.com>; Brigham, Brandon J. <brandon.brigham@morganlewis.com>; Atkins, Robert A <ratkins@paulweiss.com>; Herzog, Steven C <sherzog@paulweiss.com>; Filburn, Christopher L <cfilburn@paulweiss.com>; Banks, Michael L. <michael.banks@morganlewis.com>; Rosenblatt, Richard G. <richard.rosenblatt@morganlewis.com>

**Cc:** Richman, Ronald <Ronald.Richman@srz.com>; Garfield, Max <Max.Garfield@srz.com>
**Subject:** RE: IBM v. Smith - Defendant's First Set of Expedited RFP

Pietro –

Thanks for letting us know about Mr. Krishna's scheduling issues.  Mr. Krishna is IBM's lead declarant, and having his deposition on a Sunday, with the Findings of Fact and Conclusions of Law due the next day is not workable.  We are also facing some scheduling issues on our end as well.  We would be amenable to moving the hearing date to the first week of September, and moving all corresponding deadlines.  If the hearing date is moved to the first week of September, Mr. Smith would agree to an extension of the Orders currently in effect, assuming the Judge would agree.

If this works on your end, we can make a joint call tomorrow to the Judge's Deputy to look at her schedule.

Best,
Sarah

**Sarah E. Bouchard**
**Morgan, Lewis & Bockius LLP**
1701 Market Street | Philadelphia, PA 19103-2921
Direct: +1.215.963.5077 | Main: +1.215.963.5000 | Fax: +1.215.963.5001
sarah.bouchard@morganlewis.com | www.morganlewis.com
Assistant: Theresa M. Myers | +1.215.963.4917 | theresa.myers@morganlewis.com

---

**From:** Signoracci, Pietro J [mailto:psignoracci@paulweiss.com]
**Sent:** Thursday, August 03, 2017 5:39 PM
**To:** Brigham, Brandon J.; Atkins, Robert A; Herzog, Steven C; Filburn, Christopher L
**Cc:** Bouchard, Sarah E.; Richman, Ronald; Garfield, Max
**Subject:** RE: IBM v. Smith - Defendant's First Set of Expedited RFP

Brandon,

Arvind Krishna is returning to the country at the end of the day on Friday, August 11. He is available for a deposition in New York City on Sunday, August 13, or the following week.

Jim Kavanaugh is available Tuesday, August 8. He is on vacation beginning August 9 to August 19.

Thank you,
Pietro

**Pietro J. Signoracci** | Associate
**Paul, Weiss, Rifkind, Wharton & Garrison LLP**
1285 Avenue of the Americas | New York, NY 10019-6064
+1 212 373 3481 (Direct Phone) | +1 212 492 0481 (Direct Fax)
psignoracci@paulweiss.com | www.paulweiss.com

---

**From:** Brigham, Brandon J. [mailto:brandon.brigham@morganlewis.com]
**Sent:** Wednesday, August 02, 2017 5:05 PM
**To:** Signoracci, Pietro J <psignoracci@paulweiss.com>; DePizzo, Kristen-Elise F <kdepizzo@paulweiss.com>; Atkins, Robert A <ratkins@paulweiss.com>; Herzog, Steven C <sherzog@paulweiss.com>
**Cc:** Bouchard, Sarah E. <sarah.bouchard@morganlewis.com>; Richman, Ronald <Ronald.Richman@srz.com>; Garfield,

Max <Max.Garfield@srz.com>
**Subject:** IBM v. Smith - Defendant's First Set of Expedited RFP

Counsel –

Please see the attached.

Separately, we would like to schedule Arvind Krishna's deposition for August 11 in light of his schedule. We will forward a notice of deposition tomorrow.

**Brandon J. Brigham**
**Morgan, Lewis & Bockius LLP**
1701 Market Street | Philadelphia, PA 19103-2921
Direct: +1.215.963.4780 | Cell: 215.901.7555 | Main: +1.215.963.5000 | Fax: +1.215.963.5001
brandon.brigham@morganlewis.com | www.morganlewis.com
Assistant: Nicole Christinzio | +1.215.963.5778 | nicole.christinzio@morganlewis.com

DISCLAIMER
This e-mail message is intended only for the personal use
of the recipient(s) named above. This message may be an
attorney-client communication and as such privileged and
confidential and/or it may include attorney work product.
If you are not an intended recipient, you may not review,
copy or distribute this message. If you have received this
communication in error, please notify us immediately by
e-mail and delete the original message.

This message is intended only for the use of the Addressee and may contain information that is privileged and confidential. If you are
not the intended recipient, you are hereby notified that any dissemination of this communication is strictly prohibited. If you have
received this communication in error, please erase all copies of the message and its attachments and notify us immediately.

# Exhibit D

## Signoracci, Pietro J

| | |
|---|---|
| **From:** | Bouchard, Sarah E. <sarah.bouchard@morganlewis.com> |
| **Sent:** | Friday, August 04, 2017 8:50 PM |
| **To:** | Signoracci, Pietro J; Brigham, Brandon J.; Herzog, Steven C; Filburn, Christopher L; Laufer, Gregory; Banks, Michael L.; Rosenblatt, Richard G. |
| **Cc:** | Richman, Ronald; Garfield, Max |
| **Subject:** | RE: IBM v. Smith - Defendant's First Set of Expedited RFP |

We will accept service of the subpoena on behalf of Mr. Jassy to avoid any further harassment of him and his family over the weekend. Our acceptance of service is without waiver and with full reservation of rights, including the filing of a motion to quash and all other appropriate relief. To be clear, we proposed a solution to IBM today that addresses its desire to cross examine Mr. Jazzy in a timely manner and would provide IBM with Mr. Jassy's testimony well in advance of the hearing date of August 21. IBM completely rejected that proposal without basis, with a motive only to harass.

At the same time, IBM has been playing games with deposition schedules and is attempting to shield its executive witnesses from participating in litigation that IBM chose to assert against Mr. Smith. It is patently obvious that IBM has concerns about what its own executives will say, particularly about IBM's current strategic vision.

**Sarah E. Bouchard**
**Morgan, Lewis & Bockius LLP**
1701 Market Street | Philadelphia, PA 19103-2921
Direct: +1.215.963.5077 | Main: +1.215.963.5000 | Fax: +1.215.963.5001
sarah.bouchard@morganlewis.com | www.morganlewis.com
Assistant: Theresa M. Myers | +1.215.963.4917 | theresa.myers@morganlewis.com

---

**From:** Signoracci, Pietro J [mailto:psignoracci@paulweiss.com]
**Sent:** Friday, August 04, 2017 5:58 PM
**To:** Bouchard, Sarah E.; Brigham, Brandon J.; Herzog, Steven C; Filburn, Christopher L; Laufer, Gregory; Banks, Michael L.; Rosenblatt, Richard G.
**Cc:** Richman, Ronald; Garfield, Max
**Subject:** RE: IBM v. Smith - Defendant's First Set of Expedited RFP

Sarah,

Pursuant to our discussions earlier today, please see the attached Notice of Deposition and Notice of Subpoena.

Best,
Pietro

**Pietro J. Signoracci** | Associate
**Paul, Weiss, Rifkind, Wharton & Garrison LLP**
1285 Avenue of the Americas | New York, NY 10019-6064
+1 212 373 3481 (Direct Phone) | +1 212 492 0481 (Direct Fax)
psignoracci@paulweiss.com | www.paulweiss.com

---

**From:** Bouchard, Sarah E. [mailto:sarah.bouchard@morganlewis.com]
**Sent:** Friday, August 04, 2017 2:16 PM
**To:** Signoracci, Pietro J <psignoracci@paulweiss.com>; Brigham, Brandon J. <brandon.brigham@morganlewis.com>;

Herzog, Steven C <sherzog@paulweiss.com>; Filburn, Christopher L <cfilburn@paulweiss.com>; Laufer, Gregory <glaufer@paulweiss.com>; Banks, Michael L. <michael.banks@morganlewis.com>; Rosenblatt, Richard G. <richard.rosenblatt@morganlewis.com>
**Cc:** Richman, Ronald <Ronald.Richman@srz.com>; Garfield, Max <Max.Garfield@srz.com>
**Subject:** RE: IBM v. Smith - Defendant's First Set of Expedited RFP

Pietro –

We are disappointed that IBM is not making its witnesses available at reasonable times prior to August 14, the deadline for the Findings of Fact and Conclusions of Law. As you will recall, the Court stated that IBM would need to find different declarants if your witnesses were unavailable, given that the burden is on IBM to establish all the elements for injunctive relief. We are not going to engage in one sided discovery, to the detriment of Jeff Smith. As a result, we will not be offering any of our witnesses for depositions. There also is not a need to identify witnesses until both sides present their respective declarations on August 14. We will proceed with the Court's deadlines, and see you at the hearing on August 21 and 24.

**Sarah E. Bouchard**
**Morgan, Lewis & Bockius LLP**
1701 Market Street | Philadelphia, PA 19103-2921
Direct: +1.215.963.5077 | Main: +1.215.963.5000 | Fax: +1.215.963.5001
sarah.bouchard@morganlewis.com | www.morganlewis.com
Assistant: Theresa M. Myers | +1.215.963.4917 | theresa.myers@morganlewis.com

**From:** Signoracci, Pietro J [mailto:psignoracci@paulweiss.com]
**Sent:** Friday, August 04, 2017 12:51 PM
**To:** Bouchard, Sarah E.; Brigham, Brandon J.; Herzog, Steven C; Filburn, Christopher L; Laufer, Gregory; Banks, Michael L.; Rosenblatt, Richard G.
**Cc:** Richman, Ronald; Garfield, Max
**Subject:** RE: IBM v. Smith - Defendant's First Set of Expedited RFP

Sarah,

Please let us know by 3:00 PM today whether you intend to take Mr. Kavanaugh's deposition on Tuesday, August 8.

Please also confirm that you and AWS will be producing documents by Tuesday, August 8 in advance of Mr. Jassy's deposition on Wednesday, August 9. We did not receive a response to the attached email from yesterday afternoon.

Thank you,
Pietro

**Pietro J. Signoracci** | Associate
**Paul, Weiss, Rifkind, Wharton & Garrison LLP**
1285 Avenue of the Americas | New York, NY 10019-6064
+1 212 373 3481 (Direct Phone) | +1 212 492 0481 (Direct Fax)
psignoracci@paulweiss.com | www.paulweiss.com

**From:** Signoracci, Pietro J
**Sent:** Thursday, August 03, 2017 7:21 PM
**To:** 'Bouchard, Sarah E.' <sarah.bouchard@morganlewis.com>; Brigham, Brandon J. <brandon.brigham@morganlewis.com>; Atkins, Robert A <ratkins@paulweiss.com>; Herzog, Steven C <sherzog@paulweiss.com>; Filburn, Christopher L <CFilburn@paulweiss.com>; Laufer, Gregory <GLaufer@paulweiss.com>; Banks, Michael L. <michael.banks@morganlewis.com>; Rosenblatt, Richard G.

<richard.rosenblatt@morganlewis.com>
**Cc:** Richman, Ronald <Ronald.Richman@srz.com>; Garfield, Max <Max.Garfield@srz.com>
**Subject:** RE: IBM v. Smith - Defendant's First Set of Expedited RFP

Thanks, Sarah. We'll consider and discuss with our client and get back to you when we can.

Best,
Pietro


**Pietro J. Signoracci** | Associate
**Paul, Weiss, Rifkind, Wharton & Garrison LLP**
1285 Avenue of the Americas | New York, NY 10019-6064
+1 212 373 3481 (Direct Phone) | +1 212 492 0481 (Direct Fax)
psignoracci@paulweiss.com | www.paulweiss.com

---

**From:** Bouchard, Sarah E. [mailto:sarah.bouchard@morganlewis.com]
**Sent:** Thursday, August 03, 2017 6:57 PM
**To:** Signoracci, Pietro J <psignoracci@paulweiss.com>; Brigham, Brandon J. <brandon.brigham@morganlewis.com>;
Atkins, Robert A <ratkins@paulweiss.com>; Herzog, Steven C <sherzog@paulweiss.com>; Filburn, Christopher L
<cfilburn@paulweiss.com>; Banks, Michael L. <michael.banks@morganlewis.com>; Rosenblatt, Richard G.
<richard.rosenblatt@morganlewis.com>
**Cc:** Richman, Ronald <Ronald.Richman@srz.com>; Garfield, Max <Max.Garfield@srz.com>
**Subject:** RE: IBM v. Smith - Defendant's First Set of Expedited RFP

Pietro –

Thanks for letting us know about Mr. Krishna's scheduling issues. Mr. Krishna is IBM's lead declarant, and having his
deposition on a Sunday, with the Findings of Fact and Conclusions of Law due the next day is not workable. We are also
facing some scheduling issues on our end as well. We would be amenable to moving the hearing date to the first week
of September, and moving all corresponding deadlines. If the hearing date is moved to the first week of September, Mr.
Smith would agree to an extension of the Orders currently in effect, assuming the Judge would agree.

If this works on your end, we can make a joint call tomorrow to the Judge's Deputy to look at her schedule.

Best,
Sarah

**Sarah E. Bouchard**
**Morgan, Lewis & Bockius LLP**
1701 Market Street | Philadelphia, PA 19103-2921
Direct: +1.215.963.5077 | Main: +1.215.963.5000 | Fax: +1.215.963.5001
sarah.bouchard@morganlewis.com | www.morganlewis.com
Assistant: Theresa M. Myers | +1.215.963.4917 | theresa.myers@morganlewis.com

---

**From:** Signoracci, Pietro J [mailto:psignoracci@paulweiss.com]
**Sent:** Thursday, August 03, 2017 5:39 PM
**To:** Brigham, Brandon J.; Atkins, Robert A; Herzog, Steven C; Filburn, Christopher L
**Cc:** Bouchard, Sarah E.; Richman, Ronald; Garfield, Max
**Subject:** RE: IBM v. Smith - Defendant's First Set of Expedited RFP

Brandon,

Arvind Krishna is returning to the country at the end of the day on Friday, August 11. He is available for a deposition in New York City on Sunday, August 13, or the following week.

Jim Kavanaugh is available Tuesday, August 8. He is on vacation beginning August 9 to August 19.

Thank you,
Pietro


**Pietro J. Signoracci** | Associate
**Paul, Weiss, Rifkind, Wharton & Garrison LLP**
1285 Avenue of the Americas | New York, NY 10019-6064
+1 212 373 3481 (Direct Phone) | +1 212 492 0481 (Direct Fax)
psignoracci@paulweiss.com | www.paulweiss.com

---

**From:** Brigham, Brandon J. [mailto:brandon.brigham@morganlewis.com]
**Sent:** Wednesday, August 02, 2017 5:05 PM
**To:** Signoracci, Pietro J <psignoracci@paulweiss.com>; DePizzo, Kristen-Elise F <kdepizzo@paulweiss.com>; Atkins, Robert A <ratkins@paulweiss.com>; Herzog, Steven C <sherzog@paulweiss.com>
**Cc:** Bouchard, Sarah E. <sarah.bouchard@morganlewis.com>; Richman, Ronald <Ronald.Richman@srz.com>; Garfield, Max <Max.Garfield@srz.com>
**Subject:** IBM v. Smith - Defendant's First Set of Expedited RFP

Counsel –

Please see the attached.

Separately, we would like to schedule Arvind Krishna's deposition for August 11 in light of his schedule. We will forward a notice of deposition tomorrow.

**Brandon J. Brigham**
**Morgan, Lewis & Bockius LLP**
1701 Market Street | Philadelphia, PA 19103-2921
Direct: +1.215.963.4780 | Cell: 215.901.7555 | Main: +1.215.963.5000 | Fax: +1.215.963.5001
brandon.brigham@morganlewis.com | www.morganlewis.com
Assistant: Nicole Christinzio | +1.215.963.5778 | nicole.christinzio@morganlewis.com


DISCLAIMER
This e-mail message is intended only for the personal use
of the recipient(s) named above. This message may be an
attorney-client communication and as such privileged and
confidential and/or it may include attorney work product.
If you are not an intended recipient, you may not review,
copy or distribute this message. If you have received this
communication in error, please notify us immediately by
e-mail and delete the original message.


This message is intended only for the use of the Addressee and may contain information that is privileged and confidential. If you are not the intended recipient, you are hereby notified that any dissemination of this communication is strictly prohibited. If you have received this communication in error, please erase all copies of the message and its attachments and notify us immediately.

# Exhibit E

**UNITED STATES DISTRICT COURT**
SOUTHERN DISTRICT OF NEW YORK
----------------------------------x
INTERNATIONAL BUSINESS MACHINES
**CORPORATION,**

                        **Plaintiff,**

          v.                    17 CV 5808 (CS)

**JEFF S. SMITH,**

                  **Defendant.**
----------------------------------x
                  U.S. Courthouse
                  White Plains, N.Y.
                  August 1, 2017
                  11:20 a.m.


**Before:**      **HON. CATHY SEIBEL,**
              United States District Judge


APPEARANCES

**PAUL WEISS RIFKIND WHARTON & GARRISON, LLP**
**BY:  ROBERT A. ATKINS, Esq.**
**     PIETRO SIGNORACCI, Esq.**
**     KRISTEN-ELISE DEPIZZO, Esq.**
**1285 Avenue of the Americas**
**New York, N.Y.  10019-6064**
**Attorneys for Plaintiff**

MORGAN LEWIS
**BY:  SARAH E. BOUCHARD, Esq.**
**     BRANDON J. BRIGHAM, Esq.**
**1701 Market Street**
**Philadelphia, PA  19103-2921**
**Attorneys for Defendant Smith**

**SCHULTE ROTH & ZABEL, LLP**
**BY:  RONALD E. RICHMAN, Esq.**
**     MAX GARFIELD, Esq.**
**919 Third Avenue**
**New York, NY  10022**
**Attorneys for**


**Sue Ghorayeb, R.P.R., C.S.R.**
Official Court Reporter

```
1                 THE COURT:  If you could.  I think we all --

2                 MS. BOUCHARD:  Particularly what I said --

3                 THE COURT:  I think we all understand what you're

4       saying.

5                 MS. BOUCHARD:  Yes.

6                 THE COURT:  But if -- especially if you've done

7       these before, you have language that you can use --

8                 MS. BOUCHARD:  Sure.

9                 THE COURT:  -- to formalize listen and learn mode,

10      as well as his obligation not to share trade secrets, which

11      would be out there anyway.

12                MS. BOUCHARD:  Right, and that would give Mr.

13      Atkins's witness time to enjoy his vacation and get back.

14                MR. ATKINS:  Well, in that --

15                THE COURT:  Well --

16                MR. ATKINS:  In that event, we can have the hearing

17      on August 21st or August 24th.

18                THE COURT:  That's up to you.

19                MS. BOUCHARD:  Well, the TRO expires by its own

20      terms in 14 days.

21                MR. ATKINS:  It can be extended.

22                MS. BOUCHARD:  By agreement.

23                THE COURT:  If you want me to do it, I'll do it on

24      August 21st and August 24th, but if you don't consent to

25      extending it, then the Magistrate will do it.
```

EXHIBIT  J

# Schulte Roth & Zabel LLP

919 Third Avenue
New York, NY 10022
212.756.2000
212.593.5955 fax

www.srz.com

Writer's Direct Number
212.756.2048

Writer's E-mail Address
ronald.richman@srz.com

August 7, 2017

**VIA ECF**

The Honorable Paul E. Davison
United States Magistrate Judge
The Hon. Charles L. Brieant Jr. Federal Building and
United States Courthouse
300 Quarropas Street
White Plains, NY 10601-4150

Re:  *International Business Machines Corporation v. Jeff S. Smith*
Case No. 7-17-cv-05808 (CS)(PED)

Dear Magistrate Judge Davison:

Schulte Roth & Zabel LLP is co-counsel to defendant Jeff Smith[1] in the captioned litigation.  We write regarding several disputes that have arisen between the parties as to expedited discovery and other issues in advance of the preliminary injunction hearing scheduled in this matter for August 21st and August 24th before Judge Seibel.

By way of background, plaintiff International Business Machines Corporation ("IBM") commenced this litigation on August 1, 2017 seeking, *inter alia*, a temporary restraining order and preliminary injunction barring Mr. Smith from commencing work as a Vice President at Amazon Web Services, Inc. ("AWS"), a subsidiary of Amazon.com, Inc., on the basis of a non-competition agreement between Mr. Smith and IBM.  From August 2014 through May 2017, Mr. Smith worked as IBM's Chief Information Officer ("CIO").  IBM alleges that the non-competition agreement bars Mr. Smith from working for AWS for twelve months following May 2, 2017, the date on which Mr. Smith resigned from IBM.

Mr. Smith notified IBM on June 13, 2017 that he had accepted the AWS position and intended to commence employment on August 7, 2017.  As a result of settlement discussions among the parties and AWS following Mr. Smith's notification to IBM – which ultimately did not resolve the parties' dispute – IBM has known since at least July 12, 2017 that Mr. Smith was not willing to agree to wait until May 2018 to begin working for AWS.  Despite its advance

---

[1]  Although identified in the complaint as "Jeff S. Smith," Mr. Smith's middle initial is "P".

The Honorable Paul E. Davison
August 7, 2017
Page 2

knowledge of Mr. Smith's intentions, IBM waited until August 1 – less than a week before Mr. Smith's August 7 start date at AWS – to file this lawsuit and seek preliminary relief.

During a hearing on August 1 before Judge Seibel, the Court rejected, in part, the temporary restraining order IBM sought and permitted Mr. Smith to commence employment at AWS on August 7, 2017, Mr. Smith's intended start date, with certain restrictions. (*See* Docket Entry No. 4.) The parties advised the Court that they wished to take expedited discovery (although no order concerning discovery was issued). Further, Judge Seibel ordered the parties to submit affidavits of direct testimony and proposed findings of fact and conclusions of law to the Court by 9 a.m. on August 14, 2017. The Court scheduled the preliminary injunction hearing for August 14 and August 21.

On August 2, the day following the Court hearing, the parties conferred and agreed to exchange documents by 5 p.m. on Tuesday August 8. Also on August 2, we advised counsel to IBM that we intended to take the depositions of (at least) three IBM witnesses: (i) Arvind Krishna, IBM's lead declarant who signed the sole non-attorney declaration IBM submitted in support of its application for a temporary restraining order and preliminary injunction, to which all of the documents IBM alleges contain IBM's trade secrets and confidential information were attached, (ii) James Kavanaugh, Mr. Smith's direct supervisor at IBM, and (iii) Fletcher Previn, one of Mr. Smith's direct reports at IBM and Mr. Smith's successor as CIO at IBM. At that time, IBM indicated that it wished to depose Mr. Smith, but did not commit to taking the deposition of Andrew Jassy, the Chief Executive Officer of non-party AWS and the person to whom Mr. Smith will report at AWS. Nonetheless, counsel for Mr. Smith informed IBM that Mr. Jassy was unavailable from August 10-20 to avoid any confusion later.

Against this backdrop, despite our and AWS's best and good-faith efforts, issues have arisen with respect to deposition scheduling that we have been unable to resolve. First, IBM has impeded Mr. Smith's ability to depose witnesses under IBM's control by proposing only dates that confer a blatant tactical advantage upon IBM. IBM has advised us that Mr. Krishna, whom IBM chose as its lead declarant, is out of the country until August 11 and available for a deposition on *Sunday* August 13 – the day before the parties' pre-hearing submissions to the Court are due – or anytime during the *following* week. Given the deadline for pre-hearing submissions by 9 a.m. on August 14, depositions that take place on or after August 14 are substantially less valuable for the party taking them. (As an aside, Mr. Smith has serious concerns that IBM selected Mr. Krishna as its lead declarant solely to frustrate the process given that Mr. Krishna appears to lack first-hand or personal knowledge of many of the facts set forth in his Declaration.) IBM advised that Mr. Kavanaugh is available for deposition on August 8 – before the parties exchange document productions – and then on vacation from August 9 through August 19. IBM has not even proposed a date when Mr. Previn is available to be deposed and continues to respond to Mr. Smith's attempts to take appropriate discovery by not even mentioning Mr. Previn.

As to Mr. Jassy, Mr. Smith and non-party AWS have offered two reasonable proposals to address the discovery issues, and to accommodate IBM's request to depose Mr. Jassy, despite that Mr. Jassy lives and works in Seattle, Washington, is beyond the subpoena

The Honorable Paul E. Davison
August 7, 2017
Page 3

power of this Court to compel Mr. Jassy to attend the hearing, and may be unavailable to testify at the hearing on August 21 or 24 due to longstanding personal and professional commitments.

      First, we suggested to IBM that the parties jointly seek the Court's permission to briefly postpone the preliminary injunction hearing until early September, and to extend the temporary restraining order now in effect in the interim. IBM rejected this offer.

      We then offered to provide IBM with Mr. Jassy's affidavit of direct testimony on August 8 and to make him available for deposition on August 9, which testimony would serve as his cross-examination during the hearing. IBM also rejected this offer. Then, at approximately 6 p.m. on Friday August 4, counsel for IBM sent us a subpoena to take Mr. Jassy's deposition – despite the fact that, as noted, Mr. Jassy is not within the Court's subpoena power. (Counsel ultimately accepted service of the subpoena purely to prevent IBM from harassing Mr. Jassy and his family in attempting to serve an unenforceable subpoena, but Mr. Jassy still was personally served at his home.)

      Mr. Smith is willing to proceed to the hearing without either party taking depositions of any witnesses. Mr. Smith is also willing to proceed to the hearing with deposition discovery, but only if each party acts reasonably in terms of making witnesses available on dates that do not put the other party at a tactical disadvantage – *i.e.*, following the exchange of documents and in advance of the time pre-hearing submissions are due. IBM knew Mr. Smith was taking the AWS job nearly two months before his intended start date and then waited nearly three weeks to commence litigation after IBM knew Mr. Smith would not comply with IBM's unwavering demand that he sit out a full year. IBM alone created this logistical crunch through its inaction and gamesmanship. Even if the vacation schedules of its witnesses are merely and truly a coincidence, IBM is attempting to use those vacations to manipulate discovery to its advantage. A one-sided opportunity to depose witnesses is neither fair nor appropriate.

      Separately, following a diligent and expeditious process, on August 4, only three days after IBM commenced litigation and only four days after IBM declared that the parties' settlement discussions had reached an impasse, Mr. Smith, through counsel, located an expert witness for this litigation. We notified IBM's counsel promptly after this expert was retained. The parties are in the midst of attempting to negotiate a protective order. We have suggested using the form of protective order similar to what the same law firms involved in this dispute used in prior non-compete litigation when an employee left IBM. Significantly, IBM has taken the position that no expert witness can have access to documents IBM declares "Highly Confidential."[2] This position is untenable. A key issue in this dispute involves IBM's assertion that certain information to which Mr. Smith allegedly was exposed – eight or more months ago – constitutes protectable trade secrets and proprietary confidential information. Even putting aside questions of whether the information is actually secret, whether Mr. Smith possesses any of the

---

[2]   Other issues with the draft protective order are minor and easily resolvable. For example, IBM insists on a provision that precludes AWS personnel from access to documents IBM declares "Highly Confidential." Neither Mr. Smith nor AWS have any objection to such a provision. Co-counsel to Mr. Smith, who separately serves as counsel to AWS, already made such a representation in Court that they would not share alleged confidential IBM information with AWS personnel.

The Honorable Paul E. Davison
August 7, 2017
Page 4

information today, the staleness of the information, and the utility to AWS of such information, Mr. Smith's skill set is primarily in managing and leading organizations and not in creating or designing technology. Under IBM's proposed approach, no one who actually possesses appropriate knowledge of the technologies at issue will be permitted to challenge any of IBM's assertions. IBM cannot be the judge and jury of assessing its own self-serving allegations. Time is of the essence given the expedited discovery and hearing schedule, and IBM is dragging its feet on agreeing to what should be a boilerplate agreement and process.

Finally, on August 1, IBM sought to file its application for a temporary restraining order and preliminary injunction and supporting papers, including its memorandum of law and supporting declarations and exhibits, under seal. Judge Seibel granted IBM's request to an extent, but ordered IBM to file publicly on the Court's ECF system redacted copies of these papers by August 4, 2017. Judge Seibel's order provided that IBM's redactions were to be "limited to trade secrets and confidential information." (*See* Docket Entry No. 5.) On August 4, 2017, IBM publicly filed these papers. Among the redactions, IBM blocked out references to communications between Mr. Smith and Mr. Jassy at AWS while Mr. Smith was at IBM. The content of those communications have no legitimate basis to be sealed. While apparently embarrassing to IBM, redacting such information from public access is without legitimate basis and improper. To establish "good cause" for redaction of information, a party must demonstrate that 'a clearly defined and serious injury . . . would result from disclosure of the document.'" *King Pharmaceuticals, Inc. v. Eon Labs, Inc.*, No. 04-CV-5540 (DGT), 2010 WL 3924689, at *2 (E.D.N.Y. Sept. 28, 2010) (internal quotation marks omitted) (ellipses in original) (quoting *Allen v. City of New York*, 420 F. Supp. 2d 295, 302 (S.D.N.Y. 2006)). "Where the document sought to be shielded from disclosure is part of the official court file, the Court must consider the public's presumptive right of access to such materials in making its determination as to good cause." *Nycomed US, Inc. v. Glenmark Generics, Inc.*, No. 08-CV-5023 (CBA), 2010 WL 889799, at *2 (E.D.N.Y. Mar. 8, 2010). "A 'generalized concern of adverse publicity' is not, however, a sufficiently compelling reason to outweigh the presumption of access. On the contrary, the party seeking to maintain redactions must make a sufficient showing of good cause to justify the sealing of portions of judicial documents." *Id.* at *8. Accordingly, Mr. Smith respectfully requests an order from the Court mandating IBM to publicly re-file these papers without these improper redactions.

We respectfully request the Court's intervention to address and resolve each of these issues. Specifically, we request the following determinations:

- A postponement of the preliminary injunction hearing with the current temporary restraining order restrictions remaining in place; or

- In the alternative, the preliminary injunction hearing to proceed on August 21 and 24, with no depositions except for Mr. Jassy's two hour deposition, which may be utilized at the preliminary injunction hearing, along with his affidavit of direct testimony (IBM has not indicated that any of the witnesses it controls are unavailable to appear at the hearing dates currently in place.);

The Honorable Paul E. Davison
August 7, 2017
Page 5

- The entry of a Protective Order that permits the expert witness located by Mr. Smith to review IBM's "Highly Confidential" documents under a Stipulation of Confidentiality; and,

- The unsealing of the portion of any documents filed by IBM that are improperly still sealed before the Court.

We are available at the Court's convenience to answer any questions or participate in a conference either by telephone or in person. We thank the Court, in advance, for its attention to this matter.

Respectfully submitted,

*Ronald E. Richman* /MG

Ronald E. Richman

cc:     All Counsel of Record (via ECF)

EXHIBIT  K

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

1285 AVENUE OF THE AMERICAS
NEW YORK, NEW YORK 10019-6064
TELEPHONE (212) 373-3000

LLOYD K GARRISON (1946-1991)
RANDOLPH E PAUL (1946-1956)
SIMON H RIFKIND (1950-1995)
LOUIS S WEISS (1927-1950)
JOHN F WHARTON (1927-1977)

WRITER S DIRECT DIAL NUMBER

(212) 373-3183

WRITER S DIRECT FACSIMILE

(212) 492-0183

WRITER S DIRECT E-MAIL ADDRESS

ratkins@paulweiss.com

UNIT 3601 OFFICE TOWER A BEIJING FORTUNE PLAZA
NO 7 DONGSANHUAN ZHONGLU
CHAOYANG DISTRICT
BEIJING 100020
PEOPLE S REPUBLIC OF CHINA
TELEPHONE (86-10) 5828-6300

12TH FLOOR HONG KONG CLUB BUILDING
3A CHATER ROAD CENTRAL
HONG KONG
TELEPHONE (852) 2846-0300

ALDER CASTLE
10 NOBLE STREET
LONDON EC2V 7JU U K
TELEPHONE (44 20) 7367 1600

FUKOKU SEIMEI BUILDING
2-2 UCHISAIWAICHO 2-CHOME
CHIYODA-KU TOKYO 100-0011 JAPAN
TELEPHONE (81-3) 3597-8101

TORONTO-DOMINION CENTRE
77 KING STREET WEST SUITE 3100
PO BOX 226
TORONTO ONTARIO M5K 1J3
TELEPHONE (416) 504-0520

2001 K STREET NW
WASHINGTON DC 20006-1047
TELEPHONE (202) 223-7300

500 DELAWARE AVENUE SUITE 200
POST OFFICE BOX 32
WILMINGTON DE 19899-0032
TELEPHONE (302) 655-4410

MATTHEW W ABBOTT
EDWARD T ACKERMAN
ALLAN J ARPFA
ROBERT A ATKINS
DAVID J BALL
JOHN F BAUGHMAN
LYNN B BAYARD
DANIEL J BELLER
CRAIG A BENSON
MITCHELL L BERG
MARK S BERGMAN
BRUCE BIRENBOIM
H CHRISTOPHER BOEHNING
ANGELO BONVINO
JAMES L BROCHIN
RICHARD J BRONSTEIN
DAVID W BROWN
SUSANNA M BUERGEL
PATRICK S CAMPBELL*
JESSICA S CAREY
JEANETTE K CHAN
YVONNE Y F CHAN
LEWIS R CLAYTON
JAY COHEN
KELLEY A CORNISH
CHRISTOPHER J CUMMINGS
CHARLES E DAVIDOW
THOMAS V DE LA BASTIDE III
ARIEL J DECKELBAUM
ALICE BELISLE EATON
ANDREW J EHRLICH
GREGORY A EZRING
LESLIE GORDON FAGEN
MARC FALCONE
ROSS A FIELDSTON
BRIAN P FINNEGAN
BRAD J FINKELSTEIN
BRIAN P FINNEGAN
ROBERTO FINZI
PETER E FISCH
ROBERT C FLEDER
MARTIN FLUMENBAUM
ANDREW J FOLEY
HARRIS B FREIDUS
MANUEL S FREY
ANDREW L GAINES
KENNETH A GALLO
MICHAEL E GERTZMAN
ADAM M GIVERTZ
SALVATORE GOGLIORMELLA
ROBERT D GOLDBAUM
NEIL GOLDMAN
CATHERINE L GOODALL
ERIC GOODISON
CHARLES H GOOGE JR
ANDREW G GORDON
UDI GROFMAN
NICHOLAS GROOMBRIDGE
BRUCE A GUTENPLAN
GAINES GWATHMEY III
ALAN S HALPERIN
JUSTIN G HAMILL
CLAUDIA HAMMERMAN
GERARD E HARPER
BRIAN S HERMANN
MICHELE HIRSHMAN
MICHAEL S HONG
DAVID S HUNTINGTON
AMRAN HUSSEIN
LORETTA A IPPOLITO
BRIAN M JANSON
JAREN JANGHORBANI
MEREDITH J KANE

ROBERTA A KAPLAN
BRAD S KARP
PATRICK N KARSNITZ
JOHN C KENNEDY
BRIAN KIM
ALAN W KORNBERG
DANIEL J KRAMER
DAVID K LAKHDHIR
STEPHEN P LAMB*
JOHN E LANGE
DANIEL J LEFFELL
XIAOYU GREG LIU
JEFFREY D MARELL
MARCO V MASOTTI
EDWIN S MAYNARD
DAVID W MAYO
ELIZABETH R McCOLM
MARK F MENDELSOHN
WILLIAM B MICHAEL
TOBY S MYERSON
CATHERINE NYARADY
JANE B O BRIEN
ALEX YOUNG K OH
BRAD R OKUN
KELLEY D PARKER
MARC E PERLMUTTER
VALERIE E RADWANER
CARL L REISNER
LORIN L REISNER
WALTER G RICCIARDI
WALTER RIEMAN
RICHARD A ROSEN
ANDREW N ROSENBERG
JACQUELINE P RUBIN
RAPHAEL M RUSSO
ELIZABETH M SACKSTEDER
JEFFREY D SAFERSTEIN
JEFFREY B SAMUELS
DALE M SARRO
TERRY E SCHIMEK
KENNETH M SCHNEIDER
ROBERT B SCHUMER
JOHN M SCOTT
STEPHEN J SHIMSHAK
DAVID R SICULAR
MOSES SILVERMAN
STEVEN SIMKIN
JOSEPH J SIMONS
ADAM J SOLOWAY
SCOTT M SONTAG
TARUN M STEWART
ERIC ALAN STONE
AIDAN SYNNOTT
ROBYN F TARNOFSKY
MONICA K THURMOND
DANIEL J TOAL
LIZA M VELAZQUEZ
MARIA T VULLO
ALEXANDRA M WALSH*
LAWRENCE G WEE
THEODORE V WELLS JR
BETH A WILKINSON
STEVEN J WILLIAMS
LAWRENCE I WITDORCHIC
MARK B WLAZLO
JULIA MASON WOOD
JENNIFER H WU
JORDAN E YARETT
KAYE N YOSHINO
TONG YU
TRACEY A ZACCONE
TAURIE M ZEITZER
T ROBERT ZOCHOWSKI JR

*N I ADMITTED TO THE NEW YORK BAR

August 7, 2017

**By ECF**

The Honorable Paul E. Davison
United States Magistrate Judge
The Honorable Charles L. Brieant Jr.
Federal Building and United States Courthouse
300 Quarropas Street
White Plains, NY 10601-4150

*International Business Machines Corporation* v. *Jeff S. Smith*, No. 17 Civ. 5808

Dear Judge Davison:

We represent Plaintiff IBM, and we write in response to the letter Defendant Jeff Smith submitted to the Court earlier today. *See* ECF No. 22.

With regard to Mr. Jassy's deposition, Smith's proposal that Mr. Jassy's deposition be limited to two hours is unreasonable for the reasons stated in our prior letter: Mr. Jassy is a critical witness for whom Smith intends to offer direct testimony and who will not commit to coming to the hearing. Smith's letter does not meaningfully respond to these points. In reality, although framed as a "compromise," Smith's proposal is intended to secure a strategic advantage over IBM. In effect, Smith seeks the ability to submit written testimony from Mr. Jassy without, as Judge Seibel directed, making the witness available for cross-examination at the injunction hearing. That is not a reasonable or fair proposal.

Further, as set forth in the letter we submitted earlier this morning, *see* ECF No. 21, IBM did not "reject" Smith's offer to extend the schedule in these

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

Honorable Paul E. Davison                                                                 2

proceedings. IBM simply requested that any extension be accompanied by an agreement that would limit his "listen and learn" period at Amazon Web Services ("AWS") before the Court's adjudication of IBM's injunction request, but agreed that Smith could remain on the AWS payroll in the interim. That request was reasonable and understandable. After the August 2 hearing, Judge Seibel permitted Smith to begin at AWS *solely* in a "listen and learn" mode—to allow him to begin his orientation, in effect—but forbade him from doing any substantive work, or even *speaking* about the substance of his work. *See* ECF No. 6. As we explained to counsel for Smith, it is implausible that Smith's basic orientation at AWS could take a full month.

       Thus, in an effort to protect the closely guarded IBM trade secrets that Smith knows and that are the subject of these proceedings, we said that IBM would agree to a short adjournment of the hearing date on the condition that Smith agree to limit his "listen and learn" period at AWS before the Court could hear this matter. We proposed that this could be achieved either by Smith starting his "listen and learn" period later in August (but allowing him to go on the AWS payroll as of today) or by Smith starting his "listen and learn" period now but ending it in a week. Smith declined this proposed compromise. IBM continues to be amenable to a change in deadlines to accommodate the parties' and witnesses' schedules, but only if coupled with a reasonable modification of the underlying orders that adequately protect IBM's trade secrets.

       Smith also raises two new issues, which we briefly address.

       First, with respect to the protective order, IBM has proposed a protective order that is nearly identical to the one Smith's counsel previously executed in connection with a similar matter. (*See* Ex. A.) In response, Smith proposed a protective order that, *inter alia*, would permit witnesses, including Mr. Jassy, the CEO of one of IBM's chief competitors, to see IBM's confidential materials and trade secrets. We explained to counsel for Smith that, for obvious reasons, such an arrangement would be unacceptable. Further, with regard to experts, the protective order Smith's counsel and we previously agreed to in the other similar matter did not permit expert review of IBM's trade secret materials. (*See id.*) IBM will not agree to do so here either, and Smith has articulated no reason why this case warrants a contrary approach. IBM respectfully submits that Smith's purported expert—a blogger who regularly writes favorable articles regarding AWS—is not and should not be entitled to view IBM's competitively sensitive information. IBM remains willing to enter an order in substantially the same form as Exhibit A to this letter. The proposed protective order, which we respectfully request that the Court so-order, is attached as Exhibit B.

       Second, as to Smith's concerns with IBM's redacted papers, which were filed this past Friday, we have not yet had an opportunity to evaluate Smith's specific objections. However, IBM is prepared to re-review those redactions and work with Smith's counsel to come to an agreement as to scope. IBM therefore respectfully submits that there is no urgency requiring the Court's immediate attention to this issue, and that any resolution of this issue should follow meet-and-confer efforts between the parties and, if necessary, briefing by the parties.

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

Honorable Paul E. Davison                                                                   3

Respectfully submitted,

*Robert Atkins/jr*

Robert A. Atkins

cc (by ECF): Counsel of Record

# Exhibit A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

INTERNATIONAL BUSINESS MACHINES
CORPORATION.

      Plaintiff-Counter-
      Defendant,

    v.

GIOVANNI VISENTIN,

      Defendant-Counter-
      Claimant

ECF Case

11-cv-0399 (LAP)

## SECOND CONFIDENTIALITY STIPULATION AND PROTECTIVE ORDER

   IT IS HEREBY STIPULATED AND AGREED by and between the undersigned counsel

to International Business Machines Corporation ("IBM") and Giovanni Visentin:

   1.  This Second Confidentiality Stipulation and Protective Order (the "Order")

governs the handling of all documents, testimony, interrogatory answers, responses to requests to

admit and other information, including all copies, excerpts and summaries thereof (collectively,

the "Discovery Material") produced during the course of the above captioned action by any

parties to this action or by any non-parties, either voluntarily or as required by discovery requests

or subpoenas made pursuant to the Federal Rules of Civil Procedure.

   2.  Upon being signed by the undersigned counsel, this Order will supersede the

Confidentiality Stipulation and Protective Order signed on January 28, 2011 by counsel for

Visentin and IBM ("the Prior Order"). Documents produced while the Prior Order was in effect

shall automatically be governed by this Order, and documents designated as "Confidential,"

"Highly Confidential," or "Highly Confidential IBM Information" under the Prior Order will be treated as so designated under this Order.

3.      Documents produced by the Hewlett-Packard Company ("HP") while the Prior Order was in effect shall be governed by the Confidentiality Stipulation and Protective Order entered into between HP and IBM in the above captioned matter ("HP/IBM Order"), signed on _____ by counsel for HP and IBM. Any additional material produced by HP in the above captioned matter will be governed by the HP/IBM Order.

4.      Discovery Material shall be used only in this action (including any appeals), and not for any other purpose whatsoever.

5.      Any party or non-party producing Discovery Material shall have the right to designate such Discovery Material as "Confidential" to the extent that the producing party or non-party believes in good faith that such Discovery Material constitutes, contains or would disclose (i) proprietary business information, a trade secret or other commercial or financial information that the party or non-party, in good faith, believes would result in competitive or commercial harm in the market place if the material were disseminated to persons other than those specifically identified in Paragraph 8 below or (ii) confidential personal information or personal financial information. Any party or non-party producing Discovery Material shall also have the right to designate such Discovery Material as "Highly Confidential" to the extent that the producing party or non-party believes in good faith that such Discovery Material constitutes, contains or would disclose (i) highly sensitive proprietary business information, a trade secret or other commercial or financial information that the party or non-party, in good faith, believes would result in competitive or commercial harm in the market place if the material were

2

disseminated to persons other than those specifically identified in Paragraph 9 below or (ii)
highly sensitive confidential personal information or personal financial information. To avoid
confusion, IBM may designate Highly Confidential material that it produces as "Highly
Confidential IBM Information" and Defendant Visentin may designate any Highly Confidential
material he produces as "Highly Confidential Visentin Information." Material designated as
"Confidential," "Highly Confidential," or "Highly Confidential IBM Information," or "Highly
Confidential Visentin Information" are referred to collectively herein as "Confidential Material."
Any party or non-party who designates Discovery Material is referred to herein as the
"Designating Party."

      6.    The designation of information as Confidential Material pursuant to this Order
will not create any presumption for or against the right to confidential treatment of such
information should the issue of the right to such confidential treatment be presented to the Court.
A party's failure to object to or challenge the designation of Discovery Material as Confidential
Material at the time of production of such Confidential Material shall not constitute a waiver of
or estop such party from asserting any such objection or challenge and shall not be used or
construed in any way as an agreement or concession by such party that the Discovery Materials
so designated are or were ever confidential, proprietary or otherwise subject to trade secret
protection. Any party may at any time challenge the designation of Discovery Material as
Confidential Material by sending written notice thereof to the Designating Party. Such challenge
shall be raised in the first instance on an informal basis and resolution shall be attempted in good
faith. If the challenge cannot be resolved on an informal basis, either the objecting party or the
Designating Party may apply to the Court for an appropriate ruling. In the event that a party or

3

non-party makes such an application to the Court, such party or non-party shall provide reasonable prior notice thereof to the opposing party in this action and, if the Designating Party is a non-party, to such non-party. Nothing in this Order shall prevent a party from independently seeking or obtaining discovery, or obtaining publicly available material which may include some of the same documents covered by a confidentiality designation made pursuant to this Order.

      7.     Confidential Material shall be designated as follows:

           (a)     In the case of a document, designation shall be made by placing the legend "Confidential," "Highly Confidential," "Highly Confidential IBM Information," or "Highly Confidential Visentin Information" (as applicable) on each page prior to production, or if impracticable to do so (such as in the case of electronic media), by another method designed to alert others to the designation.

           (b)     In the case of a deposition, designation of the transcript or the portion of the transcript (including exhibits) which contains Confidential Material shall be made by a statement to such effect on the record during the course of a deposition, or by a statement in writing sent to all counsel of record within ten (10) days after the receipt of the transcript of the deposition. During the ten day period during which counsel may review the transcript to determine whether the transcript should be designated Confidential, Highly Confidential, Highly Confidential IBM Information, or Highly Confidential Visentin Information, the entire transcript shall be treated as if it were designated Highly Confidential. If the designation is made during the course of the deposition, the reporter attending such deposition shall thereafter bind the transcript thereof accordingly.

(c)    In the case of interrogatory answers and responses to requests to admit, any designation that the Discovery Material contained therein is Confidential Material shall be made by means of a statement in such answers or responses specifying the specific answers or responses designated as Confidential, Highly Confidential, Highly Confidential IBM Information, or Highly Confidential Visentin Information.

8.    Discovery Material that has been designated as "Confidential" shall not be given, shown, made available or communicated in any way to anyone except:

(a)    counsel of record in this action, and attorneys, paralegals and other support staff employed or engaged by such counsel who are assisting counsel in the conduct of this action;

(b)    the parties to this action, including IBM's present and former officers, directors and employees deemed necessary to aid counsel in the prosecution or defense of this action;

(c)    actual deponents or witnesses in this action and their counsel during the course of a deposition, hearing or at trial;

(d)    the Court (and any appellate court), court personnel and any person the Court designates in the interest of justice, upon terms that the Court deems fit and proper;

(e)    court reporters and videographers employed in connection with this action;

(f)    persons not covered above who, from the face of the material that has been designated as "Confidential" or from the source information provided by the Designating Party, appear to have received it prior to the date such material is produced in this action;

5

(g)     entities or persons engaged by counsel of record in this action to perform photocopying, scanning, database and other document management services; and,

(h)     any other person agreed to in writing by the Designating Party, provided that such person acknowledges in writing that he or she has read this Order and agrees to be bound by it by signing the acknowledgment attached hereto as *Exhibit A*.

9.     Discovery Material that has been designated as "Highly Confidential" shall not be given, shown, made available or communicated in any way to anyone except:

(a)     counsel of record in this action, and attorneys, paralegals and other support staff employed or engaged by such counsel who are assisting counsel in the conduct of this action;

(b)     actual deponents or witnesses in this action and their counsel during the course of a deposition, hearing or at trial;

(c)     the Court (and any appellate court), court personnel and any person the Court designates in the interest of justice, upon terms that the Court deems fit and proper;

(d)     court reporters or videographers employed in connection with this action;

(e)     where IBM is the Disclosing Party, to Defendant Visentin, provided that (i) from the face of the material that has been designated as "Highly Confidential" or from the source information provided by the Designating Party, he appears to have received it prior to the date such material is produced in this action, (ii) the Discovery Material that has been designated as "Highly Confidential" concerns Defendant Visentin's employment by Plaintiff or the termination thereof, the terms and conditions of his employment, his compensation and benefits, his job performance, or any obligations he had (or is alleged to have) to Plaintiff (including non-

6

competition and non-solicitation obligations), or (iii) the Discovery Material that has been designated as "Highly Confidential" is produced in response to Defendant Visentin's discovery demands concerning Plaintiff's trade secrets and confidential information that Defendant Visentin allegedly possesses;

(f) persons not covered above who, from the face of the material that has been designated as "Highly Confidential" or from the source information provided by the Designating Party, appear to have received it prior to the date such material is produced in this action;

(g) entities or persons engaged by counsel of record in this action to perform photocopying, scanning, database and other document management services; and

(h) any other person agreed to in writing by the Designating Party, provided that such person acknowledges in writing that he or she has read this Order and agrees to be bound by it by signing the acknowledgment attached hereto as *Exhibit A.*

10. Subject to the terms of this paragraph and paragraphs 11, 15, 16 and 17, Discovery Material that has been designated by IBM as "Highly Confidential IBM Information" shall not be given, shown, made available or communicated in any way to anyone except:

(a) counsel of record for Defendant Visentin and any necessary support staff;

(b) subject to paragraph 16 below, the Court (and any appellate court), court personnel, court reporters, and any person the Court designates in the interest of justice, upon terms that the Court deems fit and proper;

(c) Defendant Visentin, provided that (i) he received or had access to it during his employment at IBM, or (ii) it concerns his employment by IBM or the termination thereof, the terms and conditions of his employment, his compensation and benefits, his job

7

responsibilities and performance, or any obligations he had (or is alleged to have) to IBM (including any non-competition and non-solicitation obligation).

11. Under no circumstances shall HP, any HP employee, officer, director, or agent, or anyone acting on behalf of HP, be permitted to see or be informed of any "Highly Confidential IBM Information," except as provided in Paragraph 15. This paragraph does not apply to Defendant Visentin.

12. Subject to the terms of this paragraph and paragraphs 13, 14, 16, and 17 Discovery Material that has been designated by Visentin as "Highly Confidential Visentin Information" shall not be given, shown, made available or communicated in any way to anyone except:

(a) counsel of record for Plaintiff IBM and any necessary support staff;

(b) subject to paragraph 16 below, the Court (and any appellate court), court personnel, court reporters, and any person the Court designates in the interest of justice, upon terms that the Court deems fit and proper;

13. Under no circumstances shall IBM, any IBM employee, officer, director, or agent, or anyone acting on behalf of IBM, be permitted to see or be informed of any "Highly Confidential Visentin Information," except as provided in Paragraph 14.

14. If IBM wishes to question a witness about a document that has been designated as "Highly Confidential Visentin Information," IBM shall notify counsel for Visentin no later than three (3) business days before the date of the deposition or questioning of its intent to question the witness about the Highly Confidential Visentin Information and shall identify the document or documents about which IBM intends to question the witness. If Visentin objects to IBM

8

questioning that witness about those documents and the Highly Confidential Visentin Information therein, Visentin may seek relief from the Court. If the witness is permitted to review the Highly Confidential Visentin Information, s/he will not be permitted to retain any copy of the Highly Confidential Visentin Information. Notwithstanding the above, IBM has no obligation to notify counsel for Visentin of its intention to question Visentin or any witness employed by HP about Highly Confidential Visentin Information.

15.     If Visentin wishes to question a witness about a document that has been designated as "Highly Confidential IBM Information," Visentin shall notify counsel for IBM no later than three (3) business days before the date of the deposition or questioning of its intent to question the witness about the Highly Confidential IBM Information and shall identify the document or documents about which Visentin intends to question the witness. If IBM objects to Visentin questioning that witness about those documents and the Highly Confidential IBM Information therein, IBM may seek relief from the Court. If the witness is permitted to review the Highly Confidential IBM Information, s/he will not be permitted to retain any copy of the Highly Confidential IBM Information. Notwithstanding the above, Visentin has no obligation to notify counsel for IBM of its intention to question any witness employed by IBM about Highly Confidential IBM Information.

16.     Discovery Material that has been designated as "Highly Confidential IBM Information" or "Highly Confidential Visentin Information" shall not be used or disclosed in open court and, to the extent used at a trial, hearing or conference, such Discovery Material and any testimony relating to it shall be maintained under seal and not be made available to the public. All "Highly Confidential IBM Information" or "Highly Confidential Visentin

Information" and all copies of the same shall be returned to counsel for IBM by Defendant
Visentin or to counsel for Defendant Visentin by IBM, upon the final, non-appealable resolution
of this case.

17.    To resolve any disputes arising concerning the designation, use or filing under
seal of Discovery Material that has been designated as "Highly Confidential IBM Information,"
or "Highly Confidential Visentin Information," the Court will conduct an *in camera* review of
the material.

18.    The inadvertent production of Discovery Material without identifying such
Discovery Material as Confidential, Highly Confidential, Highly Confidential IBM Information
or Highly Confidential Visentin Information shall not by itself be a waiver of the producing party
or non-party's claim of confidentiality as to such material, and the producing party or non-party
thereafter may identify the same as Confidential, Highly Confidential, Highly Confidential IBM
Information or Highly Confidential Visentin Information with the effect that such Discovery
Material is and thereafter shall be subject to the protections of this Order.  Disclosure by any
party of such Discovery Material prior to notice by the producing party or non-party of the
confidential nature thereof shall not be deemed a violation of this Order.

19.    All portions of briefs, pleadings or other filings with this Court that contain or
refer to Confidential Material shall be filed and kept under seal until further order of the Court.
At the time of filing, such material shall be placed in a sealed envelope, which shall be marked
with the title of the action and a description of the contents.  The envelope shall also bear the
following legend:

CONFIDENTIAL

This envelope contains documents that are subject to an order governing discovery and the use of confidential discovery material entered by the United States District Court for the Southern District of New York in this action. The envelope shall not be opened nor the contents thereof disclosed or revealed except by order of the Court.

20.      Each person or entity identified in Paragraphs 8(g) and (h) or 9(g) and (h) above

prior to being given access to Confidential Material, shall be advised that (*i*) the Confidential

Material is being disclosed pursuant to and subject to the terms of this Order as entered by the

United States District Court for the Southern District of New York and may not be disclosed

other than pursuant to the terms hereof, and (*ii*) the violation of the terms of the Order may be

punishable by whatever means the United States District Court for the Southern District of New

York deems appropriate. Each such person must expressly acknowledge in writing that he or she

is familiar with the terms of the Order and agrees to be bound by its terms prior to being granted

access to the Confidential Material by signing the acknowledgment attached hereto as *Exhibit A*.

21.      To the extent that any person or entity identified in Paragraphs 8(c), 9(b), 14 or 15

above is shown Confidential Material, the party showing the Confidential Material will take

reasonable steps to ensure that such person or entity is not allowed to retain copies of the same.

22.      In the event any person other than those represented by the undersigned attorneys

should appear or become a party to this action, such person(s) shall not have access to Discovery

Material until such newly-appearing or newly-joined party has, individually or by counsel,

received and read a copy of this Order and signed the acknowledgement attached hereto as

*Exhibit A*.

11

23.     If a party inadvertently discloses Confidential Material to persons or entities not authorized to receive such information by the terms of this agreement, such disclosure shall be reported in writing to the party or non-party that produced such inadvertently disclosed Confidential Material. In the event of inadvertent disclosure, counsel for the party who inadvertently disclosed the Confidential Material shall make all reasonable efforts to retrieve the Confidential Material and any documents containing such Confidential Material, and to obtain the agreement of persons or entities to which inadvertent disclosure was made to treat the Confidential Material in accordance with the terms of this Order.

24.     In the event that any person or entity not named in Paragraph 8, 9, 10 or 12 requests the disclosure of Confidential Material through subpoena or other compulsory process, the person or entity receiving such subpoena or compulsory process (the "Receiving Party") shall give notice in writing to counsel for the Designating Party, such notice to be delivered by fax at least 14 days prior to the proposed disclosure; if the request is received less than 14 days prior to the proposed disclosure, notice shall be given promptly and before the proposed disclosure. It shall be the obligation of the Designating Party to file a motion for a court order to preclude or restrict production of any Confidential Material requested pursuant to a subpoena or other compulsory process within seven days of receiving such notice. In the event that the Designating Party timely files such a motion, the Receiving Party shall not produce or divulge the contents of any Confidential Material until such motion is resolved unless required by law. If the Designating Party fails to timely file such a motion or the Court determines that the requested documents shall be produced, the Receiving Party may produce such documents.

12

25.     If information subject to a claim of attorney-client privilege, the work product or any other privilege or immunity from discovery is inadvertently produced to a party, such production shall in no way prejudice or otherwise constitute a waiver of, or estoppel as to, any claim of attorney-client privilege, the work product or any other privilege or immunity to which the producing party or person would otherwise be entitled. If a party or non-party inadvertently produces Discovery Material that it believes is subject to the attorney-client privilege, the work product doctrine or any other privilege or immunity from discovery belonging to the producing party or non-party, the producing party or non-party may notify the receiving party that such production contained an inadvertent disclosure of privileged material, identify the allegedly privileged material, and demand return thereof. On such demand, the receiving party must return such allegedly privileged materials and destroy all copies thereof.

26.     Nothing in this Order shall prevent any party or non-party from seeking, by written agreement of the signatories hereto or Court order, further, greater or lesser protection with respect to the use of any Confidential Material in connection with the prosecution or defense of this action. Nothing in this Order shall be construed to limit in any way any producing party or non-party's use of its own Confidential Material or non-confidential Discovery Material.

27.     Nothing in this Order shall operate to require the production of information or documents that are privileged or otherwise protected from discovery. Nothing in this Order shall affect any person's right to object to any discovery request, including the right to assert that no discovery should be had concerning certain information.

13

28.     This Order may be executed in counterparts.  Each counterpart when executed
shall be deemed an original, and all shall constitute one and the same document.  Signatures may
be transmitted by facsimile or electronic mail, and facsimile or electronic mail signatures shall be
acceptable as original signatures for all purposes.

14

Martin Flumenbaum
Robert A. Atkins
Eric Alan Stone
Jacqueline P. Rubin
Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas
New York, New York 10019-6064
(212) 373-3000

*Attorneys for International Business
Machines Corporation*

Date 6/20/11

Michael L. Banks
Sarah Bouchard
Morgan, Lewis & Bockius LLP
1701 Market Street
Philadelphia, PA 19103-2921
(215) 963-5000

*Attorneys for Giovanni Visentin*

Date 6/17/11

IT IS SO ORDERED, this _____ day of June, 2011.

_____
HONORABLE JUDGE LORETTA A. PRESKA

15

**EXHIBIT A**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

INTERNATIONAL BUSINESS MACHINES
CORPORATION,

                            Plaintiff,

            v.                                          No. 11-cv-00399

GIOVANNI G. VISENTIN,

                            Defendant.

      I hereby certify (i) my understanding that Confidential Material is being provided to me pursuant to the terms and restrictions of the Second Confidentiality Stipulation and Protective Order (the "Order") entered by the United States District Court for the Southern District of New York and (ii) that I have read the Order. I understand the terms of the Order, I agree to be fully bound by the Order, and I hereby submit to the jurisdiction of the United States District Court for the Southern District of New York for purposes of enforcement of the Order.

DATE: _____          SIGNATURE: _____

# Exhibit B

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| INTERNATIONAL BUSINESS MACHINES CORPORATION,<br><br>              Plaintiff,<br><br>              v.<br><br>JEFF S. SMITH,<br><br>              Defendant. | 17 Civ. 5808 (CS)(PED) |

## **CONFIDENTIALITY STIPULATION AND PROTECTIVE ORDER**

IT IS HEREBY STIPULATED AND AGREED by and between the undersigned counsel to the parties hereto, as follows:

1.      This Confidentiality Stipulation and Protective Order (the "Order") governs the handling of all documents, testimony, interrogatory answers, responses to requests to admit and other information, including all copies, excerpts and summaries thereof (collectively, the "Discovery Material") produced during the course of the above captioned action by any parties to this action or by any non-parties, either voluntarily or as required by discovery requests or subpoenas made pursuant to the Federal Rules of Civil Procedure.

2.      Discovery Material shall be used only in this action (including any appeals), and not for any other purpose whatsoever.

3.      Any party or non-party producing Discovery Material shall have the right to designate such Discovery Material as "Confidential" to the extent that the producing party or non-party believes in good faith that such Discovery Material constitutes, contains or would disclose (i) proprietary business information, a trade secret

or other commercial or financial information that the party or non-party, in good faith, believes would result in competitive or commercial harm in the marketplace if the material were disseminated to persons other than those specifically identified in Paragraph 6 below or (ii) confidential personal information or personal financial information. Any party or non-party producing Discovery Material shall also have the right to designate such Discovery Material as "Highly Confidential" to the extent that the producing party or non-party believes in good faith that such Discovery Material constitutes, contains or would disclose (i) highly sensitive proprietary business information, a trade secret or other commercial or financial information that the party or non-party, in good faith, believes would result in competitive or commercial harm in the marketplace if the material were disseminated to persons other than those specifically identified in Paragraph 7 below or (ii) highly sensitive confidential personal information or personal financial information. Any material designated as "Confidential," "Highly Confidential," "Highly Confidential IBM Information," "Highly Confidential Smith Information," or "Highly Confidential AWS Information," shall be referred to herein as "Confidential Material". Any party or non-party who designates Discovery Material is referred to herein as the "Designating Party".

4.      The designation of information as Confidential Material pursuant to this Order will not create any presumption for or against the right to confidential treatment of such information should the issue of the right to such confidential treatment be presented to the Court, nor may the fact of such designation be used by any party to support or rebut the allegations at issue in the above-captioned litigation. A party's failure to object to or challenge the designation of Discovery Material as Confidential Material at the time of production of such Confidential Material shall not constitute a

2

waiver of or estop such party from asserting any such objection or challenge and shall not

be used or construed in any way as an agreement or concession by such party that the

Discovery Materials so designated are or were ever confidential, proprietary or otherwise

subject to trade secret protection.  Any party may at any time challenge the designation of

Discovery Material as Confidential Material by sending written notice thereof to the

Designating Party.  Such challenge shall be raised in the first instance on an informal

basis and resolution shall be attempted in good faith.  If the challenge cannot be resolved

on an informal basis, either the objecting party or the Designating Party may apply to the

Court for an appropriate ruling.  In the event that a party or non-party makes such an

application to the Court, such party or non-party shall provide reasonable prior notice

thereof to the parties to this action and, if the Designating Party is a nonparty, to such

non-party.  In the event of a challenge prior to the August 21, 2017 hearing on plaintiff's

motion for a preliminary injunction, such meet and confer must occur within 24 hours of

such challenge and, if not resolved through the meet and confer, then it may be raised

immediately with the court.  Nothing in this Order shall prevent a party from

independently seeking or obtaining discovery, or obtaining publicly available material

which may include some of the same documents covered by a confidentiality designation

made pursuant to this Order.

     5.     Confidential Material shall be designated as follows:

     (a)     In the case of a document, designation shall be made by

placing the legend "Confidential," "Highly Confidential," "Highly Confidential IBM

Information," "Highly Confidential Smith Information" or "Highly Confidential AWS

Information" (as applicable) on each page prior to production, or if impracticable to do so

(such as in the case of electronic media), by another method designed to alert others to the designation.

(b)     In the case of a deposition, designation of the portion of the transcript (including exhibits) which contains Confidential Material shall be made by a statement to such effect on the record during the course of a deposition, or by a statement in writing sent to all counsel within two (2) days after the receipt of the transcript of the deposition.  During the two-day period during which counsel may review the transcript to determine whether the transcript should be designated "Confidential" or "Highly Confidential," the entire transcript shall be treated as if it were designated Highly Confidential.  If the designation is made during the course of the deposition, the reporter attending such deposition shall thereafter bind the transcript thereof accordingly.

(c)     In the case of interrogatory answers and responses to requests to admit, any designation that the Discovery Material contained therein is Confidential Material shall be made by means of a statement in such answers or responses specifying the specific answers or responses designated as "Confidential," "Highly Confidential," "Highly Confidential IBM Information," or "Highly Confidential Smith Information."

6.     Discovery Material that has been designated as "Confidential" shall not be given, shown, made available or communicated in any way to anyone except:

(a)     counsel of record in this action, and attorneys, paralegals and other support staff employed by such counsel of record who are assisting such counsel in the conduct of this action;

4

       (b)     the parties in this action, including their present and former officers, directors and employees deemed necessary to aid counsel in the prosecution or defense of this action;

       (c)     actual deponents or witnesses in this action and their counsel of record during the course of a deposition, hearing or at trial;

       (d)     the Court (and any appellate court), court personnel and any person the Court designates in the interest of justice, upon terms that the Court deems fit and proper;

       (e)     court reporters and videographers employed in connection with this action;

       (f)     persons not covered above who, from the face of the material that has been designated as "Confidential" or from the source information provided by the Designating Party, appear to have received it prior to the date such material is produced in this action;

       (g)     entities or persons engaged by counsel of record in this action to perform photocopying, scanning, database and other document management services; and,

       (h)     any other such person agreed to in writing by the Designating Party, provided that such person acknowledges in writing that he or she has read this Order and agrees to be bound by it by signing the acknowledgment attached hereto as Exhibit A.

Doc#: US1:11490013v2

7.    Discovery Material that has been designated as "Highly Confidential" shall not be given, shown, made available or communicated in any way to anyone except:

(a)    counsel of record in this action, and attorneys, paralegals and other support staff employed by such counsel of record who are assisting counsel in the conduct of this action;

(b)    actual deponents or witnesses in this action and their counsel of record during the course of a deposition, hearing or at trial;

(c)    the Court (and any appellate court), court personnel and any person the Court designates in the interest of justice, upon terms that the Court deems fit and proper;

(d)    court reporters or videographers employed in connection with this action;

(e)    where IBM is the Designating Party, to Defendant Smith, provided that (i) from the face of the material that has been designated as "Highly Confidential" or from the source information provided by the Designating Party, he appears to have received it prior to the date such material is produced in this action, (ii) the Discovery Material that has been designated as "Highly Confidential" concerns Defendant Smith's employment by Plaintiff or the termination thereof, the terms and conditions of his employment, his compensation and benefits, his job performance, or any obligations he had (or is alleged to have) to Plaintiff (including non-competition and non-solicitation obligations), or (iii) the Discovery Material that has been designated as "Highly Confidential" is produced in response to Defendant Smith's discovery demands concerning

6

Plaintiff's trade secrets and confidential information that Defendant Smith allegedly possesses;

(f) persons not covered above who, from the face of the material that has been designated as "Highly Confidential" or from the source information provided by the Designating Party, appear to have received it prior to the date such material is produced in this action;

(g) entities or persons engaged by counsel of record in this action to perform photocopying, scanning, database and other document management services; and

(h) any other person agreed to in writing by the Designating Party, provided that such person acknowledges in writing that he or she has read this Order and agrees to be bound by it by signing the acknowledgment attached hereto as Exhibit A.

8. Subject to the terms of this paragraph and paragraphs 9, 12, 15, and 16, Discovery Material that has been designated by IBM as "Highly Confidential IBM Information" shall not be given, shown, made available or communicated in any way to anyone except:

(a) counsel of record for Defendant Smith and any necessary support staff;

(b) subject to paragraph 15 below, the Court (and any appellate court), court personnel, court reporters, and any person the Court designates in the interest of justice, upon terms that the Court deems fit and proper; or

(c) where IBM is the Designating Party, to Defendant Smith, provided that (i) from the face of the material that has been designated as "Highly

Confidential IBM Information" or from the source information provided by the Designating Party, he appears to have received it prior to the date such material is produced in this action, or (ii) the Discovery Material that has been designated as "Highly Confidential IBM Information" concerns Defendant Smith's employment by Plaintiff or the termination thereof, the terms and conditions of his employment, his compensation and benefits, his job performance, or any obligations he had (or is alleged to have) to Plaintiff (including non-competition and non-solicitation obligations).

9.      Discovery Material designated by IBM as "Confidential," "Highly Confidential," or "Highly Confidential IBM Information" shall not be shared with or disclosed to (a) AWS, or any AWS employee, officer or director, or consultant, or party acting on behalf of AWS, or (b) any attorney or support staff at Morgan Lewis & Bockius LLP in his/her capacity of representing AWS in this matter as of August 1, 2017 or thereafter.

10.      Subject to the terms of this paragraph and paragraphs 11, 15, and 16, Discovery Material that has been designated by Smith as "Highly Confidential Smith Information" shall not be given, shown, made available or communicated in any way to anyone except:

(a)      counsel of record for Plaintiff IBM and any necessary support staff; or

(b)      subject to paragraph 15 below, the Court (and any appellate court), court personnel, court reporters, and any person the Court designates in the interest of justice, upon terms that the Court deems fit and proper.

11.     If IBM wishes to question a witness about a document that has been designated as "Highly Confidential Smith Information," IBM shall notify counsel for Smith no later than two (2) business days before the date of the deposition or questioning (or, in the event the document is produced less than two days before a deposition, within 24 hours of its receipt) of IBM's intent to question the witness about the material designated as "Highly Confidential Smith Information" and shall identify the document or documents about which IBM intends to question the witness.  If Smith objects to IBM questioning that witness about those documents and the material designated as "Highly Confidential Smith Information" therein, Smith may seek relief from the Court.  If the witness is permitted to review the material designated as "Highly Confidential Smith Information," s/he will not be permitted to retain any copy of the material designated as "Highly Confidential Smith Information."  Notwithstanding the above, IBM has no obligation to notify counsel for Smith of its intention to question Smith or any witness employed by AWS about material designated as "Highly Confidential Smith Information."

12.     If Smith wishes to question a witness about a document that has been designated as "Highly Confidential IBM Information," Smith shall notify counsel for IBM no later than two (2) business days before the date of the deposition or questioning (or, in the event the document is produced less than two days before a deposition, within 24 hours of its receipt) of Smith's intent to question the witness about the material designated as "Highly Confidential IBM Information" and shall identify the document or documents about which Smith intends to question the witness.  If IBM objects to Smith questioning that witness about those documents and the material

designated as "Highly Confidential IBM Information" therein, IBM may seek relief from the Court. If the witness is permitted to review the material designated as "Highly Confidential IBM Information," s/he will not be permitted to retain any copy of the material designated as "Highly Confidential IBM Information." Notwithstanding the above, Smith has no obligation to notify counsel for IBM of his intention to question any witness employed by IBM about material designated as "Highly Confidential IBM Information."

13. Subject to the terms of this paragraph and paragraphs 14, 15, and 16, Discovery Material that has been designated by AWS as "Highly Confidential AWS Information" shall not be given, shown, made available or communicated in any way to anyone except:

(a) counsel of record for each of the parties to this action, and any necessary support staff; or

(b) Defendant Smith;

(c) subject to paragraph 15 below, the Court (and any appellate court), court personnel, court reporters, and any person the Court designates in the interest of justice, upon terms that the Court deems fit and proper.

14. If IBM wishes to question a witness about a document that has been designated as "Highly Confidential AWS Information," such party shall notify counsel for AWS no later than two (2) business days before the date of the deposition or questioning (or, in the event the document is produced less than two days before a deposition, within 24 hours of its receipt) of IBM's intent to question the witness about the material designated as "Highly Confidential AWS Information" and shall identify the

10

document or documents about which such party intends to question the witness. If AWS objects to IBM questioning that witness about those documents and the material designated as "Highly Confidential AWS Information" therein, AWS may seek relief from the Court. If the witness is permitted to review the material designated as "Highly Confidential AWS Information," s/he will not be permitted to retain any copy of the material designated as "Highly Confidential AWS Information." Notwithstanding the above, IBM does not have any obligation to notify counsel for AWS of its intention to question any witness employed by AWS about material designated as "Highly Confidential AWS Information."

15.      Discovery Material that has been designated as "Highly Confidential IBM Information," "Highly Confidential Smith Information" or "Highly Confidential AWS Information" shall not be used or disclosed in open court and, to the extent used at trial, hearing or conference, such Discovery Material and any testimony relating to it shall be maintained under seal and not made available to the public. All "Highly Confidential IBM Information," "Highly Confidential Smith Information" or "Highly Confidential AWS Information" and all copies of the same shall be returned to counsel for IBM by Defendant Smith, to counsel for Defendant Smith by IBM, or to counsel for AWS by IBM and Smith, upon the final, non-appealable resolution of this case.

16.      To resolve any disputes arising concerning the designation, use or filing under seal of Discovery Material that has been designated as "Highly Confidential IBM Information," "Highly Confidential Smith Information," "Highly Confidential AWS

Information" or "Highly Confidential AWS Information," the Court will conduct an *in camera* review of the material.

17.     The inadvertent production of Discovery Material without identifying such Discovery Material as "Confidential," "Highly Confidential," "Highly Confidential IBM Information," "Highly Confidential Smith Information," or "Highly Confidential AWS Information" shall not by itself be a waiver of the producing party or non-party's claim of confidentiality as to such material, and the producing party or non-party thereafter may identify the same as "Confidential," "Highly Confidential," "Highly Confidential IBM Information," "Highly Confidential Smith Information," or "Highly Confidential AWS Information" with the effect that such Discovery Material is and thereafter shall be subject to the protections of this Order.  Disclosure by any party of such Discovery Material prior to notice by the producing party or non-party of the confidential nature thereof shall not be deemed a violation of this Order.

18.     All portions of briefs, pleadings or other filings with this Court that contain or refer to Confidential Material shall be filed and kept under seal until further order of the Court.  At the time of filing, such material shall be placed in a sealed envelope, which shall be marked with the title of the action and a description of the contents.  The envelope shall also bear the following legend:

**<u>CONFIDENTIAL</u>**

**This envelope contains documents that are subject to an order governing discovery and the use of confidential discovery material entered by the United States District Court for the Southern District of New York in this action.  The envelope shall not be opened nor the contents thereof disclosed or revealed except by order of the Court**

19.     Each person or entity identified in Paragraphs 6(g) and (h) or 7 (g) and (h) above prior to being given access to Confidential Material, shall be advised that (i) the Confidential Material is being disclosed pursuant to and subject to the terms of this Order as entered by the United States District Court for the Southern District of New York and may not be disclosed other than pursuant to the terms hereof, and (ii) the violation of the terms of the Order may be punishable by whatever means the United States District Court for the Southern District of New York deems appropriate. Each such person must expressly acknowledge in writing that he or she is familiar with the terms of the Order and agrees to be bound by its terms prior to being granted access to the Confidential Material by signing the acknowledgment attached hereto as Exhibit A.

20.     To the extent that any person or entity identified in Paragraphs 6(c) or 7(b) above is shown Confidential Material, the party showing the Confidential Material will take reasonable steps to ensure that such person or entity is not allowed to retain copies of the same.

21.     In the event any person other than those represented by the undersigned attorneys should appear or become a party to this action, such person(s) shall not have access to Discovery Material until such newly-appearing or newly-joined party has, individually or by counsel, received and read a copy of this Order and signed the acknowledgement attached hereto as Exhibit A.

22.     If a party inadvertently discloses Confidential Material to persons or entities not authorized to receive such information by the terms of this agreement, such disclosure shall be reported in writing to the party or non-party that produced such inadvertently disclosed Confidential Material. In the event of inadvertent disclosure,

13

counsel for the party who inadvertently disclosed the Confidential Material shall make all reasonable efforts to retrieve the Confidential Material and any documents containing such Confidential Material, and to obtain the agreement of persons or entities to which inadvertent disclosure was made to treat the Confidential Material in accordance with the terms of this Order.

23.     In the event that any person or entity not named in Paragraph 6 or 7 requests the disclosure of Confidential Material through subpoena or other compulsory process, the person or entity receiving such subpoena or compulsory process (the "Receiving Party") shall give notice in writing to counsel for the Designating Party, such notice to be delivered by fax at least 14 days prior to the proposed disclosure; if the request is received less than 14 days prior to the proposed disclosure, notice shall be given promptly and before the proposed disclosure.  It shall be the obligation of the Designating Party to file a motion for a court order to preclude or restrict production of any Confidential Material requested pursuant to a subpoena or other compulsory process within seven days of receiving such notice.  In the event that the Designating Party timely files such a motion, the Receiving Party shall not produce or divulge the contents of any Confidential Material until such motion is resolved unless required by law.  If the Designating Party fails to timely file such a motion or the Court determines that the requested documents shall be produced, the Receiving Party may produce such documents.

24.     If information subject to a claim of attorney-client privilege, the work product or any other privilege or immunity from discovery is inadvertently produced to a party, such production shall in no way prejudice or otherwise constitute a

14

waiver of, or estoppels as to, any claim of attorney-client privilege, the work product or any other privilege or immunity to which the producing party or person would otherwise be entitled.  If a party or non-party inadvertently produces Discovery Material that it believes is subject to the attorney-client privilege, the work product doctrine or any other privilege or immunity from discovery belonging to the producing party or non-party, the producing party or non-party may notify the receiving party that such production contained an inadvertent disclosure of privileged material, identify the allegedly privileged material, and demand the return thereof.  On such demand, the receiving party must return such allegedly privileged materials and destroy all copies thereof.

25.     All Discovery Material produced in this action shall remain the property of the party or person who produced the Discovery Material irrespective of how and in what form produced.  This Order, insofar as it restricts the communication and use of Discovery Material, shall continue to be binding throughout and after the conclusion of this action, including any appeals.  At the conclusion of this action, including the time for filing and resolution of all appeals, the parties shall within sixty (60) days destroy, in a manner assured of maintaining confidentiality, all Discovery Material, copies thereof and documents reflecting same, and shall provide a sworn certification by counsel evidencing such destruction to the Designating Party, *provided, however,* that (i) the parties shall retain and not destroy Discovery Material if destruction would violate the law and (ii) that each party or non-party may retain, subject to the terms and conditions of this Order, full copies of all papers filed with or submitted to the Court, deposition transcripts, exhibits marked at depositions or at trial, and any documents that were prepared by counsel in this action and that contain Discovery Material.

15

26.     Nothing in this Order shall prevent any party or non-party from seeking, by written agreement of the signatories hereto or Court order, further, greater or lesser protection with respect to the use of any Confidential Material in connection with the prosecution or defense of this action.  Nothing in this Order shall be construed to limit in any way any producing party or non-party's use of its own Confidential Material or non-confidential Discovery Material.

27.     Nothing in this Order shall operate to require the production of information or documents that are privileged or otherwise protected from discovery. Nothing in this Order shall affect any person's right to object to any discovery request, including the right to assert that no discovery should be had concerning certain information.

28.     This Order may be executed in counterparts.  Each counterpart when executed shall be deemed an original, and all shall constitute one and the same document. Signatures may be transmitted by facsimile or electronic mail, and facsimile or electronic mail signatures shall be acceptable as original signatures for all purposes.

_____         _____
PAUL, WEISS, RIFKIND,                    Date
 WHARTON & GARRISON LLP
Robert A. Atkins
Steven C. Herzog
Pietro J. Signoracci
1285 Avenue of the Americas
New York, New York  10019-6064
Telephone:  212-373-3000

*Attorneys for International Business Machines Corporation*

16

_____        _____
SCHULTE ROTH & ZABEL LLP                  Date
Ronald E. Richman
Max Garfield
919 3rd Avenue
New York, NY 10022
Telephone: 929-341-1306

*Attorneys for Defendant Jeff Smith*

_____        _____
MORGAN LEWIS & BOCKIUS LLP                Date
Sarah E. Bouchard
Brandon J. Brigham
1701 Market Street
Philadelphia, PA 19103
Telephone: 215-963-5000

*Attorneys for Defendant Jeff Smith*

IT IS SO ORDERED, this _____ day of August, 2017.

_____
HONORABLE CATHY SEIBEL
UNITED STATES DISTRICT JUDGE

17

**EXHIBIT A**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| INTERNATIONAL BUSINESS MACHINES CORPORATION,<br><br>             Plaintiff,<br><br>      v.<br><br>JEFF S. SMITH,<br><br>             Defendant. | 17 Civ. 5808 (CS)(PED) |

        I hereby certify (i) my understanding that Confidential Material is being provided to me pursuant to the terms and restrictions of the Confidentiality Stipulation and Protective Order (the "Order") entered by the United States District Court for the Southern District of New York and (ii) that I have read the Order. I understand the terms of the Order, I agree to be fully bound by the Order, and I hereby submit to the jurisdiction of the United States District Court for the Southern District of New York for purposes of enforcement of the Order.

DATE: _____        SIGNATURE: _____

18

EXHIBIT  L

# Morgan Lewis

**Sarah E. Bouchard**
Partner
+1.215.963.5077
sarah.bouchard@morganlewis.com

August 8, 2017

**VIA ELECTRONIC MAIL**

Robert A. Atkins, Esq.
Steven C. Herzog, Esq.
Pietro J. Signoracci, Esq.
1285 Avenue of the Americas
New York, NY 10019-6064

Re:    International Business Machines Corporation v. Jeff S. Smith
       Case No. 17 Civ. 5808 (CS) (PED) (S.D.N.Y.)

Dear Counselors:

Amazon Web Services ("AWS"), by and through its attorneys, Morgan, Lewis & Bockius LLP, hereby responds to the Subpoena Duces Tecum ("Subpoena") and the requests for production described in Attachment A thereto (the "Requests") served on AWS in the above-captioned matter.

As an initial matter, and even though AWS is not a party, it wants to cooperate and has endeavored to search and produce on an expedited and voluntary basis non-objectionable documents in response to the Subpoena.  To that end, documents bates-labeled AMZ_IBM00000001-AMZ_IBM00000785 can be downloaded from the FTP website shared via email.  Given the short notice of the filing of this lawsuit and the extraordinary request for expedited discovery directed at a third-party we cannot state that our searches have yet been exhausted.  That said, we can represent that AWS has undertaken an extensive search on a highly-accelerated basis and is producing a significant amount of responsive documents.

Nevertheless, on its face, the Subpoena is invalid.  A subpoena commanding the production of documents may only require production of documents within 100 miles of where a company regularly transacts business in person.  Fed. R. Civ. Proc. 45(c)(2)(A).  AWS is headquartered in Seattle, Washington, but the Subpoena demands compliance in New York, NY.

Further, the Requests are substantively improper in several ways that violate Federal Rule of Civil Procedure 45(c)(1).  That Rule requires a party to "take reasonable steps to avoid imposing undue burden or expense" on a subpoena recipient.  The Requests, however, impose an unnecessary burden and expense on AWS.  First, in several Requests in the Subpoena, International Business Machines Corporation ("Plaintiff" or "IBM") seeks documents that are available from the Parties to the litigation or have already been produced in the litigation.  For example, Plaintiff seeks communications between AWS and Defendant Jeff P. Smith.  As you are aware, you requested

**Morgan, Lewis & Bockius** LLP

1701 Market Street
Philadelphia, PA  19103-2921
United States

**T** +1.215.963.5000
**F** +1.215.963.5001

Robert A. Atkins, Esq.
August 8, 2017
Page 2

these exact same documents from Mr. Smith. To the extent that those documents are determined to be appropriately discoverable, Plaintiff purportedly already has this information and thus there is no need to burden AWS to gather, review, and produce the same documents.

The Requests also seek documents and information that are not relevant to Plaintiff's claims against Mr. Smith, and, therefore, attempt to impose an undue burden and expense on the Subpoenaed Individuals in violation of Rule 45(c)(1). In fact, the Requests are a fishing expedition to gather information related to AWS's business practices. Proving this, IBM has requested "[a]ll documents regarding competition with IBM." The impropriety of that request is self-evident. Amazon will concede that IBM views Amazon as a competitor.

Accordingly, AWS asserts the following additional objections in order to preserve them as required by the Federal Rules of Civil Procedure:

1. As stated above, AWS objects to the Subpoenas, including all definitions, instructions and requests, on the ground that the Subpoena served upon it is procedurally defective and without legal effect because, among other things, it fails to comply with Federal Rule of Civil Procedure 45(C)(a)(A) in that it seeks the production of documents in New York, NY.

2. AWS objects to the August 8, 2017 date for production as stated in the Subpoenas, as the collection and production of the documents sought will be burdensome, time consuming, and costly.

3. AWS objects to each Request under Federal Rule of Civil Procedure 45(c)(1) on the ground that they request documents from a non-party that could be obtained from Defendant Jeff P. Smith, and, as such, subject AWS to undue burden and expense.

4. AWS objects to each Request to the extent that they seek production of electronically stored information that is not reasonably accessible without undue burden or cost.

5. AWS objects to each Request to the extent that it seeks to impose requirements on it in excess of, or inconsistent with, the requirements of the applicable Federal Rules of Civil Procedure.

6. AWS objects to each Request to the extent that it seeks information protected by the attorney-client privilege, the work product doctrine, the common interest doctrine, and/or any other applicable privilege or protective doctrine. When AWS produces documents responsive to the Requests, it will produce only documents that are responsive and not privileged.

7. AWS objects to each Request as being an improper attempt to obtain their confidential, proprietary, and trade secret information.

8. AWS objects to each Request to the extent it would require it to provide information which is available to Plaintiff or in its possession, custody or control.

9. AWS objects to each Request to the extent it seeks information not within its possession, custody or control.

Robert A. Atkins, Esq.
August 8, 2017
Page 3

10. AWS objects to each Request to the extent it seeks information or documents that are not relevant to a claim or defense of a party nor reasonably calculated to lead to the discovery of admissible evidence.

11. AWS's objections are made to the best of their current knowledge, information, and belief. AWS's objections and answers are at all times subject to such additional or different information that discovery or further investigation might disclose.

As noted above, despite these objections, AWS has attempted to collect, search, and produce non-objectionable documents in a timely manner.  That production is available as described above.

Should you have any questions, please contact me.

Sincerely,

Sarah E. Bouchard

SEB/pme

C: All Counsel of Record

EXHIBIT  M

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

1285 AVENUE OF THE AMERICAS
NEW YORK, NEW YORK 10019-6064
TELEPHONE (212) 373-3000

LLOYD K GARRISON    (1946-1991)
RANDOLPH E PAUL    (1946-1956)
SIMON H RIFKIND    (1950 1995)
LOUIS S WEISS    (1927-1950)
JOHN F WHARTON    (1927-1977)

UNIT 3601 OFFICE TOWER A BEIJING FORTUNE PLAZA
NO 7 DONGSANHUAN ZHONGLU
CHAOYANG DISTRICT
BEIJING 100020
PEOPLE S REPUBLIC OF CHINA
TELEPHONE (86-10) 5828-6300

12TH FLOOR HONG KONG CLUB BUILDING
3A CHATER ROAD CENTRAL
HONG KONG
TELEPHONE (852) 2846-0300

FUKOKU SEIMEI BUILDING
2-2 UCHISAIWAICHO 2-CHOME
CHIYODA-KU TOKYO 100-0011 JAPAN
TELEPHONE (81 3) 3597-8101

TORONTO DOMINION CENTRE
77 KING STREET WEST SUITE 3100
PO BOX 226
TORONTO ONTARIO M5K 1J3
TELEPHONE (416) 504-0520

2001 K STREET NW
WASHINGTON DC 20006-1047
TELEPHONE (202) 223 7300

500 DELAWARE AVENUE SUITE 200
POST OFFICE BOX 32
WILMINGTON DE 19899-0032
TELEPHONE (302) 655-4410

· ALDER CASTLE
10 NOBLE STREET
LONDON EC2V 7JU U K
TELEPHONE (44 20) 7367 1600

WRITER S DIRECT DIAL NUMBER

(212) 373-3192

WRITER S DIRECT FACSIMILE

(212) 492-0192

WRITER S DIRECT E-MAIL ADDRESS

cfilburn@paulweiss.com

August 10, 2017

**By Email**

Sarah E. Bouchard
Morgan, Lewis & Bockius LLP
1701 Market Street
Philadelphia, PA 19103-2921
sarah.bouchard@morganlewis.com

*IBM* v. *Smith*, No. 17 Civ. 5808

Dear Sarah:

We write concerning the document production by AWS in response to a subpoena we served on AWS and that you agreed to accept service of on AWS's behalf.

Having reviewed the documents produced by AWS, we have serious concerns about the adequacy of AWS's responses to our subpoena. In particular, we requested that AWS produce (a) "documents concerning competition with IBM" and (b) documents sufficient to identify the names and subject matters of all teams or groups in which Smith will be expected to participate as an employee of AWS. We have not found any documents in AWS's production responsive to either of these requests. This is concerning, particularly because nowhere in its objections to our subpoena did AWS indicate that it did not intend to search for documents responsive to these requests.

IBM is entitled to such documents. During the TRO hearing, the Court, in response to your contention that AWS and IBM do not compete, said it expected IBM to seek documents showing that AWS views IBM as a competitor or that AWS analyzes what IBM is doing in the market. Further, in light of you contention at that same hearing

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

Mr. Sarah E. Bouchard                                               2

that Jeff Smith's role at AWS would be "very scoped" and would keep him out of pricing and marketing, as well as Mr. Jassy's testimony yesterday that Smith is expected to participate in all senior teams and meetings at AWS and will not be removed from those meetings for any reason, documents reflecting the content and subject matters of those discussions are clearly relevant.

In agreeing to accept service of the AWS subpoena, you told us that you "want[ed] to cooperate." In that spirit, please confirm no later than 2:00pm tomorrow that AWS will supplement its production with documents in the above categories, and that it will do so no later than 5:00pm on Monday, August 14.

Very truly yours,

Christopher L. Filburn

cc (by email):  Counsel of Record

EXHIBIT  N

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

INTERNATIONAL BUSINESS
MACHINES CORPORATION,

                Plaintiff,

          v.

JEFF S. SMITH,

                Defendant.

Case No. 7-17-cv-05808 (CS)(PED)

## CONFIDENTIALITY STIPULATION AND PROTECTIVE ORDER

       IT IS HEREBY STIPULATED AND AGREED by and between the undersigned counsel to the parties hereto as follows:

       1.     This Confidentiality Stipulation and Protective Order (the "Order") governs the handling of all documents, testimony, interrogatory answers, responses to requests to admit and other information, including all copies, excerpts and summaries thereof (collectively, the "Discovery Material") produced during the course of the above captioned action by any parties to this action or by any non-parties, either voluntarily or as required by discovery requests or subpoenas made pursuant to the Federal Rules of Civil Procedure.

       2.     Discovery Material shall be used only in this action (including any appeals), and not for any other purpose whatsoever.

       3.     Any party or non-party producing Discovery Material shall have the right to designate such Discovery Material as "Confidential" to the extent that the producing party or non-party believes in good faith that such Discovery Material constitutes, contains or would disclose (i) proprietary business information, a trade secret or other commercial or financial

information that the party or non-party, in good faith, believes would result in competitive or

commercial harm in the marketplace if the material were disseminated to persons other than those

specifically identified in Paragraph 6 below or (ii) confidential personal information or personal

financial information.  Any party or non-party producing Discovery Material shall also have the

right to designate such Discovery Material as "Highly Confidential" to the extent that the

producing party or non-party believes in good faith that such Discovery Material constitutes,

contains or would disclose (i) highly sensitive proprietary business information, a trade secret or

other commercial or financial information that the party or non-party, in good faith, believes would

result in competitive or commercial harm in the marketplace if the material were disseminated to

persons other than those specifically identified in Paragraph 7 below or (ii) highly sensitive

confidential personal information or personal financial information.  Any material designated as

"Confidential," "Highly Confidential," "Highly Confidential IBM Information," "Highly

Confidential Smith Information," or "Highly Confidential AWS Information," shall be referred to

herein as "Confidential Material".  Any party or non-party who designates Discovery Material is

referred to herein as the "Designating Party".

   4.  The designation of information as Confidential Material pursuant to this Order will

not create any presumption for or against the right to confidential treatment of such information

should the issue of the right to such confidential treatment be presented to the Court, nor may the

fact of such designation be used by any party to support or rebut the allegations at issue in the

above-captioned litigation.  A party's failure to object to or challenge the designation of

Discovery Material as Confidential Material at the time of production of such Confidential

Material shall not constitute a waiver of or estop such party from asserting any such objection or

challenge and shall not be used or construed in any way as an agreement or concession by such party that the Discovery Materials so designated are or were ever confidential, proprietary or otherwise subject to trade secret protection.  Any party may at any time challenge the designation of Discovery Material as Confidential Material by sending written notice thereof to the Designating Party.  Such challenge shall be raised in the first instance on an informal basis and resolution shall be attempted in good faith.  If the challenge cannot be resolved on an informal basis, either the objecting party or the Designating Party may apply to the Court for an appropriate ruling.  In the event that a party or non-party makes such an application to the Court, such party or non-party shall provide reasonable prior notice thereof to the parties to this action and, if the Designating Party is a nonparty, to such non-party.  Nothing in this Order shall prevent a party from independently seeking or obtaining discovery, or obtaining publicly available material which may include some of the same documents covered by a confidentiality designation made pursuant to this Order.

5.    Confidential Material shall be designated as follows:

(a)    In the case of a document, designation shall be made by placing the legend "Confidential," "Highly Confidential," "Highly Confidential IBM Information," "Highly Confidential Smith Information" or "Highly Confidential AWS Information" (as applicable) on each page prior to production, or if impracticable to do so (such as in the case of electronic media), by another method designed to alert others to the designation.

(b)    In the case of a deposition, designation of the portion of the transcript (including exhibits) which contains Confidential Material shall be made by a statement to such effect on the record during the course of a deposition, or by a statement in writing sent to all

counsel within two (2) days after the receipt of the transcript of the deposition. During the two-day period during which counsel may review the transcript to determine whether the transcript should be designated "Confidential" or "Highly Confidential," the entire transcript shall be treated as if it were designated Highly Confidential. If the designation is made during the course of the deposition, the reporter attending such deposition shall thereafter bind the transcript thereof accordingly.

(c)    In the case of interrogatory answers and responses to requests to admit, any designation that the Discovery Material contained therein is Confidential Material shall be made by means of a statement in such answers or responses specifying the specific answers or responses designated as "Confidential," "Highly Confidential," "Highly Confidential IBM Information," or "Highly Confidential Smith Information."

6.    Discovery Material that has been designated as "Confidential" shall not be given, shown, made available or communicated in any way to anyone except:

(a)    counsel of record in this action, and attorneys, paralegals and other support staff employed or engaged by such counsel who are assisting counsel in the conduct of this action;

(b)    the parties to this action, including IBM, their present and former officers, directors and employees deemed necessary to aid counsel in the prosecution or defense of this action;

(c)    actual deponents or witnesses in this action and their counsel during the course of a deposition, hearing or at trial;

(d)    the Court (and any appellate court), court personnel and any person the Court designates in the interest of justice, upon terms that the Court deems fit and proper;

(e)    court reporters and videographers employed in connection with this action;

(f)    persons not covered above who, from the face of the material that has been designated as "Confidential" or from the source information provided by the Designating Party, appear to have received it prior to the date such material is produced in this action;

(g)    entities or persons engaged by counsel of record in this action to perform photocopying, scanning, database and other document management services; and,

(h)    any other such person agreed to in writing by the Designating Party, provided that such person acknowledges in writing that he or she has read this Order and agrees to be bound by it by signing the acknowledgment attached hereto as *Exhibit A*.

7.    Discovery Material that has been designated as "Highly Confidential" shall not be given, shown, made available or communicated in any way to anyone except:

(a)    counsel of record in this action, and attorneys, paralegals and other support staff employed or engaged by such counsel who are assisting counsel in the conduct of this action;

(b)    actual deponents or witnesses in this action and their counsel during the course of a deposition, hearing or at trial;

(c)    the Court (and any appellate court), court personnel and any person the Court designates in the interest of justice, upon terms that the Court deems fit and proper;

(d)    court reporters or videographers employed in connection with this action;

5

(e)    where IBM is the Designating Party, to Defendant Smith, provided that (i) from the face of the material that has been designated as "Highly Confidential" or from the source information provided by the Designating Party, he appears to have received it prior to the date such material is produced in this action, (ii) the Discovery Material that has been designated as "Highly Confidential" concerns Defendant Smith's employment by Plaintiff or the termination thereof, the terms and conditions of his employment, his compensation and benefits, his job performance, or any obligations he had (or is alleged to have) to Plaintiff (including non-competition and non-solicitation obligations), or (iii) the Discovery Material that has been designated as "Highly Confidential" is produced in response to Defendant Smith's discovery demands concerning Plaintiff's trade secrets and confidential information that Defendant Smith allegedly possesses;

(f)    persons not covered above who, from the face of the material that has been designated as "Highly Confidential" or from the source information provided by the Designating Party, appear to have received it prior to the date such material is produced in this action;

(g)    entities or persons engaged by counsel of record in this action to perform photocopying, scanning, database and other document management services; and

(h)    any other person agreed to in writing by the Designating Party, provided that such person acknowledges in writing that he or she has read this Order and agrees to be bound by it by signing the acknowledgment attached hereto as *Exhibit A*.

8.    Subject to the terms of this paragraph and paragraphs 9, 10, and 12, Discovery Material that has been designated by IBM as "Highly Confidential IBM Information" shall not be given, shown, made available or communicated in any way to anyone except:

      (a)     counsel of record for Defendant Smith and any necessary support staff;

      (b)     subject to paragraph 15 below, the Court (and any appellate court), court personnel, court reporters, and any person the Court designates in the interest of justice, upon terms that the Court deems fit and proper;

      (c)     Defendant Smith, provided that (i) he received or had access to it during his employment at IBM, or (ii) it concerns his employment by IBM or the termination thereof, the terms and conditions of his employment, his compensation and benefits, his job responsibilities and performance, or any obligations he had (or is alleged to have) to IBM (including any non-competition and non-solicitation obligation).

9.     Under no circumstances shall AWS, any AWS employee, officer, director, or agent, or anyone acting on behalf of AWS, be permitted to see or be informed of any "Highly Confidential IBM Information." This paragraph does not apply to Defendant Smith or to counsel of record.

10.     Subject to the terms of this paragraph and paragraphs 12 and 15, Discovery Material that has been designated by Smith as "Highly Confidential Smith Information" shall not be given, shown, made available or communicated in any way to anyone except:

      (a)     counsel of record for Plaintiff IBM and any necessary support staff;

      (b)     subject to paragraph 15 below, the Court (and any appellate court), court personnel, court reporters, and any person the Court designates in the interest of justice, upon terms that the Court deems fit and proper.

11.     Subject to the terms of this paragraph and paragraphs 12 and 15, Discovery
Material that has been designated by AWS as "Highly Confidential AWS Information" shall not
be given, shown, made available or communicated in any way to anyone except:

(a)     counsel of record for each of the parties to this action, and any necessary
support staff; or

(b)     Defendant Smith;

(c)     subject to paragraph 15 below, the Court (and any appellate court), court
personnel, court reporters, and any person the Court designates in the interest of justice, upon
terms that the Court deems fit and proper.

12.     Under no circumstances shall IBM, any IBM employee, officer, director, or agent,
or anyone acting on behalf of IBM, be permitted to see or be informed of any "Highly
Confidential Smith Information" or "Highly Confidential AWS Information."

13.     Discovery Material that has been designated as "Highly Confidential IBM
Information", "Highly Confidential AWS Information", or "Highly Confidential Smith
Information" shall not be used or disclosed in open court and, to the extent used at a trial, hearing
or conference, such Discovery Material and any testimony relating to it shall be maintained
under seal and not be made available to the public.

14.     To resolve any disputes arising concerning the designation, use or filing under
seal of Discovery Material that has been designated as "Highly Confidential IBM Information,"
"Highly Confidential Smith Information," "Highly Confidential AWS Information" or "Highly
Confidential AWS Information," the Court will conduct an *in camera* review of the material.

8

15.    The inadvertent production of Discovery Material without identifying such Discovery Material as Confidential, Highly Confidential, Highly Confidential IBM Information or Highly Confidential Smith Information shall not by itself be a waiver of the producing party or non-party's claim of confidentiality as to such material, and the producing party or non-party thereafter may identify the same as Confidential, Highly Confidential, Highly Confidential IBM Information or Highly Confidential Smith Information with the effect that such Discovery Material is and thereafter shall be subject to the protections of this Order.  Disclosure by any party of such Discovery Material prior to notice by the producing party or non-party of the confidential nature thereof shall not be deemed a violation of this Order.

16.    All portions of briefs, pleadings or other filings with this Court that contain or refer to Confidential Material shall be filed and kept under seal until further order of the Court. At the time of filing, such material shall be placed in a sealed envelope, which shall be marked with the title of the action and a description of the contents.  The envelope shall also bear the following legend:

<u>CONFIDENTIAL</u>

> This envelope contains documents that are subject to an order governing discovery and the use of confidential discovery material entered by the United States District Court for the Southern District of New York in this action.  The envelope shall not be opened nor the contents thereof disclosed or revealed except by order of the Court.

17.    Each person or entity identified in Paragraphs 6(g) and (h) or 7(g) and (h) above prior to being given access to Confidential Material, shall be advised that (*i*) the Confidential Material is being disclosed pursuant to and subject to the terms of this Order as entered by the United States District Court for the Southern District of New York and may not be disclosed

other than pursuant to the terms hereof, and (*ii*) the violation of the terms of the Order may be punishable by whatever means the United States District Court for the Southern District of New York deems appropriate. Each such person must expressly acknowledge in writing that he or she is familiar with the terms of the Order and agrees to be bound by its terms prior to being granted access to the Confidential Material by signing the acknowledgment attached hereto as *Exhibit A*.

18.    To the extent that any person or entity identified in Paragraphs 6(c) or 7(b), above is shown Confidential Material, the party showing the Confidential Material will take reasonable steps to ensure that such person or entity is not allowed to retain copies of the same.

19.    In the event any person other than those represented by the undersigned attorneys should appear or become a party to this action, such person(s) shall not have access to Discovery Material until such newly-appearing or newly-joined party has, individually or by counsel, received and read a copy of this Order and signed the acknowledgement attached hereto as *Exhibit A*.

20.    If a party inadvertently discloses Confidential Material to persons or entities not authorized to receive such information by the terms of this agreement, such disclosure shall be reported in writing to the party or non-party that produced such inadvertently disclosed Confidential Material. In the event of inadvertent disclosure, counsel for the party who inadvertently disclosed the Confidential Material shall make all reasonable efforts to retrieve the Confidential Material and any documents containing such Confidential Material, and to obtain the agreement of persons or entities to which inadvertent disclosure was made to treat the Confidential Material in accordance with the terms of this Order.

21.     In the event that any person or entity not named in Paragraph 8, 9, 10 or 11 requests the disclosure of Confidential Material through subpoena or other compulsory process, the person or entity receiving such subpoena or compulsory process (the "Receiving Party") shall give notice in writing to counsel for the Designating Party, such notice to be delivered by fax at least 14 days prior to the proposed disclosure; if the request is received less than 14 days prior to the proposed disclosure, notice shall be given promptly and before the proposed disclosure. It shall be the obligation of the Designating Party to file a motion for a court order to preclude or restrict production of any Confidential Material requested pursuant to a subpoena or other compulsory process within seven days of receiving such notice. In the event that the Designating Party timely files such a motion, the Receiving Party shall not produce or divulge the contents of any Confidential Material until such motion is resolved unless required by law. If the Designating Party fails to timely file such a motion or the Court determines that the requested documents shall be produced, the Receiving Party may produce such documents.

22.     If information subject to a claim of attorney-client privilege, the work product or any other privilege or immunity from discovery is inadvertently produced to a party, such production shall in no way prejudice or otherwise constitute a waiver of, or estoppel as to, any claim of attorney-client privilege, the work product or any other privilege or immunity to which the producing party or person would otherwise be entitled. If a party or non-party inadvertently produces Discovery Material that it believes is subject to the attorney-client privilege, the work product doctrine or any other privilege or immunity from discovery belonging to the producing party or non-party, the producing party or non-party may notify the receiving party that such production contained an inadvertent disclosure of privileged material, identify the allegedly

11

privileged material, and demand return thereof. On such demand, the receiving party must return such allegedly privileged materials and destroy all copies thereof.

23.     Nothing in this Order shall prevent any party or non-party from seeking, by written agreement of the signatories hereto or Court order, further, greater or lesser protection with respect to the use of any Confidential Material in connection with the prosecution or defense of this action. Nothing in this Order shall be construed to limit in any way any producing party or non-party's use of its own Confidential Material or non-confidential Discovery Material. For the avoidance of doubt, Defendant Smith intends to have either the parties stipulate or the Court issue an order allowing an expert access to alleged "Highly Confidential IBM Information."

24.     Nothing in this Order shall operate to require the production of information or documents that are privileged or otherwise protected from discovery. Nothing in this Order shall affect any person's right to object to any discovery request, including the right to assert that no discovery should be had concerning certain information.

25.     All Discovery Material produced in this action shall remain the property of the party or person who produced the Discovery Material irrespective of how and in what form produced. This Order, insofar as it restricts the communication and use of Discovery Material, shall continue to be binding throughout and after the conclusion of this action, including any appeals. At the conclusion of this action, including the time for filing and resolution of all appeals, the parties shall within sixty (60) days destroy, in a manner assured of maintaining confidentiality, all Discovery Material, copies thereof and documents reflecting same, and shall provide a certification by counsel evidencing such destruction to the Designating Party, *provided, however,* that (i) the

parties shall retain and not destroy Discovery Material if destruction would violate the law and (ii) that each party or non-party may retain, subject to the terms and conditions of this Order, full copies of all papers filed with or submitted to the Court, deposition transcripts, exhibits marked at depositions or at trial, and any documents that were prepared by counsel in this action and that contain Discovery Material.

      26.    This Order may be executed in counterparts. Each counterpart when executed shall be deemed an original, and all shall constitute one and the same document. Signatures may be transmitted by facsimile or electronic mail, and facsimile or electronic mail signatures shall be acceptable as original signatures for all purposes.

8 / 8 / 2017
Date

PAUL, WEISS, RIFKIND,
  WHARTON & GARRISON LLP
Robert A. Atkins
Steven C. Herzog
Pietro J. Signoracci
1285 Avenue of the Americas
New York, New York 10019-6064
Telephone: 212-373-3000

*Attorneys for International Business Machines Corporation*

8/8/2017
Date

SCHULTE ROTH & ZABEL LLP
Ronald E. Richman
Max Garfield
919 3rd Avenue
New York, NY 10022
Telephone: 929-341-1306

*Attorneys for Defendant Jeff Smith*

MORGAN LEWIS & BOCKIUS LLP
Sarah E. Bouchard
Brandon J. Brigham
1701 Market Street
Philadelphia, PA 19103
Telephone: 215-963-5000

8-8-17
Date

*Attorneys for Defendant Jeff Smith*

IT IS SO ORDERED, this _____ day of August, 2017.

HONORABLE CATHY SEIBEL
UNITED STATES DISTRICT JUDGE

14

**EXHIBIT A**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| INTERNATIONAL BUSINESS MACHINES CORPORATION, <br><br>                 Plaintiff, <br><br>               v. <br><br> JEFF S. SMITH, <br><br>                 Defendant. | 17 Civ. 5808 (CS)(PED) |

I hereby certify (i) my understanding that Confidential Material is being provided to me pursuant to the terms and restrictions of the Confidentiality Stipulation and Protective Order (the "Order") entered by the United States District Court for the Southern District of New York and (ii) that I have read the Order. I understand the terms of the Order, I agree to be fully bound by the Order, and I hereby submit to the jurisdiction of the United States District Court for the Southern District of New York for purposes of enforcement of the Order.

DATE: _____      SIGNATURE: _____

15

EXHIBIT  O

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

1285 AVENUE OF THE AMERICAS
NEW YORK, NEW YORK 10019-6064

TELEPHONE (212) 373-3000

LLOYD K. GARRISON (1946-1991)
RANDOLPH E. PAUL (1946-1956)
SIMON H. RIFKIND (1950-1995)
LOUIS S. WEISS (1927-1950)
JOHN F. WHARTON (1927-1977)

WRITER'S DIRECT DIAL NUMBER

(212) 373-3183

WRITER'S DIRECT FACSIMILE

(212) 492-0183

WRITER'S DIRECT E-MAIL ADDRESS

ratkins@paulweiss.com

UNIT 3601, OFFICE TOWER A, BEIJING FORTUNE PLAZA
NO. 7 DONGSANHUAN ZHONGLU
CHAOYANG DISTRICT
BEIJING 100020
PEOPLE'S REPUBLIC OF CHINA
TELEPHONE (86-10) 5828-6300

12TH FLOOR, HONG KONG CLUB BUILDING
3A CHATER ROAD, CENTRAL
HONG KONG
TELEPHONE (852) 2846-0300

ALDER CASTLE
10 NOBLE STREET
LONDON EC2V 7JU, U.K.
TELEPHONE (44 20) 7367 1600

FUKOKU SEIMEI BUILDING
2-2 UCHISAIWAICHO 2-CHOME
CHIYODA-KU, TOKYO 100-0011, JAPAN
TELEPHONE (81-3) 3597-8101

TORONTO-DOMINION CENTRE
77 KING STREET WEST, SUITE 3100
P.O. BOX 226
TORONTO, ONTARIO M5K 1J3
TELEPHONE (416) 504-0520

2001 K STREET, NW
WASHINGTON, DC 20006-1047
TELEPHONE (202) 223-7300

500 DELAWARE AVENUE, SUITE 200
POST OFFICE BOX 32
WILMINGTON, DE 19899-0032
TELEPHONE (302) 655-4410

MATTHEW W. ABBOTT
EDWARD T. ACKERMAN
ALLAN J. ARFFA
ROBERT A. ATKINS
DAVID J. BALL
JOHN F. BAUGHMAN
LYNN B. BAYARD
DANIEL J. BELLER
CRAIG A. BENSON
MITCHELL L. BERG
MARK S. BERGMAN
BRUCE BIREMBOIM
H. CHRISTOPHER BOEHNING
ANGELO BONVINO
JAMES L. BROCHIN
RICHARD J. BRONSTEIN
DAVID W. BROWN
SUSANNA M. BUERGEL
PATRICK S. CAMPBELL*
JESSICA S. CAREY
JEANETTE K. CHAN
YVONNE Y. F. CHAN
LEWIS R. CLAYTON
JAY COHEN
KELLEY A. CORNISH
CHRISTOPHER J. CUMMINGS
CHARLES E. DAVIDOW
THOMAS V. DE LA BASTIDE III
ARIEL J. DECKELBAUM
ALICE BELISLE EATON
ANDREW J. EHRLICH
GREGORY A. EZRING
LESLIE GORDON FAGEN
MARC FALCONE
ROSS A. FIELDSTON
ANDREW C. FINCH
BRAD J. FINKELSTEIN
BRIAN P. FINNEGAN
ROBERTO FINZI
PETER E. FISCH
ROBERT C. FLEDER
MARTIN FLUMENBAUM
ANDREW J. FOLEY
HARRIS B. FREIDUS
MANUEL S. FREY
ANDREW L. GAINES
KENNETH A. GALLO
MICHAEL E. GERTZMAN
ADAM M. GIVERTZ
SALVATORE GOGLIORMELLA
ROBERT D. GOLDBAUM
NEIL GOLDMAN
CATHERINE L. GOODALL
ERIC GOODISON
CHARLES H. GOOGE, JR.
ANDREW G. GORDON
UDI GROFMAN
NICHOLAS GROOMBRIDGE
BRUCE A. GUTENPLAN
GAINES GWATHMEY, III
ALAN S. HALPERIN
JUSTIN G. HAMILL
CLAUDIA HAMMERMAN
GERARD E. HARPER
BRIAN S. HERMANN
MICHELE HIRSHMAN
MICHAEL S. HONG
DAVID S. HUNTINGTON
AMRAN HUSSEIN
LORETTA A. IPPOLITO
BRIAN M. JANSON
JAREN JANGHORBANI
MEREDITH J. KANE

ROBERTA A. KAPLAN
BRAD S. KARP
PATRICK N. KARSNITZ
JOHN C. KENNEDY
BRIAN KIM
ALAN W. KORNBERG
DANIEL J. KRAMER
DAVID K. LAKHDHIR
STEPHEN P. LAMB*
JOHN E. LANGE
DANIEL J. LEFFELL
XIAOYU GREG LIU
JEFFREY D. MARELL
MARCO V. MASOTTI
EDWIN S. MAYNARD
DAVID W. MAYO
ELIZABETH R. McCOLM
MARK F. MENDELSOHN
WILLIAM B. MICHAEL
TOBY S. MYERSON
CATHERINE NYARADY
JANE B. O'BRIEN
ALEX YOUNG H. OH
BRAD R. OKUN
KELLEY D. PARKER
MARC E. PERLMUTTER
VALERIE E. RADWANER
CARL L. REISNER
LORIN L. REISNER
WALTER G. RICCIARDI
WALTER RIEMAN
RICHARD A. ROSEN
ANDREW N. ROSENBERG
JACQUELINE P. RUBIN
RAPHAEL M. RUSSO
ELIZABETH M. SACKSTEDER
JEFFREY D. SAFERSTEIN
JEFFREY B. SAMUELS
DALE M. SARRO
TERRY E. SCHIMEK
KENNETH M. SCHNEIDER
ROBERT B. SCHUMER
JOHN M. SCOTT
STEPHEN J. SHIMSHAK
DAVID R. SICULAR
MOSES SILVERMAN
STEVEN SIMKIN
JOSEPH J. SIMONS
AUDRA J. SOLOWAY
SCOTT M. SONTAG
TARUN M. STEWART
ERIC ALAN STONE
AIDAN SYNNOTT
ROBYN F. TARNOFSKY
MONICA K. THURMOND
DANIEL J. TOAL
LIZA M. VELAZQUEZ
MARIA T. VULLO
ALEXANDRA M. WALSH*
LAWRENCE G. WEE
THEODORE V. WELLS, JR.
BETH A. WILKINSON
STEVEN J. WILLIAMS
LAWRENCE I. WITDORCHIC
MARK B. WLAZLO
JULIA MASON WOOD
JENNIFER H. WU
JORDAN E. YARETT
KAYE N. YOSHINO
TONG YU
TRACEY A. ZACCONE
TAURIE M. ZEITZER
T. ROBERT ZOCHOWSKI, JR.

*NOT ADMITTED TO THE NEW YORK BAR

August 14, 2017

**By ECF**

The Honorable Paul E. Davison
United States Magistrate Judge
The Honorable Charles L. Brieant Jr.
Federal Building and United States Courthouse
300 Quarropas Street
White Plains, NY 10601-4150

       *International Business Machines Corporation* v. *Jeff S. Smith*, No. 17 Civ. 5808

Dear Judge Davison:

          We represent Plaintiff International Business Machines Corporation ("IBM"). Pursuant to the Court's directive during the August 11 telephone conference, we are submitting this letter to address outstanding discovery disputes between IBM and Defendant Jeff Smith. We will first address the issues IBM has raised with the document productions by Smith and Amazon Web Services ("AWS"), and then the issues Smith has raised with IBM's production of documents. The parties met and conferred by phone on August 11; the issues discussed below are the issues as to which the parties were unable to reach agreement. In addition, although not the subject of our meet and confer, Smith has told us that he intends to seek to preclude the testimony of IBM's forensic expert, and we address that issue below. Finally, we would like to seek the Court's guidance concerning (i) Smith's request that IBM's Chairman, President and Chief Executive Officer accept a subpoena to testify at the preliminary injunction hearing, and (ii) the scheduling of two depositions.

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

Honorable Paul E. Davison                                                                2

I.     **IBM's Issues with Smith's/AWS's Production**

      There are four outstanding issues with respect to Smith's/AWS's document productions.[1]

      A.    *Smith and/or AWS Have Improperly Redacted a Highly Relevant Document Concerning Smith's Job Responsibilities*

      First, Smith has declined to produce an un-redacted version of ▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ He should be required to produce a fully un-redacted version.

      By way of background, AWS initially produced a document entitled ▮▮▮
▮▮▮▮▮▮▮▮ (Ex. 1.)  As Mr. Jassy testified at his recent deposition, ▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (Ex. 2 at 65:15-17.)  Neither document was redacted in any way.

      During his deposition, Mr. Jassy testified that ▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (*Id.* at 69:16-18.)  Mr. Jassy further testified that, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (*Id.* at 70:8-71:4.)

      Neither Smith nor AWS included the ▮▮▮▮▮▮▮ in their initial document productions to IBM, though IBM's requests unquestionably called for the document.  We asked counsel for Jassy and Smith at the Jassy deposition for production of the ▮▮▮▮▮▮▮ and reiterated that request in an August 10 letter.  On Friday, AWS produced the ▮▮▮▮▮▮▮▮▮▮▮▮.  (Ex. 3.)  This document is significant.  Among other things, ▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

---

[1]    With respect to any documents in AWS's possession, Smith's/AWS's counsel asked us during our August 11 meet and confer whether we intended to ask this Court to compel AWS to comply with our subpoena or whether we would make a motion to compel in the Western District of Washington.  Smith's/AWS's counsel thus appeared to be suggesting that this Court has no power to direct AWS to comply with the subpoena.  That suggestion is of a piece with the argument Smith's/AWS's counsel made in opposing our request last week that this Court direct Mr. Jassy to sit for a deposition.  In so directing Mr. Jassy, the Court recognized that it was empowered to hold Smith's/AWS's counsel to their representations to us.  The same circumstances are present now.  Smith's/AWS's counsel told us that they were authorized to accept service of a document subpoena directed to AWS and further told us that they wished to cooperate with us on document production.  They now appear to be retreating from that promise by refusing to produce critical documents in response to discovery demands to which they did not specifically object.  Under these circumstances, this Court can—and should—enforce AWS's promise.

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

Honorable Paul E. Davison                                                         3



There is no justification whatsoever for any redactions. It is not privileged, and neither Smith nor AWS has contended otherwise. Counsel for Smith and AWS raised concerns about the competitive sensitivity of the documents and its contents. The parties stipulated to, and the Court so-ordered, a Protective Order in this matter for the express purpose of protecting the confidential and competitively sensitive information that is at the heart of this matter, which involves two direct competitors in the Cloud Computing business. To the extent there is any sensitivity about the substance of the ██████████████, the Protective Order permits Smith and/or AWS to designate the document "highly confidential," thereby ensuring that AWS's competitor IBM does not view any of Smith's and/or AWS's confidential information.

Nonetheless, during our August 11 meet and confer, Smith's/AWS's counsel told us that the Protective Order covers only *the parties*' documents, not AWS's, and that the ██████████ belonged to AWS, not Smith. Neither of these contentions is accurate. The Protective Order explicitly authorizes AWS to designate documents as highly confidential. As such, even if the document were appropriately considered to be an AWS document, the proper course would be for AWS to produce it with a highly confidential designation. Moreover, because the document was sent to Smith, it is now in his possession, and he, as a party, should be required to produce it, and to produce it in full with no redactions.

B.     *Smith Has Failed to Produce the Full*
       *Set of His Communications with AWS*

In our document requests, we asked Smith to produce documents, including text messages, "concerning communications with AWS or anyone acting on AWS's behalf regarding actual or potential employment at AWS, including communications with Andrew Jassy." Smith's production includes text messages between Smith and Mr. Jassy, but only from May 16, 2017 to June 9, 2017, even though our document requests sought documents "created, generated or received after August 1, 2014 to the present." We therefore asked Smith to produce all text messages between Smith and Mr. Jassy, including text messages from August 1, 2014 to May 16, 2017 and messages from June 9, 2017 to the present. We further asked Smith to explain whether

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

Honorable Paul E. Davison                                                    4

any such messages previously existed but were destroyed or otherwise not preserved to the extent he was unable to produce any additional text communications or communications with AWS.

We asked Smith on Friday to get back to us on this issue; to date we have heard nothing.  We would, therefore, ask the Court to direct Smith to produce all such documents or, if none exist, to represent whether he destroyed or failed to preserve any relevant texts or communications with AWS.

C.     *AWS Has Failed to Produce*
       *Documents Concerning Competition with IBM*

In its subpoena to AWS, IBM asked AWS to produce "[a]ll documents concerning competition with IBM."  As noted, Smith's/AWS's counsel agreed to cooperate with respect to discovery.  AWS made no specific objection to that document request and, before last Friday, never advised us that they did not intend to look for any responsive documents.  Nonetheless, AWS produced *no documents* responsive to this request.

Documents reflecting AWS competition with IBM are critical to the core issues in this case.  At the TRO hearing, Smith expressed the view that AWS and IBM are not in fact competitors.  (Ex. 4 at 24:3-24.)  In response, Judge Seibel posted this question:  "When we go to discovery in this case, they [IBM] are not going to find a single document in the possession of Amazon Web Services where anybody at Amazon Web Services talks about or wonders or expresses a concern or curiosity about what IBM is doing?"  (*Id.* at 25:2-6.)  Smith thus put at issue whether IBM and AWS are in fact competitors, and Judge Seibel appropriately recognized that AWS's views as to IBM's competitiveness are relevant to the parties' dispute, and would be a proper subject of pre-hearing discovery.

During our meet and confer, Smith/AWS did not articulate any meaningful reason why AWS should not produce responsive documents.  Instead, Smith/AWS claimed that the request was burdensome.  We asked AWS's counsel several times—repeatedly—if they would be willing to negotiate the scope of this request in any way at all, and each time we were met with stonewalling.  We also asked if Smith/AWS could identify a limited number of custodians or even a central repository with memoranda reflecting AWS's views of IBM as a competitor.  Smith's/AWS's counsel were unwilling to engage in any discussion as to the scope of this request and declined to produce anything responsive to it.

Smith/AWS also said that AWS could not produce any documents responsive to this request because, in their view, it calls for disclosure of confidential AWS cloud computing strategy.  The Protective Order addresses any such concern.

Smith/AWS also appeared to suggest that documents in AWS's files responsive to this request would be duplicative of Mr. Jassy's testimony ████████

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

Honorable Paul E. Davison                                                      5



That will not suffice.  Naturally, Mr. Jassy We are entitled to take discovery to test AWS's assertion about the competition between AWS and IBM, one of the main issues the Court must consider on the preliminary injunction motion.

In short, Smith should be directed to conduct a reasonable search for documents reflecting AWS competition with IBM in cloud computing.

D.      *AWS Has Failed to Produce Documents Concerning the Names and Subject Matters of Executive Teams Smith Will Participate in at AWS*

In its subpoena to AWS, IBM asked AWS to produce "[d]ocuments sufficient to show the names of, and general subject matters discussed by, any and all committees, teams, and/or groups of AWS executives and/or employees Smith is expected to participate in, including any and all regular or specific meetings with Andrew Jassy."  As with the preceding request, Smith's/AWS's counsel agreed to cooperate, did not make a specific objection to this request and, before last Friday, never advised us that they did not intend to look for any responsive documents.  Nonetheless, AWS has produced nothing on this issue.

These documents are highly relevant to the parties' dispute.  Smith represented at the TRO hearing that his role at AWS would be "very scoped . . . in a narrow area of cloud services" and would "keep[] him out of sales" and "keep[] him out of pricing."  (*Id.* at 8:12-17.)                                         Mr. Jassy's testimony at his deposition.  Mr. Jassy testified that



(Ex. 2 at 43:4-10.)

(*Id.* at 38:22-39:3; 45:18-24.)

(*Id.* at 45:4-16; Ex. 5 at 1.)

Given Smith's                                                                  —we are entitled to documents showing what teams Smith will be part of and what those teams will be discussing.

During our meet and confer with Smith's/AWS's counsel, we asked if AWS would be willing to produce any documents responsive to this request.  Smith's/AWS's counsel did *not* appear to take the position that this request was burdensome or irrelevant.  To date, though, we have received no documents responsive to this request.  Accordingly, we request that AWS be directed to produce responsive documents.

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

Honorable Paul E. Davison            6

II.     **Smith's Issues with IBM's Production**

       As we understand it, Smith has two main outstanding issues with IBM's production.

      A.     *Smith Has Advanced No Justification for His Demand That IBM*
             *Search the Emails of Its Chairman, President and Chief Executive Officer*

       First, Smith has demanded that IBM search the email files of its Chairman, President and Chief Executive Officer, Virginia M. Rometty. Smith has advanced no justification for that demand—which we believe is a transparent attempt to harass—and none exists.

       In response to Smith's document requests, IBM promptly engaged in an appropriate and reasonable collection, search, review, and production of responsive documents. That effort resulted in the identification of a number of IBM personnel with material and unique knowledge of and involvement in the parties' dispute. Those individuals' files were then searched by using targeted search terms designed to home in on relevant documents. That exercise has generated more than ***14,000 pages*** of documents, all collected, reviewed and produced over barely two weeks. In the context of these expedited and preliminary proceedings, IBM's efforts in this regard were undertaken in good faith, were proportionate to the needs of the case, and were appropriate under the circumstances.

       Nonetheless, Smith has complained that IBM did not search the email files of Mrs. Rometty, its Chairman, President and Chief Executive Officer. Smith, however, has provided no legitimate basis that would require IBM to do so. The genesis of this issue is an email that Smith produced to us. Smith sent that email—in which he explained his departure from IBM—to Mrs. Rometty using his personal Gmail account. We explained to Smith that we did not produce the email because we had not searched Mrs. Rometty's email files and that Smith had the email in question in any event, so there was no need for us to search for it.

       In response, Smith changed his story. For the first time, Smith told us that he believed Mrs. Rometty had forwarded the email to another IBM executive, and asked us to produce the forwarded version. At the same time, Smith announced for the first time that he believed Mrs. Rometty "made the determination to seek to preclude [him] from working for [AWS] and that she did so for *illegitimate and improper reasons*." (emphasis added). When we asked Smith's counsel to explain the basis for that belief, we were told that Smith had learned that Mrs. Rometty had *orally* told another IBM executive what her reason was for seeking to enforce Smith's non-compete and that, according to Smith, that reason was "improper." We repeatedly asked Smith's counsel to tell us what that supposed reason was so that we could understand the basis for his request; he declined to do so.

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

Honorable Paul E. Davison                                                                 7

      Smith's refusal to engage with us as to the basis for his demand that we
search the email files of IBM's Chairman, President and Chief Executive Officer should
end this inquiry.  Or, he should simply tell us what the purported "reason" is he claims
IBM is pursuing this matter so that the parties can have a good faith discussion about it.
In any event, whatever "motive" Smith believes IBM has for seeking to enforce his non-
compete agreement is not relevant to the issues to be adjudicated at the hearing.  And it
certainly in no way warrants searching the emails of the company's Chairman, President
and Chief Executive Officer, who has no unique knowledge of those issues that Smith
cannot obtain from either all of the documents we have produced or other IBM witnesses.
Smith's request should be denied.

      B.    *Smith's Demand That IBM Search for Evidence of*
          *"Disloyalty" by Other IBM Employees Should Be Rejected*

      Second, Smith has demanded that IBM search the files of *four more*
document custodians for a period of eight months.  This demand should be rejected.

      Specifically, Smith has relied on communications he evidently had with
██████████████████████████████████████████ through March 2017.  According to Smith, in those exchanges ████████████
██████████████████████████ Smith claims to have forwarded ████████
emails or summaries of the emails to three other IBM executives.  Smith has now
complained that IBM did not produce these emails, and has asked us to search the email
files of ████████████ and these three other executives for an eight-month period because,
in Smith's view, "the communications are highly relevant to IBM's allegations that Mr.
Smith committed acts of disloyalty and that he did not act in the best interests of IBM."

      Stated in simple terms, Smith seems to think that if he can find evidence
that other IBM executives shared his views on particular aspects of IBM's business,
including cloud computing, that would help him defend against what he perceives to be
IBM's allegation that Smith was disloyal.  Smith misapprehends IBM's position.  The
issue is not whether other IBM executives or employees *internally expressed* similar
views of IBM products.  The issue is that Smith repeatedly (and covertly) shared his
insider views of IBM products and views of IBM personnel ***with the CEO of AWS***, while
serving as one of the highest-ranking executives at IBM.  That ████████████████ may
have shared his thoughts about an IBM product with a fellow IBM executive does not
explain or excuse Smith's disparaging and disloyal comments to one of IBM's biggest
competitors.

      As noted, IBM undertook a reasonable and appropriate search, and it has
no obligation to search the files of executives who have nothing to do with the dispute
here.  That is what Smith is now asking IBM to do.  His request, which is as transparent a
fishing expedition as any, should be denied.

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

Honorable Paul E. Davison                                                                    8

### III.     <u>**Smith's Request to Preclude IBM's Forensic Expert from Testifying**</u>

Smith advised us after close of business this past Friday that he would seek to preclude the testimony of IBM's forensic expert, Stroz Friedberg. The reason Smith proffered to us for his preclusion request is that IBM supposedly did not produce documents related to Stroz Friedberg's forensic analysis of Smith's iPhone and iPad. Smith has never sought to discuss this issue with us. Had he done so, we would have explained that he is mistaken. We will do so now.

IBM's counsel at Paul, Weiss retained Stroz Friedberg to assist it in its representation of IBM in this matter. In particular, Stroz Friedberg was asked to perform a forensic analysis of Smith's iPhone and iPad to determine what, if any, information they contained. As reflected in the declaration of a Stroz Friedberg employee submitted today to Judge Seibel in support of IBM's preliminary injunction motion, Stroz Friedberg concluded that Smith's iPhone and iPad had been wiped. That declaration, and its exhibits, are now in Smith's possession, and there are no non-privileged documents concerning Stroz Friedberg that IBM has not produced or appended to that declaration.

So, IBM has not, as Smith suggests, failed to produce any responsive, non-privileged Stroz Friedberg documents: there is simply nothing else to produce. And, Smith has already indicated his intention to depose the Stroz Friedberg declarant. Under these circumstances, there is no basis for precluding Stroz Friedberg's testimony.

### IV.     <u>**Other Issues for the Court's Direction**</u>

There are two other issues we wish to bring to the Court's attention.

First, on Thursday, Smith advised us that he intends to subpoena Mrs. Rometty to testify at the preliminary injunction hearing on August 24, and asked us if we would voluntarily produce Mrs. Rometty or whether service of a subpoena compelling her attendance would be necessary.

While we are prepared to accept service of a subpoena to obviate any need for a process server, we do intend to object to any effort by Smith to compel Mrs. Rometty to testify. Apart from the fact that Mrs. Rometty will be unavailable next week and out of the country on August 24, we believe that the demand that she appear in Court is just intended as harassment. Therefore, we would ask the Court for guidance as to how and when to raise this issue, whether by way of a motion to quash a subpoena for Mrs. Rometty (which motion we are prepared to file promptly upon receiving such subpoena) or by objecting to a subpoena and opposing any motion to compel Smith may bring.

Second, there may be an issue concerning the scheduling of two depositions, one of IBM witness John Considine and the other of Smith's proffered expert, Bernard Golden.

With respect to Mr. Considine (the General Manager of Cloud Infrastructure Services at IBM), we told Smith last week that he could be available to

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

Honorable Paul E. Davison                                                9

testify in New York on August 17.  Smith nevertheless sent us a notice for Mr.
Considine's deposition purporting to set it for August 18 in New York.  Mr. Considine
lives and works in Boston and will be in Boston on August 18.

        With respect to Mr. Golden, we asked Smith last week to make him
available for a deposition in New York on August 17.  Smith has not told us whether Mr.
Golden is for any reason unavailable on that date; instead, Smith told us Mr. Golden
could be deposed on August 22.  We have sent Smith a notice for Mr. Golden's
deposition on August 17 but have not heard back from Smith as to whether Mr. Golden
will appear for his deposition on that date.

*     *     *

        We thank the Court for its attention to these matters and will be prepared
to answer any questions the Court may have at today's conference.

        Respectfully submitted,

        Robert A. Atkins

cc (by ECF): Counsel of Record

# Exhibit 1

█████     ███████████
█         ████████
██        █████████████████
████      ██████████
█████████ █████████████
██████████  ███████████████████████

████████████████████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████████████████████
████████████████████████████████████

   ▪  ████████████████████████████████████████████

         ███████████████████
         ████████

   ▪  ████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████
██████████████████████████████████

███████████████

















# Exhibit 2



Case 7:17-cv-05808-CS-PED Document 42-2 Filed 08/14/17 Page 9 of 11









# Exhibit 3



























# Exhibit 4

**UNITED STATES DISTRICT COURT**
SOUTHERN DISTRICT OF NEW YORK
---------------------------------x
INTERNATIONAL BUSINESS MACHINES
**CORPORATION,**

                              **Plaintiff,**

               v.                    17 CV 5808 (CS)

**JEFF S. SMITH,**

                              **Defendant.**
---------------------------------x
                              U.S. Courthouse
                              White Plains, N.Y.
                              August 1, 2017
                              11:20 a.m.


**Before:**        **HON. CATHY SEIBEL,**
                   United States District Judge


APPEARANCES

**PAUL WEISS RIFKIND WHARTON & GARRISON, LLP**
**BY:  ROBERT A. ATKINS, Esq.**
      **PIETRO SIGNORACCI, Esq.**
      **KRISTEN-ELISE DEPIZZO, Esq.**
**1285 Avenue of the Americas**
**New York, N.Y.  10019-6064**
**Attorneys for Plaintiff**

MORGAN LEWIS
**BY:  SARAH E. BOUCHARD, Esq.**
      **BRANDON J. BRIGHAM, Esq.**
**1701 Market Street**
**Philadelphia, PA  19103-2921**
**Attorneys for Defendant Smith**

**SCHULTE ROTH & ZABEL, LLP**
**BY:  RONALD E. RICHMAN, Esq.**
      **MAX GARFIELD, Esq.**
**919 Third Avenue**
**New York, NY  10022**
**Attorneys for**


**Sue Ghorayeb, R.P.R., C.S.R.**
Official Court Reporter

```
1              THE COURT:  Let me cut you off.
2              MS. BOUCHARD:  Sure.
3              THE COURT:  I'm leaving on vacation tomorrow.
4              MS. BOUCHARD:  Okay, Your Honor.
5              THE COURT:  Your timing is -- Plaintiff's timing is
6    impeccable.
7              MS. BOUCHARD:  Yes, as it usually is in these
8    things.  We would like to have the opportunity to at least
9    review the briefs before we're able to argue.  There were many
10   misrepresentations just in the Complaint alone.
11             THE COURT:  Give me a for instance.
12             MS. BOUCHARD:  Certainly.  We have proposed a very
13   scoped role for Mr. Smith, in a narrow area of cloud services.
14   That was not shared in the Complaint.  I can pass up the
15   proposal.
16             Most importantly, that proposal keeps him out of
17   sales, it keeps him out of pricing.  It prevents him from
18   soliciting customers that he engaged with at IBM.  It also
19   prohibits him from soliciting employees at IBM, and, most
20   importantly, it confirms his agreement not to share
21   confidential and trade secret information.
22             THE COURT:  So, what will he be doing?
23             MS. BOUCHARD:  He'll be working in an area leading
24   internal teams in a marketplace, developer tools, and support
25   and manage service provider offerings.
```

1              MR. RICHMAN:  I'm sorry.  I'm sorry, Your Honor.

2              THE COURT:  -- Mr. Richman.

3              MS. BOUCHARD:  So, Your Honor, may I pass something

4    up.

5              THE COURT:  Sure.

6              MS. BOUCHARD:  Because they referenced the Gartner

7    report and they referenced in their Complaint that Amazon and

8    IBM are neck and neck.  Okay.  That was the impression that

9    they left in that Complaint, in that publicly filed Complaint.

10             In the same Gartner report, you will see that

11   Gartner prepared a chart and that chart has four quartiles,

12   and you will see where Amazon Web Services falls in that

13   quartile.  Do you see it?  It's on the top.

14             THE COURT:  Yes, but I don't see why it's relevant.

15   I don't care if Amazon Web Services is kicking IBM's behind,

16   that's not --

17             MS. BOUCHARD:  Your Honor --

18             THE COURT:  So what?

19             MS. BOUCHARD:  It does matter, because the

20   information that Mr. Smith would have at IBM would have to be

21   of use to Amazon.  It is of no use.  The Gartner report speaks

22   about the maturity of Amazon's product.

23             THE COURT:  That I'm not buying.  It's of no use?

24             MS. BOUCHARD:  It is of no use, Your Honor.

25             THE COURT:  Zero use?  That they have absolutely no

                    Sue Ghorayeb,  Official Court Reporter

Case 2:17-cv-00806-RSL-PE Document 1-1 Filed 06/14/17 Page 3 of 29

1    interest in IBM -- what IBM is doing?

2              When we go to discovery in this case, they are not

3    going to find a single document in the possession of Amazon

4    Web Services where anybody at Amazon Web Services talks about

5    or wonders or expresses a concern or curiosity about what IBM

6    is doing?

7              MS. BOUCHARD:  Maybe Microsoft.

8              THE COURT:  That's really hard to believe.

9              MS. BOUCHARD:  Yeah.  Actually, it's going to be

10   more about Microsoft and it's going to be more about Google,

11   who are their actual competitors.

12             THE COURT:  Well, I don't know.  According to this

13   document, IBM is a visionary, not a leader.

14             MS. BOUCHARD:  No.  It's a, it's a middle of the

15   road visionary.

16             THE COURT:  It's a middle of the road visionary.

17   So, when we --

18             MS. BOUCHARD:  And it can't execute.

19             THE COURT:  When we go through discovery in this

20   case, nobody is going to find any documents in Amazon Web

21   Services' computers or anywhere where they say, "I wonder what

22   IBM is working on," or, "I hear IBM is working on something,"

23   or, "we should do this because IBM can't do it," or, "we

24   should do this because we want to take customers from IBM."

25             MS. BOUCHARD:  So, maybe there is a document, but

                    Sue Ghorayeb,  Official Court Reporter

# Exhibit 5













